**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
F I L E D

JUN 1 2 2025

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| ERIC LYNDELL MOORE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. _____ |
| JACKSON WALKER LLP; COPPER | ) |
| PROPERTY CTL PASS THROUGH TRUST; | ) |
| PENNEY INTERMEDIATE HOLDINGS | ) |
| LLC; H/2 CAPITAL PARTNERS LLC; | ) |
| BRIGADE CAPITAL MANAGEMENT, LP; | ) |
| SILVER POINT CAPITAL, L.P.; OWL | ) |
| CREEK ASSET MANAGEMENT, L.P.[1] | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Eric Lyndell Moore ("Plaintiff") files this Complaint and respectfully alleges as follows:

### I. INTRODUCTION

1.    This action seeks declaratory relief arising from an undisclosed "Uptier Transaction" orchestrated by Defendant Jackson Walker. Through this collusive arrangement, the DIP Lender Defendants misappropriated billions of dollars in cash and assets from the J.C. Penney estate. A similar, but transparent, Uptier Transaction was recently held impermissible by the Fifth Circuit in its *Serta* decision.[2]

---

[1] Certain parties have not been named as defendants at this time as some may have already settled or are expected by Plaintiff Eric L. Moore to settle in the near future. This is not an exhaustive list of DIP Lenders who were overpaid or who misappropriated assets belonging to other JCPenney creditors.

[2] In *Serta*, the Uptier Transaction was disclosed, giving affected creditors a meaningful opportunity to object and assert their rights. By contrast, here it was concealed, depriving stakeholders of due process and enabling the wrongful diversion of estate assets without challenge. See *In re Serta Simmons Bedding, LLC,* 81 F.4th 1284 (5th Cir. 2024)

2.    Defendants Brigade Capital and H/2 Capital spearheaded the scheme, using a pre-plan Settlement Agreement as the vehicle to divert funds far exceeding their legal entitlements to themselves and fellow DIP Lenders, including Defendants Silver Point Capital and Owl Creek Asset Management. This fraudulent conduct directly violates the Fifth Circuit's ruling in *Aweco*.[3]

3.    Defendants now possess collateral—and/or its proceeds—that secure the 1st Lien and 2nd Lien Bonds held by Plaintiff and other stakeholders. Plaintiff seeks judicial declarations that:

a.    the value of the secured creditors' collateral must be determined based on fair market value, and that the credit bid amount does not control or establish that value;

b.    the collateral valuation and resulting distributions in this case violated both the terms of the Settlement Agreement and the legal standard for treatment of secured creditors established in *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997);

c.    the transfer of the OpCo assets to two preferred members of the Unsecured Creditor class for zero consideration—while denying recovery to all others—violates 11 U.S.C. §§ 1123(a)(4) and 1129(b)(2)

d.    the undisclosed "uptier" distribution scheme executed in the J.C. Penney bankruptcy violates the Fifth Circuit's holding in *In re Serta Simmons Bedding, LLC,* 81 F.4th 1284 (5th Cir. 2024);

e.    distributions arising from the pre-plan Settlement Agreement violate the absolute priority rule as articulated in *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984).

---

[3] See *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) (holding that a bankruptcy court abuses its discretion if it authorizes a settlement which violates the absolute priority rule)

## II.  PARTIES

4.   Plaintiff is an individual residing in San Diego County, San Diego, California.

5.   Defendant Jackson Walker LLP ("Jackson Walker") is a law firm authorized to do business in the State of Texas.

6.   Defendant Copper Property CTL Pass Through Trust ("Copper Property Trust") is a real estate investment trust with a business address at 3 Second Street, Suite 206, Jersey City, New Jersey 07311.[4]

7.   Defendant Penney Intermediate Holdings LLC ("Penney Intermediate") is majority co-owned and controlled by Simon Property Group ("Simon") and Brookfield Properties ("Brookfield").[5] These affiliated entities maintain principal business addresses at 225 West Washington Street, Indianapolis, Indiana 46204, and 250 Vesey Street, 15th Floor, New York, New York 10281, respectively.

8.   Defendant H/2 Capital Partners LLC ("H/2") is a hedge fund that served as a debtor-in-possession (DIP) lender to J.C. Penney and is a co-owner of Copper Property Trust. Its business address is 680 Washington Boulevard, Stamford, Connecticut 06901.

9.   Defendant Brigade Capital Management, LP ("Brigade") is a hedge fund that served as a DIP lender to J.C. Penney and is a co-owner of Copper Property Trust. It is located at 399 Park Avenue, Suite 1600, New York, New York 10022.

---

[4] This trust was created to receive lease payments and to liquidate roughly 160 properties owned by J.C. Penney and leased back to Defendant Penney Intermediate Holdings.
[5] Simon and Brookfield established Penny Intermediate Holdings to receive OpCo, the Debtors' operating company. During the bankruptcy, Simon and Brookfield took possession and control of J.C. Penney's operating company and now operate through Penney Intermediate as its successor entity. Penney Intermediate is the lessee of approximately 160 real estate properties spun off into Copper Property Trust, and continues to make lease payments to Copper Property Trust pursuant to a sale-leaseback arrangement structured during the bankruptcy.

10.  Defendant Silver Point Capital, L.P. ("Silver Point") is a hedge fund that served as a DIP lender to J.C. Penney and is a co-owner of Copper Property Trust. Its business address is 20 Horseneck Lane, Suite 6300, Greenwich, Connecticut 06830.

11.  Defendant Owl Creek Asset Management, L.P. ("Owl Creek") is a hedge fund that served as a DIP lender to J.C. Penney and is a co-owner of Copper Property Trust. Its business address is 640 Fifth Ave, Floor 20, New York, New York 90019.

12.  Plaintiff respectfully requests that citation be issued at this time for all Defendants.

### III. STANDING

13.  Plaintiff and joinders[6] have standing to bring this action as the beneficial owners of J.C. Penney 1st Lien Secured Bonds, 2nd Lien Secured Bonds and Unsecured Bonds.

### IV. JURISDICTION AND VENUE

14.  This Court has subject matter jurisdiction over the lawsuit under 28 U.S.C. § 1331 and § 1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

15.  Declaratory relief is sought pursuant to the Federal Declaratory Judgment Act 28 U.S.C. § § 2201, 2202.

16.  Venue is proper in this District under 28 U.S.C. § 1391(b) because Jackson Walker has a principal Texas office in Houston, Texas, and the majority of the actions give rise in the Southern District.

---

[6] Joinder parties Barnett Capital and Michael Wachs, together with Plaintiff, collectively hold approximately $330 Million in 1st and 2nd Lien Bonds and Unsecured Bonds.

## V. FACTUAL BACKGROUND

### The Unnecessary Dip Facility

17. On May 15, 2020, J.C. Penney and its subsidiaries filed for Chapter 11 bankruptcy listing over $8 Billion in assets, including $475 Million in cash. The company had no near-term debt due and had another $1.25 Billion in liquidity, bringing its cash total to more than $1.7 Billion as of the Petition Date.

18. The Debtors had such a strong cash and liquidity position that they did not need, or apply for, a DIP loan on the first day. In fact, they did not require a DIP loan at any point during the proceedings.[7]

19. On or about June 2, 2020, James Mesterharm of Alix Partners, acting as the Debtors' restructuring advisor, filed a misleading expert report, falsely claiming that the Debtors were strapped for cash and required a DIP loan. In that report, Mr. Mesterharm asserted that the $475 Million in cash the Debtors held at the time of filing was insufficient to fund operations.[8] However, he failed to disclose that the Debtors had an additional $1.25 Billion in cash drawn from the ABL, and remained in possession of their operating company which was both cash-flow and income-statement positive.[9]

---

[7] By the time the Debtors actually drew on the DIP, their unrestricted cash position had increased to $913 Million (in addition to the $1.25 Billion from the draw on the asset-based lending (ABL) facility) See *Sale Hearing Transcript*, Dkt. 1822, at 47-48; See also J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials"), as filed with the U.S. Securities and Exchange Commission (SEC) (also attached hereto as Exhibit A)
[8] See *Declaration and Expert Report of James A. Mesterharm in Support of the Debtors' Motion for Entry of a Final Order Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code*, Dkt. 452
[9] The DIP loan that Mr. Mesterham promoted was unnecessary as the Debtors had over $1.7 Billion in Liquidity, $2 Billion in inventory, and no near term debt due. By June of 2020 when Mr. Mesterharm made these statements, the Debtors were returning to historical EBITDAS and were referred to as "a cash machine" by CR3 Partners' William Snyder. He testified, "J.C. Penney makes over $300 million on their credit cards. They make almost $300 million on their online business. They don't have to make money at the stores. They can just break even at the stores, and they make $600 million a year...by the end of June, they had generated $900 million...And they were positive cash flow. And they were positive income statement and they had a business plan that made sense." *Sale Hearing Transcript*, Dkt. 1822, at 273-274

20. As of May 15, 2020, the Petition Date, despite having $1.725 Billion in cash, and roughly $2 Billion in inventory, the Debtors entered into a DIP loan agreement with certain of their 1st Lien and Term Loan Secured Holders.[10]

**Rejection of Superior Offers for the DIP Facility, OpCo, and PropCo**

*The DIP Facility*

21. The accepted DIP agreement was markedly inferior to competing proposals. One group of 1st Lien Bondholders offered a DIP loan with substantially more favorable terms—including a lower interest rate and no roll-up.[11] Yet, the only DIP loan the parties were willing to accept came from the Defendant DIP Lenders. That loan required a $450 million roll-up of their own 1st Lien and Term Loan Secured debt into DIP debt, plus an additional $450 million placed in escrow—totaling $900 million in DIP financing.[12] This structure was not chosen for the estate's benefit, but rather as a critical element of Defendants' broader scheme to capture and control the Debtors' assets.

22. The impropriety of the DIP loan in this case was so pronounced that it became the subject of scholarly analysis, highlighting how non-standard, bundled DIP loan structures can be strategically weaponized to subvert creditor priorities:

> In [the J.C. Penney] case, a DIP loan tied to a restructuring support agreement allowed a majority group to prime a minority group, roll up undersecured debt, and control the allocation of payoffs in the case. We find that a standardized, unbundled DIP loan would have required an interest rate of at least 545% to give the majority group the same payoff it received in the case. We argue that courts should revive and strengthen

---

[10] This DIP loan was secured by the Debtors' $475 million in cash, $1.4 billion in previously unencumbered real estate, and substantially all other assets of the estate. See Dkt. 566.

[11] See In re J.C. Penney Co., Inc., Case No. 20-20182 (DRJ) (Bankr. S.D. Tex.), June 4, 2020, Hr'g Tr. [Docket No. 563] (the "DIP Hr'g Tr.") 14:13-19 (Debtors' counsel describing the competing DIP proposal as "unquestionably betteron its face. Better from a terms perspective. It's less expensive. There is no rollup. The milestones are relaxed . . .[The] proposal does not force a potential sale. And again, all of the fees are very much different."); id. at 160:8 (Court describing, in approving the DIP Facility, that it was nonetheless "highly objectionable"). See also Dkt. 1532, at 10, Footnote 12

[12] The first $225 Million drawn on the DIP Loan was never needed, and the second $225 Million was never even drawn, but sat in an escrow account on which the DIP Lenders received interest.

standardization and unbundling norms. This would better defend priorities by encouraging competition and increasing transparency of DIP loan terms.

*—Excerpt from "Standardizing and Unbundling the Sub Rosa DIP Loan," Emory Bankruptcy Developments Journal (July 15, 2023)*

*The OpCo Assets*

23. On September 9, 2020, the Debtors announced they had an agreement in principle with

Defendants Simon and Brookfield to purchase the OpCo assets for $1.75 Billion:

> Brookfield Property Group ("Brookfield") and Simon Property Group ("Simon") intend to acquire substantially all of JCPenney's retail and operating assets ("OpCo") for $1.75 billion, which includes a combination of cash and new term loan debt...Upon execution of the APA, the agreement will be binding on Brookfield, Simon, and the First Lien Lenders. JCPenney intends to file a motion seeking authorization from the U.S. Bankruptcy Court for the Southern District of Texas (the "Court") to conduct an auction pursuant to Section 363 of U.S. Bankruptcy Code. Accordingly, the motion is expected to set out the proposed bidding procedures for the auction, with Brookfield, Simon, and the First Lien Lenders serving as the "stalking horse bidder," designed to achieve the highest or otherwise best offer for the benefit of JCPenney's stakeholders.

> *See J.C. Penney press release dated September 9, 2020 (attached hereto as Exhibit B).*

*The PropCo Assets*

24. On September 11, a competing group of 1st Lien and Term Loan Secured Holders made

an offer that would have provided a 57% recovery to that class:

**CONFIDENTIAL**
**SUBJECT TO FRE 408**
**FOR DISCUSSION PURPOSES ONLY /**
**SUBJECT TO MATERIAL CHANGE**

**Transaction Recoveries Analysis**
*First Lien Minority Lender Group Proposal* ——— MOELIS & COMPANY

| ($ in millions) | | | | Distributable Value |
|---|---|---|---|---|
| Cash to Lenders (post-OpCo Sale) | | | | $ 300 |
| OpCo Sale Take Back 1L Debt | | | | 500 |
| PropCo Sale Cash | | | | 1,000 |
| LiquidationCo | | | | [TBD] |
| **Total** | | | | **$ 1,800** |

| | Claims | % of Class | Recovery | % Recovery |
|---|---|---|---|---|
| **DIP Facility** | | | | |
| DIP Lender Group | $ 844 | 93.8% | $ 844 | 100.0% |
| Minority Lender Group | 56 | 6.2% | 56 | 100.0% |
| **Total** | **$ 900** | **100.0%** | **$ 900** | **100.0%** |
| *Distributable Value Remaining* | | | *$ 900* | |
| **1L Debt** | | | | |
| DIP Lender Group | $1,177 | 74.9% | $ 674 | 57.3% |
| Minority Lender Group | 304 | 19.4% | 174 | 57.3% |
| Other 1L Lenders | 90 | 5.7% | 52 | 57.3% |
| **Total** | **$1,571** | **100.0%** | **$ 900** | **57.3%** |

Note: Based on disclosed First Lien Minority Group holdings as of 9/18/20

[3]

*(Excerpt from Debtors' Disclosure Materials; boxed annotations added for reference)*

25.  This better offer was for $1 Billion for just the Debtor's PropCo assets.[13] Additionally, this offer would have yielded an actual recovery of at least $2 Billion, as the Debtors' $1 billion in unrestricted cash would have been distributed to creditors in accordance with the absolute priority rule. This offer was double the $1 Billion offer from the Defendant DIP Lenders—for both PropCo and OpCo.[14]

---

[13] See Summary Term Sheet from the Disclosure Materials, J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1.
[14] See Dkt. 1532.

8

26. By September 11, 2020, the Debtors had received offers totaling $3.75 Billion for their OpCo and PropCo assets. Notably, the $1.75 Billion OpCo offer was intended to serve as a stalking horse bid—meant to initiate a competitive auction process and attract higher bids.

*Selection of Inferior Offer Reflects Coordinated Scheme*

27. The fundamental purpose of a bankruptcy sale is to maximize value for the benefit of the debtor's estate and its creditors. See, e.g., *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("As a general matter, the [debtor in possession] must demonstrate that the proposed sale price is the highest and best offer[.]"). Upon information and belief, by early September 2020, the Debtors had received competing offers exceeding $4 billion for their OpCo and PropCo assets. These offers far surpassed the amount ultimately accepted.

28. Nevertheless, Defendant Jackson Walker, acting in collusion with the DIP Lenders, accepted a $1 Billion offer from Defendant Copper Property Trust—an offer worth less than the cash the Debtors already had on hand. This offer plainly failed to meet the standard of being the "highest and best." It provided just an 8% recovery to 1st Lien and Term Loan Secured Holders, while delivering an *undisclosed* recovery exceeding 700% to the DIP Lenders.[15]

29. This inferior outcome was not the result of sound business judgment or a legitimate competitive process. Instead, the lower offer prevailed due to a pattern of intimidation, collusion, and threats of retaliation. These tactics distorted the sale process, prevented meaningful competition, and served only to enrich the DIP Lenders at the expense of other creditors.

30. Defendant Jackson Walker rejected all higher and better offers because it was cooperating with Defendants H/2 and Brigade Capital who had devised a plan to rig the bidding and sale process and secretly divert and misappropriate billions of dollars belonging to other creditors in

---

[15] The law is well established that, to receive approval of a proposed sale of assets, a debtor must demonstrate that the proffered purchase price is the highest and best offer. *See e.g., Matter of VCR I, LLC.,922 F.3d 323, 327* (5th Cir 2019).

favor of the DIP Lenders. The foundation of this illegal scheme is captured in an email in which the Debtors' co-counsel references Brigade "pushing recovery to the DIP:"



(*Excerpt from confidential internal email, Dkt. 1635-1, boxed annotation added for reference, magnification added for legibility, See Exhibit C*)[16]

31.    This is similar to the criminal behavior that led to the indictment of Daniel Kamensky in the Neiman Marcus bankruptcy case—another case overseen by Judge David R. Jones with Defendant Jackson Walker representing the Debtor and Defendant Brigade Capital acting as purchaser.[17]

**Cancellation of the Auction**

32.    The Debtors were scheduled to auction substantially all of their assets in a public sale on September 14, 2020—just three days after the higher PropCo offer, referenced in the email above, was received. However, on the very day the auction was set to occur, it was abruptly canceled without explanation.[18]

---

[16] See Dkt. 1635-1, at 2 (attached hereto as Exhibit C)

[17] In that case, Mr. Kamensky was charged with violations of 15 U.S.C. §§ 77q, 77x; 18 U.S.C. §§ 152(6), 1343, 1512 & 2. See *U.S. v. Daniel Kamensky*

[18] See Dkt. 1401, at, 2 (filed on Sept. 14, 2020) "PLEASE TAKE FURTHER NOTICE that the Auction will not be proceeding on September 14, 2020, and the Debtors reserve the right to hold the Auction on a later date."

33.  In a legitimate bankruptcy sale process, competing groups proceed to an open auction, with the highest and best offer prevailing. Here, by contrast, the emergence of materially higher bids triggered a sudden shift: the sudden and unexplained cancellation of the auction.

34.  Rather than allowing the competitive process to continue, the conspiring parties diverted the matter to mediation.[19] This deviation was a critical component of a broader scheme to avoid a competitive process, conceal asset valuations and unjustly enrich the DIP Lenders, while stripping other creditors of their rightful recoveries.[20]

**The Settlement Agreement, Valuation and Distribution of Assets**

*Value of the Debtors' Assets*

35.  As of September 5, 2020, the Debtors reported total assets of $8.317 Billion in their Consolidated Balance Sheets filed with the U.S. Securities and Exchange Commission (SEC):

---

[19] See *Order Directing Settlement Conference*, Dkt. No. 1408 (filed Sept. 14, 2020)—the same date the auction was scheduled to occur.

[20] This is precisely the kind of end-run around creditor rights that the Supreme Court rejected in *Jevic*. See *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455–65 (2017). In *Jevic*, the Supreme Court struck down a proposed "structured dismissal" that would have distributed estate assets in violation of the Bankruptcy Code's priority rules. The Court held that such a scheme could not be approved simply because it was styled as a "settlement," warning that allowing parties to circumvent the Code's procedural safeguards in this manner would encourage them to make "similar claims" in future cases, thereby eroding the integrity of the bankruptcy process. Id. at 464-65, 470-71. That is exactly what occurred here: senior creditors and insiders used the guise of a supposed "settlement" reached through mediation to sidestep the competitive sale process and unlawfully exclude junior creditors—conduct *Jevic* expressly forbids.

## J. C. PENNEY COMPANY, INC.
### (Debtor-in-Possession)
### CONSOLIDATED BALANCE SHEETS
#### (Unaudited)

| (In millions) | September 5, 2020 | September 7, 2019 | February 1, 2020 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash in banks and in transit | $ 219 | $ 144 | $ 108 |
| Cash short-term investments | 663 | 8 | 278 |
| Restricted cash | 529 | — | — |
| Cash, cash equivalents and restricted cash | 1,411 | 152 | 386 |
| Merchandise inventory | 1,805 | 2,514 | 2,166 |
| Prepaid expenses and other | 533 | 304 | 174 |
| Total current assets | 3,749 | 2,970 | 2,726 |
| Property and equipment, net | 3,108 | 3,567 | 3,488 |
| Operating lease assets | 786 | 920 | 998 |
| Prepaid pension | 34 | 169 | 120 |
| Other assets | 640 | 661 | 657 |
| **Total assets** | $ 8,317 | $ 8,287 | $ 7,989 |

*(Excerpt from* J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure

Materials")*, see also Exhibit A)*

36. As of both the Petition Date, May 15, 2020, and the Settlement Agreement date,

November 9, 2020, the Debtors' estate had a fair market value of over $8 Billion according to

multiple sources, including:

    a.  The Debtors' SEC Filings dated September 5, 2020[21]

    b.  An expert valuation report filed with the court by CR3 Partners.[22]

    c.  The audited financials of Defendants Copper Property Trust and Penney

       Intermediate Holdings, who received substantially all of the Debtor's assets[23]

---

[21] See Exhibit A

[22] See Dkts. 1454 and 1692

[23] In prior proceedings before the Bankruptcy Court, Defendant Copper Property Trust objected to the Court taking judicial notice of their own audited financial statements, which reflect a fair market value of $1.93 billion for the PropCo real estate.

*The Settlement Agreement*

37. On or about November 9, 2020, a Settlement Agreement between the Debtors, the DIP Lenders and 1st Lien and Term Loan Secured Holders was filed. The honorable Judge Marvin Isgur mediated this pre-plan Settlement Agreement.[24]

38. The Settlement Agreement states that the DIP Lenders, who were owed $900 Million, would submit a credit bid in the amount of $900 Million, and that the First Lien and Term Loan Holders, who were owed $1.57 Billion, would submit a credit bid of $100 Million.[25] The total credit bid amount was $1 Billion.

39. In exchange for this $1 Billion credit bid, the Settlement Agreement distributed substantially all the Debtors' assets,[26] including, among other things, the:

    a.   PropCo Acquired Assets, including the PropCo real estate[27] and PropCo Closing Cash[28]

---

[24] The Settlement Agreement reads in part, "…the DIP Administration Agent, and the DIP Collateral Agent have authorized and directed that PropCo Purchaser credit bid the Credit Bid Amount, on account of $900 million of DIP Obligations and an aggregate $100 million of Term Loan Obligations and First Lien Obligations, allocated ratably based on outstanding Term Loan Obligations and First Lien Obligations, which obligations are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law." (Dkt. 1814, at 9) (Underline added)

[25] It is important to note that on or about September 21, 2020, the assets subject to the Settlement Agreement were valued at $8.2 Billion-$10 Billion, according to an expert valuation report by William K. Synder of CR3 partners See Dkts. 1454, and 1692. The Debtor itself reported a total asset value of $8.317 Billion to the SEC in its Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials") (also attached hereto as Exhibit A).

[26] The assets were divided into two entities: the property company ("PropCo") and the operating company ("OpCo"). Collectively, these assets were valued by the Debtors at more than $8 Billion as of September 5, 2020. See J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials") (also attached hereto as Exhibit A). The Debtors also reported holding more than $1 Billion in unrestricted cash at the time of the settlement.

[27] The fair market value of the PropCo real estate was established at $1.93 Billion—a judicially determined valuation for the PropCo collateral—not including the $360 Million in PropCo Closing Cash. This valuation was made by GLAS, the Trustee for Copper Property Trust, and has been publicly filed with the SEC. The filings confirm that the PropCo collateral securing the First Lien and Term Loans was valued at $1.93 Billion. However, this judicially-determined valuation has been disregarded by both the Debtors' attorney, Jackson Walker, and the Defendants in their collateral valuations and resulting distributions. See Dkt. 1647-1 Pg. 67, "The Beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee."

[28] Defendants acknowledge that $360 Million in cash—referred to as the "PropCo Closing Cash"—was paid to the DIP Lenders/Purchasers at closing, bringing the total value of the PropCo assets transferred to them to no less than $2.29 Billion ($1.93B in PropCo real estate + $360M in cash).

   b.    OpCo Acquired Assets, including the OpCo real estate,[29] inventory[30] and

         closing cash[31]

   c.    Debtor's surplus cash[32]

40. During mediation, all parties maintained the fiction that the Debtors' more than $8

Billion in assets were worth only $1 Billion, or at most, less than the $2.5 Billion in outstanding

debt.[33] They ignored valuations in SEC filings, Cushman & Wakefield appraisals,[34] and the CR3

report, which was the only valuation of the Debtors' assets on the court record.[35]

41. As a result of this improper Settlement Agreement, substantially all the Debtors' assets,

worth $8 Billion, were distributed to the conspiring Defendant DIP Lenders who were only owed

$900 Million. The DIP Lenders then transferred the OpCo assets to Defendant Penney

Intermediate Holdings for zero consideration. Defendants Penney Intermediate and Copper

Property Trust closed on their "purchases" on December 7, 2020, and January 30, 2021,

respectively.

---

[29] The OpCo real estate was valued at approximately $1.7 Billion. See *JCPenney Request for Financing Proposal*, Dkt. 513-1

[30] The Debtors' inventory was valued at approximately $2 billion. See J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials") (also attached hereto as Exhibit A)

[31] Defendants acknowledge that $634 million in cash—referred to as the "OpCo Closing Payment"—was paid to the Penney Intermediate at closing, bringing the total value of the OpCo assets transferred to them to no less than $5.2 Billion. See *Penney Intermediate Holdings LLC Consolidated Financial Statements* dated January 30, 2021, at 5, as filed with the SEC.

[32] By September 2020, the Debtors' unrestricted cash position had reached approximately $1.4 Billion: "JCP has $1.4B of cash, can afford to pay off the DIP loan, pay administrative costs, and continue to pay its debts in the ordinary course," See Dkt. 1454, at 17. The record confirms that the DIP Lenders received substantially all of the Debtors' assets, but does not disclose any specific transfer of this cash. In the absence of any alternative accounting, it must be presumed that the DIP Lenders received the cash as well.

[33] The DIP Debt was $900 Million and the First Lien/Term Loan Debt was $1.57 Billion.

[34] See Dkt. 513-1 *JCPenney Request for Financing Proposal*

[35] Although required by 11 U.S.C. § 1129(a)(8), no liquidation analysis was filed in this case. Despite the expert valuation filed by CR3 and the Debtors' own SEC filings—both of which valued the Debtors' assets at no less than $8 Billion—participating professionals, including the Debtors' financial advisor David Kurtz, who testified that he was unaware of the value of the Debtors' assets—uniformly disclaimed knowledge of the estate's value, facilitating a process that concealed the true value of the estate from both creditors and the Court. See Kurtz' testimony: *Sale Hearing Transcript* Dkt. 1822, at 206–207

42.   Defendant Jackson Walker and Defendant Copper Property Trust allege that the value of the collateral securing the 1st and 2nd Lien Secured Bonds is controlled by, and capped by, the $100 Million credit bid submitted by the First Lien Holders——yet they do not treat the $900 Million credit bid submitted by the DIP Lenders as having any such limiting effect on their recovery.[36]

*Events Surrounding the Improper Distribution of Estate Assets*

43.   A chronological review of events leading up to these distributions reveals a series of irregular and improper actions—orchestrated by Defendant Jackson Walker at the direction of Defendants H/2 and Brigade—that ultimately bypassed a competitive bidding process, concealed the true value of the Debtors' assets and diverted estate value away from rightful creditors:

- **May 12, 2020** – Defendant Jackson Walker takes steps to steer the J.C. Penney bankruptcy case into then–Chief Bankruptcy Judge David R. Jones' courtroom.[37]

- **May 15, 2020** – Debtors file their bankruptcy petition, reporting $8.6 Billion in total assets, including $475 Million in cash.

- **August 19, 2020** – Debtor's attorney lies in open court, asserting that an $8.4 Billion liquidation value is "absolutely ludicrous."[38]

---

[36] Section 363(k) of the Bankruptcy Code provides that a secured creditor may credit bid up to the amount of its allowed claim—but not beyond it. In this case, the amount of the allowed claim for the DIP Lenders was only $900 Million. However, they received distributions in excess of $8 billion in cash and assets. See 11 U.S.C. § 363(k): "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."

[37] Jackson Walker secretly maintained an improper relationship with Judge Jones through Jones' live-in girlfriend Elizabeth Freeman, who was a partner at the firm. Text messages reveal that Jackson Walker used Freeman's relationship with Jones to forum shop and influence the outcome of cases before Judge Jones. See James Nani, *Judge's Girlfriend Texts Indicate JCPenney Bankruptcy Maneuver*, Bloomberg Law (Oct. 17, 2024). On May 12, 2020, just three days before J.C. Penney filed for bankruptcy, Ms. Freeman—a Jackson Walker partner before, during, and after Jones' oversight of the J.C. Penney bankruptcy—texted a colleague, "Talked to Jones. He's got us," and later added, "I'm keeping this down lowwwww." Id. —The messages reveal that Jackson Walker coordinated directly with Judge Jones through Freeman to ensure the case was assigned to him, compromising the neutrality of the venue selection and the integrity of the judicial process. These internal Jackson Walker text messages came to light through discovery in a court proceeding involving the firm's undisclosed and improper relationship with Judge Jones.

[38] See Hr'g Tr. at 18:16–22, Aug. 19, 2020, (Debtors' counsel Joshua Sussberg rejecting an $8.4 Billion valuation)

- **September 5, 2020** – Debtors list $8.317 Billion in assets on their 8-K.

- **September 9, 2020** – Debtors announce an agreement in principle to sell substantially all of their operating assets ("OpCo") to Simon and Brookfield for $1.75 Billion, with formal bidding procedures to follow.

- **September 11, 2020** – A materially higher and better offer for PropCo is submitted by a competing group: $1 billion for just the PropCo assets—plus an additional $1 billion in cash distributions—far exceeding the DIP Lenders' $1 billion credit bid for both OpCo and PropCo. Internal communications from Debtors' counsel acknowledge that the offer conflicts with Defendant Brigade Capital's agenda to direct value toward the DIP Lenders.

- **September 14, 2020** – On the date scheduled for the public auction, the auction is abruptly canceled. Two of the competing bidders are diverted into private "settlement" discussions.

- **November 9, 2020** – The inferior $1 Billion bid from the Defendant DIP Lenders prevails. The Settlement Agreement secretly allocates substantially all of the Debtors' $8 Billion assets to the DIP Lender group.

- **January 30, 2021** - Financial disclosures show Defendant Penney Intermediate Holdings holding $5.2 billion in assets, while Defendant Copper Property Trust reports fair value of $1.935 Billion for the PropCo real estate assets.[39]

44. To execute this plan to embezzle distributions owed to other creditor classes, Defendants H/2, Brigade, and Jackson Walker, with the support of a compromised court, engaged in a pattern of intimidation, threats, and improper influence—including financial inducements—targeted at

---

[39] These figures confirm that the Debtors' assets were grossly undervalued during the bankruptcy proceedings—and that the true value was improperly diverted to insider buyers.

attorneys and other fiduciaries representing creditor groups who disagreed with the gross undervaluation of the estate and the improper transfer of cash and assets to the DIP Lenders in amounts far exceeding what they were owed.

**VI. CLAIMS FOR RELIEF**

45.   There now exists an actual controversy between Plaintiff and Defendants regarding Plaintiff's rights to the collateral securing the 1st Lien and Term Loan Secured, and 2nd Lien Secured Parties, and the proper distribution of that collateral. This Court has the authority to declare the contractual rights and duties of the parties under the Settlement Agreement and applicable provisions of bankruptcy law, including 28 U.S.C. §§ 2201 and 2202.

**A. Count I - Declaratory Judgment: Fair Market Value of PropCo Real Estate Was Determined to Be $1.93 Billion by the PropCo Trustee**

46.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

47.   An actual, substantial legal controversy exists regarding the 1st Lien and Term Loan and 2nd Lien Secured collateral being valued at the credit bid amount rather than the fair market value.

48.   The primary issue in this case is straightforward: the cash and other collateral securing the claims of the 1st and 2nd Lien Secured Bondholders must be valued at <u>Fair Market Value</u>.[40]

---

[40] The discrepancy between the two valuation standards arises because an asset's fair market value reflects "a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property.'" *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 (1994) (quoting BLACK'S LAW DICTIONARY 971 (6th ed. 1990)). By contrast, foreclosure value—the "very antithesis" of fair market value—involves a forced sale for "'*the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner.*'" Id. at 537-38 (same). There is a "glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other." Id. at 538

not <u>Foreclosure Value</u>.[41] This requirement is established and consistently affirmed by controlling authority, including:

    a.    the United States Supreme Court,[42]

    b.    the Fifth Circuit Court of Appeals,[43]

    c.    Section 506(a) of the Bankruptcy Code,[44]

    d.    the governing bond indentures,[45] and

    e.    the operative documents in this case, including the Sale Order, Asset Purchase Agreement, and Disclosure Statement.[46]

---

[41] See the Sale Order, Dkt. 1814, at 47; See also the Asset Purchase Agreement, Dkt. 1668-1, at 97, Section 9.2 "Allocation Of Purchase Price," both of which contain fair market value requirements.

[42] The Supreme Court has held that "foreclosure value" does not accurately reflect a secured creditor's interest in collateral. See *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 955–56, 960–65 (1997); In re *Stembridge*, 394 F.3d 383, 386–88 (5th Cir. 2004). The bankruptcy court's reliance on foreclosure value was erroneous, as foreclosure value is typically substantially lower than fair market, going concern, or replacement value. See *Rash*, 520 U.S. at 957–58.

[43] In *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997), the Fifth Circuit held that, under Section 506(a) of the Bankruptcy Code, a secured creditor's interest must be valued according to the fair market value of the collateral at the time of bankruptcy—not the price offered in a private or credit bid sale. The court determined that <u>this applies regardless of the sale price in a private transaction, emphasizing that the creditor's lien attaches to the value of the collateral itself, not merely the price it may fetch in a transaction.</u>

[44] Section 506(a)(1) states: An allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

[45] The bond indentures for both the 1st Lien and 2nd Lien Secured Bonds contain "Appraised Value" provisions requiring the use of a Cushman & Wakefield appraisal, or an equivalent from a nationally recognized, unaffiliated appraiser, based on an "estimated market rent" methodology. See Indenture dated Mar. 12, 2018, by and among J.C. Penney Corp., Inc., the Guarantors party thereto, and Wilmington Trust, N.A., as Trustee, relating to $400,000,000 8.625% Senior Secured Second Priority Notes due 2025; and Indenture dated June 23, 2016, by and among *J. C. Penney Corporation, Inc.*, as Issuer, the Guarantors party thereto, and *Wilmington Trust, National Association*, as Trustee, relating to $500,000,000 of 5.875% Senior Secured Notes due 2023.

[46] See the Sale Order, Dkt. 1814, at 47: "PropCo Trust will, for tax reporting purposes, report PropCo as owning the assets it acquires at their fair market value at the time of the PropCo closing (<u>and the face amount of the underlying Credit Bid Amount shall not be determinative of fair market value</u>) and such fair market value shall be used by PropCo Trust and the Debtors for the purpose of determining the aggregate value used for the PropCo allocation as such term is used in Section 9.2 of the asset purchase agreement." (underlining added). See also the Asset Purchase Agreement, Dkt. 1668-1, at 103, Section 9.2: "Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchasers, Sellers, and their respective Affiliates shall, consistent with the requirements of Section 1060 of the Code and the regulations promulgated thereunder and any similar provision of applicable Law, allocate the purchase price (and any Assumed Liabilities and other items treated as part of the purchase price for U.S. federal, and applicable state and local, income Tax purposes) among the Acquired Assets." See also the Disclosure Statement, Dkt. 1647-1, at 67: "The Beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee."

18

49. The fair market value requirement is codified in 11 U.S.C. § 506(a) and is a matter of binding Fifth Circuit precedent. Moreover, the bankruptcy record reflects that the $1 Billion credit bid amount does not control the valuation of the assets for tax purposes.[47] The Sale Order and related documents expressly require the Debtors and the PropCo asset beneficiaries to report consistently with the fair market value as determined by the PropCo Trustee. [48]

50. The $360 Million in PropCo Closing Cash must be assigned its full face value of $360 Million, and the $1.93 Billion fair market value assigned to the PropCo real estate is a judicially determined valuation.[49] Although this judicially determined valuation exists, the Debtors and Defendants have disregarded it entirely, refusing to pay the 1st Lien and Term Loan Secured Creditors, 2nd Lien Secured Holders, and Unsecured Holders their distributions according to the fair market value of the assets acquired. Instead, they allege that the fair market value of the assets is the Credit Bid Amount.

51. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the PropCo cash and collateral securing the DIP Debt, 1st Lien and Term Loan Secured Debt, and 2nd Lien Secured Debt must be valued at fair market value, as determined by the PropCo Trustee to be $1.93 Billion for the PropCo real estate, and totaling $2.29 billion—and that the Credit Bid Amount does not control or determine the value of the acquired assets.

**B. Count II - Declaratory Judgment: Improper Valuation in Violation of the Settlement Agreement and *T-H New Orleans* (5th Cir. 1997)**

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

---

[47] See *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967) (establishing the "Danielson Rule"), which bars parties from asserting inconsistent positions—such as claiming a certain value or characterization for tax benefits while denying that same value or characterization to creditors or other stakeholders. Here, because the bankruptcy record confirms that the $1 Billion credit bid does not control the value of the assets for tax purposes, the Danielson Rule precludes Defendants from asserting that it controls the value for creditor recoveries.

[48] See Dkts. 1668-1, at 103 Section 9.2; 1814, at 47; and 1647-1, at 67

[49] See Dkt. 1647-1, at 67

19

53. An actual, substantial legal controversy exists regarding whether Defendants violated the terms of the Settlement Agreement and controlling Fifth Circuit precedent by valuing the collateral underlying the 1st and 2nd Lien Bonds based on the Credit Bid Amount, rather than fair market value.

54. The Settlement Agreement explicitly provides that, for purposes of valuing the collateral subject to the settlement, the Credit Bid Amount does not control the value of the property. It states, in part:

> Notwithstanding that the Transaction provides fair and reasonable value for the Acquired Assets, the face amount underlying **the Credit Bid Amount does not control the value of the Acquired Assets for tax reporting purposes,** which shall be determined pursuant to paragraph 49 of this order. (Dkt. 1814, at 7-8, Section K. Private Sale is Appropriate)[50] (emphasis added)

55. There is no legal basis for using the Credit Bid Amount as a proxy for fair market value. In *In re T-H New Orleans Ltd. Partnership,* 116 F.3d 790 (5th Cir. 1997), the Fifth Circuit held that, under Section 506(a) of the Bankruptcy Code, a secured creditor's interest must be valued according to the fair market value of the collateral at the time of bankruptcy—not the price offered in a private or credit bid sale. The court determined that this applies regardless of the sale price in a private transaction, emphasizing that the creditor's lien attaches to the value of the collateral itself, not merely the price it may fetch in a transaction.

56. Despite these legal and contractual requirements, Defendant Jackson Walker secretly used the Settlement Agreement to distribute roughly $8 Billion of the Debtors' assets to the DIP Lenders who were only entitled to $900 Million. This improper distribution was justified by the

---

[50] Paragraph 49 of the sale order reads in part, "PropCo Trust will, for tax reporting purposes, report PropCo as owning the assets it acquires at their fair market value at the time of the PropCo Closing (and the face amount underlying the Credit Bid Amount shall not be determinative of fair market value) and such fair market value shall be used by PropCo Trust and the Debtors for purposes of determining the aggregate value used for the PropCo Allocation as such term is used in Section 9.2 of the Asset Purchase Agreement" (Dkt 1814, at 47) (Underline added)

false premise that the Debtors' assets were worth only $1 Billion—the amount of the credit bid in this private sale. However, because the transaction was not a true market sale, fair market value—not the Credit Bid Amount—must govern.

57.  Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the PropCo cash and collateral securing the DIP Debt, 1st Lien and Term Loan Secured Debt, and 2nd Lien Secured Debt must be valued at fair market value, as determined by the PropCo Trustee to be $2.29 Billion.  Plaintiff seeks a declaratory judgment that Defendant's treatment of the Credit Bid Amount as controlling violated both the Settlement Agreement and binding precedent, including *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997), which holds that secured collateral must be valued at fair market value under 11 U.S.C. § 506(a), not merely the price offered in a private or credit bid sale.

## C. Count III - Improper Distribution of OpCo Assets to Select Unsecured Creditors Without Consideration Violates §§ 1123(a)(4), 1129(b)(2)

58.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

59.  An actual, substantial legal controversy exists regarding whether Defendants violated 1123(a)(4) and 1129(b)(2) by transferring more than $5 Billion in OpCo Assets to two preferred Unsecured Creditors—Simon and Brookfield, through their entity Penney Intermediate Holdings—for zero consideration, while all other Unsecured Creditors recovered virtually nothing on the class's $3 Billion claim.

60.  Section 1123(a)(4) requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[51]  Here, the remaining Unsecured Creditors did not agree to less favorable treatment than Simon and Brookfield; rather they were

---

[51] See *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)

denied comparable recovery because they were not gifted estate assets as Simon and Brookfield were.

61.   Their diminished recoveries were the result of material concealment of the Debtors' $8 Billion in assets and the false representation that Simon and Brookfield were paying nearly $2 Billion for what they received. In truth, no outside consideration was paid. These misrepresentations were orchestrated by Defendants Jackson Walker, Simon, Brookfield and Penney Intermediate Holdings in order to defraud stakeholders and evade the Code's equal treatment requirements.

62.   Section 1129(b)(2) prohibits unequal treatment of creditors within the same class. In this case, the Debtors distributed billions of dollars in estate assets to two favored Unsecured Creditors—Simon and Brookfield—while providing virtually nothing to other creditors within the same class.[52] Compounding the violation, the Debtors filed no liquidation analysis to justify or even explain these distributions. Without such an analysis, there is no basis for concluding that the plan met the requirements of 1129(b)(2), and the lopsided treatment of similarly situated creditors cannot be defended as either fair or equitable.[53]

63.   As chair of the Unsecured Creditors' Committee, Simon Property Group breached its fiduciary duty to advocate for the equal and proportional treatment of all Unsecured Creditors.[54]

---

[52] The Unsecured Creditors Committee accepted a nominal $1.5 Million settlement after being told that no assets remained in the estate to distribute toward the class's $3 Billion claim—because the 1st Lien Creditors had accepted a below-par recovery under the Settlement Agreement, thereby eliminating any recovery for junior creditors. See Dkt. 1789, *Statement of the Official Committee of Unsecured Creditors in Support of the Debtors' Sale Motion*. This is precisely the type of scenario the Fifth Circuit addressed in *In re AWECO, Inc.*, which exists to prevent higher-priority creditors from using settlements to improperly exclude lower-priority classes from recovery outside of a confirmed plan.

[53] See *In re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.") Here, members of the class of Unsecured Creditors did not receive equal value. Unsecured Creditors Simon and Brookfield received more than $5 Billion in estate assets for no outside consideration, while all other members of the Unsecured Creditor class received virtually nothing—despite having equal legal entitlement to a *pro rata* distribution.

[54] Similar breach of fiduciary duty by a member of the Unsecured Creditors Committee led to the indictment and conviction of Daniel Kamensky.

Instead, it prioritized its own recovery at the direct expense of others within the same class. Under 11 U.S.C. § 726(b), a *pro rata* distribution requires that each creditor be compensated "[p]roportionately; according to an exact rate, measure, or interest." *Pro Rata*, BLACK'S LAW DICTIONARY (11th ed. 2019). The Bankruptcy Code further mandates equal treatment of creditors within the same class. See 11 U.S.C. §§ 726(b), 1322(a)(3). Accordingly, each unsecured creditor must receive the same percentage recovery until those with smaller claims are paid in full. See 11 U.S.C. §§ 726(b), 1322(a)(3).

64. Defendants Jackson Walker and Simon and Brookfield allege that Simon and Brookfield, through Defendant Penney Intermediate Holdings, were the purchasers of the Debtors' operating company assets ("OpCo"), which were valued at over $5 Billion. The term "purchaser" implies that meaningful consideration was paid into the Debtors' estate. However, the audited financial statements of both Penney Intermediate and Simon/Brookfield demonstrate that no external consideration was ever provided to the Debtors for these assets.

65. According to the Asset Purchase Agreement, Penney Intermediate Holdings was supposed to provide the following consideration for OpCo:[55]

    a.    OpCo Credit Bid Amount[56]

    b.    $692 Million Cash[57]

    c.    $1.3 Billion ABL Payoff Amount

    d.    $520 Million Term Loan

    e.    Earnout (contingent consideration)

---

[55] See the Asset Purchase Agreement, Dkt. 1668, at 25, Section 2.1
[56] There was no OpCo credit bid because unsecured debt cannot be used to credit bid, and Simon and Brookfield held only unsecured claims.
[57] Misleading press reports circulated promoting the impression that this amount would be paid to the Debtors. See, e.g., *J.C. Penney Signs Deal to be Taken Over by Landlords Simon and Brookfield*, *Retail Dive*. (Oct. 29, 2020).

66. However, none of these payments were made to the Debtor. There was no OpCo Credit Bid Amount–the entire $1 Billion credit bid was allocated to the PropCo purchase. No portion remained for, or was applied to, the acquisition of OpCo. The $692 Million in cash, labeled "OpCo Closing Cash," came from the Debtors' estate and was given to the alleged purchaser at closing.[58] The Debtors themselves paid off the ABL. The new $520 Million Term Loan was merely a lien against inventory that was already owned by the Debtors and the 1st Lien Holders. Finally, the required milestones to trigger any earnout consideration for the Unsecured Creditors were not met.[59] In short, no consideration whatsoever was provided in exchange for the Debtors' operating company assets. [60]

67. Nevertheless, misleading official statements were released to the public in order to discourage potential competitors and conceal misappropriation of the OpCo assets. These statements claimed that Simon and Brookfield were providing nearly $2 Billion to the Debtors to acquire its operating company—despite the fact that no such consideration was ever paid.[61]

68. Misleading testimony and court filings have also falsely asserted that the Debtors' $1.3 Billion ABL debt would be repaid by the OpCo "purchaser." In reality, accounting records confirm that the Debtor received no consideration for its operating company assets. Even the

---

[58] Due to various closing requirements, the amount was reduced to $634 million. See *Penney Intermediate Holdings LLC Consolidated Financial Statements*, dated Jan. 30, 2021, at 13

[59] "'Unsecured Claims Earnout Pool" means 50% of any incremental amounts payable under Section 1 of the Earnout Agreement between $110,000,000 and $140,000,000,' Dkt. 1788, at 20

[60] In *In re Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980), the Fifth Circuit held that a foreclosure sale yielding only 57% of fair market value did not constitute "reasonably equivalent value," and observed that no court had upheld a transfer for less than 70% of fair value. This observation—often referred to as the "Durrett rule"—has been cited by other courts evaluating whether transfers may be avoided under the Bankruptcy Code for failure to provide fair consideration. See, e.g., *In re Littleton*, 888 F.2d 90, 92 n.5 (11th Cir. 1989). Here, the DIP Lender Defendants and Penney Intermediate provided zero consideration for the Debtors' operating company assets—an amount not only far below the *Durrett* threshold, but in direct violation of the Settlement Agreement's requirements and the Fifth Circuit's mandate in *In re T-H New Orleans Ltd. Partnership, 116 F.3d 790 (5th Cir. 1997)*, that asset transfers in bankruptcy must reflect reasonably equivalent value. Technically, no good faith purchase of the assets has occurred, as no consideration for the operating business was ever received by the Debtors.

[61] See J.C. Penney press release dated September 9, 2020, (also attached hereto as Exhibit B)

largely misleading Case Status Update submitted by the Wind-Down Debtor on November 1, 2023, reflects no such payment from the alleged OpCo purchaser to the Debtor. [62]

69. In essence, there was no good faith purchase—only a liquidation of the Debtors' assets conducted in violation of the absolute priority rule.[63]

70. All of this misconduct was part of Defendant Jackson Walker's scheme to use the Settlement Agreement as a vehicle to enable the other Defendants to misappropriate more than $7 Billion in assets belonging to other creditors. Defendant Penney Intermediate provided no consideration for the $5.2 billion in OpCo assets it received, and the DIP Lender Defendants likewise provided no consideration beyond their $900 Million credit bid. The Defendants are therefore improperly in possession of embezzled assets rightfully belonging to other creditors.

71. Accordingly, Plaintiff seeks a declaration from this Court under 28 U.S.C. §§ 2201 and 2202 that the transfer of more than $5 billion in operating company assets to two preferred Unsecured Creditors—without any outside consideration—violated 11 U.S.C. §§ 1123(a)(4) and 1129(b)(2). Such a declaration is necessary to confirm that the Bankruptcy Code prohibits unequal treatment of similarly situated creditors and the covert transfer of estate assets under false pretenses. Without this judicial determination, Defendants' misconduct will remain shielded by the very scheme that deprived creditors of their rightful recoveries and undermined the integrity of the bankruptcy process. Declaratory relief is therefore warranted to redress the unlawful conduct, prevent further harm, and ensure compliance with the Code's fundamental principles of fairness, transparency, and equal treatment.

---

[62] See Case Status Update (Nov. 1, 2023), and Hr'g Tr. (Nov. 1, 2023)

[63] The absolute priority rule mandates that creditors be paid in order of priority–and that they may receive no more than the full value of their allowed claims. Any remaining value must flow down to satisfy the claims of lower-priority creditors. This prevents senior creditors from capturing surplus value at the expense of others, which is what happened in this case. See *11 U.S.C. § 1129(b)(2)(B)*; *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984).

## D. Count IV - Declaratory Judgment: Undisclosed Uptier Transaction Violates Distribution Standards Confirmed by *Serta Simmons* (5th Cir. 2024)

72.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

73.   An actual, substantial legal controversy exists regarding the permissibility of an undisclosed "Uptier Transaction" that steered disproportionate recovery to the DIP Lenders, to the detriment of other creditor classes, and those in the same class who were not allowed to "uptier" their 1st Lien Debt into DIP debt.

74.   The $8 Billion in cash, real estate, and other assets disposed of through the Settlement Agreement were distributed neither in accordance with the absolute priority rule nor on a *pro rata* basis. Counsel for the Defendant DIP Lenders admitted in writing that the DIP Lenders received 75 PropCo securities per $1,000 of DIP Debt while the 1st Lien and Term Loan Secured Creditors received only 4.77 PropCo certificates per $1,000 of debt. The PropCo Closing Cash was allocated on the same disproportionate basis. Per Defendant Copper Property Trust's attorney:

> On Nov 13, 2023, at 4:26 PM,
> Kinney, Brian
> <BKinney@milbank.com> wrote:
>
>
> We provided the information regarding Cetus in a
> separate email, which Mr. Moore then raised questions
> on. Here are the questions and responses:
>
> 1. What is the dollar amount per $1,000 in face value of
> PropCo, New Term Loan and Earn-out distributed to the
> 1st Lien Minority Group members?
> All holders received 10 Earnout certificates , 75 Propco
> certificates, and $520 in principal take back loan for each
> $1,000 of DIP Loan. Noteholders received 0.63637
> Earnout Certificates, 4.772771 Propco certificates, and
> $32.760302 in principal take back term loan for each
> $1000 of 1L notes.

*(Excerpt from email to Plaintiff, see Exhibit D)*

75.  The Settlement Agreement references only the $1 Billion Credit Bid Amount and fails to disclose the fair market value of substantially all of the Debtors' assets.[64]

76.  Without providing a valuation of the Debtors' assets—or relying on existing valuation data—Defendants assert that the 1st Lien and Term Loan Secured Parties, who were owed $1.57 Billion, should receive distributions based solely on, and equaling, their $100 Million credit bid.

77.  Defendants assert that the remaining $7.9 Billion in asset distributions should go to the DIP Lending Parties who were only owed $900 Million for their DIP Debt.

78.  This type of unfair and improper transaction is called an "Uptier Transaction."[65]  In the J.C. Penney bankruptcy, the Uptier Transaction was undisclosed.[66] However, even when such schemes are disclosed to other creditors and parties in interest, the Fifth Circuit recently held in *Serta* that overpaying DIP Lenders and favored creditors through an Uptier Transaction is unlawful and improper.

79.    On December 31, 2024, the U.S. Court of Appeals for the Fifth Circuit ruled in *In re Serta Simmons Bedding, LLC,* 81 F.4th 1284 (5th Cir. 2024) that mattress company Serta Simmons Bedding, LLC ("Serta") violated the *"sacred right"* of its lenders to ratable repayment by placing more than $1 Billion of new super-priority debt that would have priority over its existing indebtedness for such new indebtedness.

---

[64] The fair market value of the assets was reported to the SEC by the two entities that received them—Penney Intermediate Holdings and Copper Property Trust. However, those valuations were never filed with the Bankruptcy Court. The only dollar figure referenced in connection with the transaction was the Credit Bid Amount. See Case Status Update (Nov. 1, 2023), and Hr'g Tr. (Nov. 1, 2023).

[65] *See Uptier Exchange Transactions: Lawful Innovation of Lender-on-Lender Violence? 40 Yale J. REG. 408, 413-414 (2023)* and *Vincent S.J. Buccola & Greg Nini, The Loan Market Response to Dropdown and Uptier Transactions,53* J. LEGAL STUD. 489, 501 (2024) (restyled).

[66] In the Serta Simmons bankruptcy–overseen by Judge David R. Jones, as was the J.C. Penney bankruptcy–the Uptier Transaction was disclosed, allowing parties the opportunity to object and ultimately appeal to the Fifth Circuit. By contrast, in the J.C. Penney case, the extreme overpayment of the DIP Lenders was concealed: no liquidation analysis was filed, and no financial disclosures were submitted to the Bankruptcy Court reflecting the value of the assets the DIP Lenders received.

80. Plaintiff contends the J.C. Penney transaction violates the principles established by the Fifth Circuit in *Serta*, and seeks a declaratory judgment that such a transaction is impermissible under controlling precedent. Specifically, Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the non *pro-rata* distributions–through which the DIP Lenders secretly received more than seven times the amount owed on their $900 Million DIP loan–are improper in light of the *Serta* ruling.

**E. Count V - Declaratory Judgment: Distributions Under the Pre-Plan Settlement Violate *In re AWECO, Inc.*, 725 F. 2d 293 (5th Cir. 1984)**

81. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

82. An actual and substantial legal controversy exists regarding the permissibility of distributions made pursuant to the pre-plan Settlement Agreement. Specifically, Plaintiff contends that these distributions violate the absolute priority rule as articulated by the Fifth Circuit in *Aweco*.

83. The pre-plan settlement between the DIP Lenders and the 1st Lien and Term Loan Secured Parties distributed substantially all the Debtors' assets–valued at no less than $8 Billion. Under this settlement, Defendants assert that only $100 Million of those assets belong to the 1st Lien and Term Loan Secured Holders, while approximately $7.9 Billion is allocated to the DIP Lenders.[67] Defendants have argued that, because the distribution occurred via a pre-plan settlement agreement, rather than a confirmed plan, the absolute priority rule does not apply.

---

[67] This grossly improper distribution was never disclosed to the Bankruptcy Court, the U.S. Trustee, or other parties in interest. This conduct violates 18 U.S. § 152, which prohibits concealment of assets in connection with a bankruptcy proceeding. The assets and resulting distributions were concealed under the guise of a $1 Billion credit bid for substantially all of the Debtor's assets–the value of which was intentionally concealed, disregarded and denied to subvert the statutory repayment scheme and evade the absolute priority.

84.   However, in *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984), the Fifth Circuit held that pre-plan settlements must comply with the absolute priority rule. That decision remains binding precedent in this Circuit.[68]

85.   Plaintiff therefore seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that distributions made under the pre-plan settlement (Dkt. 1814) must comply with *Aweco*.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that:

86.   Defendants be cited to appear and answer herein;

87.   The Court enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, determining the rights and obligations of the parties under the Settlement Agreement and applicable bankruptcy law, including but not limited to the following declarations:

   a.   That the value of the cash and collateral, including the PropCo real estate collateral, securing the 1st Lien and Term Loan Secured Debt, as well as the 2nd Lien Secured Debt must be determined based on fair market value, not foreclosure or credit bid value; and that such fair market value for the PropCo real estate was judicially determined by the PropCo Trustee to be $1.93 Billion, which controls for purposes of creditor distributions and tax reporting under 11 U.S.C. § 506(a), applicable plan documents, and governing precedent;

   b.   That the Settlement Agreement and controlling precedent, including *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997), requires that substantially all of the Debtor's assets be valued based on their fair market value–not the Credit Bid Amount;

---

[68]See also *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), in which the Supreme Court held that structured dismissals or settlements that deviate from the Bankruptcy Code's priority scheme without the consent of affected parties are impermissible.

    c.    That the selective transfer of the OpCo assets to two preferred members

of the Unsecured Creditor class—while denying recovery to all others

and providing no outside consideration—violates 11 U.S.C. §§ 1123(a)(4)

and 1129(b)(2);

    d.    That the undisclosed, non-*pro rata* distributions to the DIP Lenders—resulting

in recoveries exceeding seven times the amount owed on the $900 million DIP

facility—are improper pursuant to *In re Serta Simmons Bedding, LLC,* 81

F.4th 1284 (5th Cir. 2024);

    e.    That the distributions made under the pre-plan settlement (Dkt. 1814) which

disposed of substantially all of J.C. Penney's more than $8 Billion in assets,

must comply with the absolute priority rule set forth in *In re AWECO, Inc.,*

725 F.2d 293, 298 (5th Cir. 1984) and In re *Czyzewski v. Jevic Holding Corp.,*

580 U.S. 451 (2017).

88. Plaintiff and joinder parties are granted such other and further relief as the Court deems just and proper.

## IX. DEMAND FOR JURY TRIAL

89. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 11, 2025             Respectfully submitted,

                                     ERIC L. MOORE

                                     /s/ *Eric L. Moore*

                                     Eric L. Moore
                                     202 Island Avenue
                                     San Diego, CA 92101
                                     Telephone: (336) 671-2193
                                     Email: moorelyndell7@gmail.com
                                     *Pro se*

## CERTIFICATE OF ACCURACY

I hereby certify that the facts and circumstances described in the above pleading giving rise to the request for relief are true and correct to the best of my knowledge, information, and belief.

/s/ *Eric L. Moore*
Eric L. Moore

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Eric L. Moore*

Eric L. Moore

**JACKSON WALKER L.L.P.**

Matthew D. Cavenaugh (TX Bar Bo. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

**NORTON ROSE FULBRIGHT US LLP**

Jason L. Boland (SBT 24040542)
William Greendyke (SBT 08390450)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar Street, Suite 2000
Houston, Texas 77010-3095
Telephone: (713) 651-5151
jason.boland@nortonrosefulbright.com
william.greendyke@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Paul Trahan (SBT 24003075)
Emily Wolf (SBT 24106595)
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201
Email: paul.trahan@nortonrosefulbright.com
Email: emily.wolf@nortonrosefulbright.com

-and-

**RUSTY HARDIN & ASSOCIATES, LLP**

Russell Hardin, Jr. (SBT 08972800)
Leah M. Graham (SBT 24073454)
Jennifer E. Brevorka (SBT 24082727)
Emily Smith (SBT 24083876)
5 Houston Center
1401 McKinney, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
rhardin@rustyhardin.com
lgraham@rustyhardin.com
jbrevorka@rustyhardin.com
esmith@rustyhardin.com

Counsel for Jackson Walker

**COPPER PROPERTY TRUST**
Attn: Legal Department
3 Second Street, Suite 206
Jersey City, New Jersey 07311

**MILBANK LLC**

Brian Kinney
Dennis F. Dunne *(admitted pro hac vice)*
Andrew M. LeBlanc *(admitted pro hac vice)*
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
bkinney@milbank.com
ddunne@milbank.com
aleblanc@milbank.com

Counsel for DIP Lenders/Copper Property Trust
(PropCo)

**PENNEY INTERMEDIATE HOLDINGS
LLC**

% Simon Property Group
Attn: Legal Department
225 West Washington Street
Indianapolis, IN 46204

-and-

% Brookfield Properties
Attn: Legal Department
Brookfield Place New York
250 Vesey Street, 15th Floor
New York, NY 10281
Telephone: (212) 417-7000

Defendant

**BRIGADE CAPITAL MANAGEMENT**

Attn: Aaron Daniels
399 Park Avenue, 16th Floor
New York, NY 10022

Defendant

**H/2 CAPITAL PARTNERS**

Attn: Legal Department
680 Washington Blvd, 7th Floor
Stamford, CT 06901

Defendant

**H/2 CAPITAL PARTNERS**

Attn: Ellis F. Rinaldi
% Rinaldi & Associates
Three Pickwick Plaza, Suite 250
Stamford, CT 06901

Defendant

**SILVER POINT CAPITAL**

Attn: Steven Weiser
2 Greenwich Plaza, 1st Floor
Greenwich, CT 06830

Defendant

**OWL CREEK ASSET MANAGEMENT**

Attn: Legal Department
640 Fifth Ave, Floor 20
New York, NY 90019

Defendant

**SIMON PROPERTY GROUP**

Attn: Legal Department
225 West Washington Street
Indianapolis, IN 46204

Defendant

**BROOKFIELD PROPERTIES**

Attn: Legal Department
Brookfield Place New York
250 Vesey Street, 15th Floor
New York, NY 10281
Telephone: (212) 417-7000

Defendant

**KEVIN M. EPSTEIN**
**UNITED STATES TRUSTEE**
**REGION 6**

1100 Commerce Street, Room 976
Dallas, Tx 75242
Telephone: (214) 767-8967
Facsimile: (214) 767-8971
kevin.m.epstein@usdoj.gov

**MILLIE APONTE SALL**
**ASSISTANT U.S. TRUSTEE**

515 Rusk, Suite 3516
Houston, Texas 77002
Telephone: (713) 718-4650
Facsimile: (713) 718-4670
millie.sall@usdoj.gov

**HECTOR DURAN**
**OFFICE OF THE U.S. TRUSTEE**

515 Rusk St Ste 3516
Houston, TX 77002-2604
Telephone: (713) 718-4664
Hector.Duran.Jr@usdoj.gov

**BRIAN R. HENAULT**
**OFFICE OF THE U.S. TRUSTEE**

515 Rusk St Ste 3516
Houston, TX 77002-2604
Telephone: (713) 718-4653
Facsimile: (713) 718-4670
Brian.R.Henault@usdoj.gov

**GLAS TRUST COMPANY, LLC**

Jeffrey Schoenfeld
Yana Kislenko
Irena Goldstein
3 Second Street, Suite 206
Jersey City, NJ 07311
Telephone: (201) 839-2187
jeffrey.schoenfeld@glas.agency
yana.kislenko@glas.agency
irena.goldstein@glas.agency

Copper Property Trust Trustee

**MCDERMOTT, WILL & EMERY**

Jonathan Levine
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
jlevine@mwe.com

Counsel to Copper Property Trust Trustee

**HILCO JCP, LLC**

Larry Finger
5 Revere Drive, Suite 410
Northbrook, IL 60062
Telephone: (703) 244-4588
lfinger@ctltrust.net

Manager of Copper Property Trust

# EXHIBIT A

# J. C. PENNEY COI
## (Debtor-in-Po
## CONSOLIDATED BAI
### (Unaudit

*(In millions)*

## Assets

Current assets:

    Cash in banks and in transit

    Cash short-term investments

    Restricted cash

        Cash, cash equivalents and restricted cash

    Merchandise inventory

    Prepaid expenses and other

        Total current assets

Property and equipment, net

Operating lease assets

Prepaid pension

Other assets

        **Total assets**

## Liabilities and stockholders' equity

Current liabilities:

    Merchandise accounts payable

    Other accounts payable and accrued expenses

# EXHIBIT B

Case 25-02752   Document 81   Filed 06/26/25   TX35   Page 37 of 45



# JCPenney Reaches Agreement in Principle with Brookfield Property Group and Simon Property Group to Acquire Retail and Operating Assets

**Intends to Establish Separate "OpCo" and "PropCo" Entities to Maximize Value for Stakeholders and Maintain JCPenney Banner for Decades to Come**





**PLANO, Texas (Sept. 9, 2020)** – J. C. Penney Company, Inc. (OTCMKTS: JCPNQ) today announced that it has reached an agreement in principle to sell JCPenney through a court-supervised sale process. The Company plans to seek approval of a disclosure statement and, ultimately, confirmation of a plan of reorganization in parallel with the sale process. Related to the sale process, JCPenney expects to execute a "stalking horse" asset purchase agreement ("APA"), which will track an executed letter of intent, outlining the following:

Case 20-20182 Document 2052 Filed in TXSB on Page 38 of 45

- Brookfield Property Group ("Brookfield") and Simon Property Group ("Simon") intend to acquire substantially all of JCPenney's retail and operating assets ("OpCo") for $1.75 billion, which includes a combination of cash and new term loan debt.

- The agreement contemplates the formation of a separate real estate investment trust and a property holding company ("PropCos"), which will include 161 of the Company's real estate assets and all of its owned distribution centers. The PropCos will be owned by the Company's Ad Hoc Group of First Lien Lenders ("First Lien Lenders").

- The OpCo and PropCos will enter into a master lease with respect to the properties and distribution centers moved into the PropCos.

"We have determined that an agreement with Brookfield and Simon, as well as the formation of separate real estate investment trusts owned by our First Lien Lenders, is the best path forward to maximize value for our stakeholders, ensure we keep the most stores open and associates employed, and position JCPenney to build on our over 100-year history," said Jill Soltau, chief executive officer of JCPenney. "The interest in our operations reflects our Company's strength and our loyal customer base. It is a testament to the hard work and dedication of our talented associates and the progress we have made in implementing our Plan for Renewal to Offer Compelling Merchandise, Drive Traffic, Deliver an Engaging Experience, Fuel Growth, and Build a Results-Minded Culture."

Ms. Soltau continued, "As we continue to move through the sale process, our focus will remain on serving our customers and working seamlessly with our vendor partners. We have been a trusted partner to all of our stakeholders since 1902, and we expect to continue that track record for decades to come under the JCPenney banner."

Upon the execution of the APA, the agreement will be binding on Brookfield, Simon, and the First Lien Lenders. JCPenney intends to file a motion seeking authorization from the U.S. Bankruptcy Court for the Southern District of Texas (the "Court") to conduct an auction pursuant

to Section 363 of U.S. Bankruptcy Code. Accordingly, the motion is expected to set out the proposed bidding procedures for the auction, with Brookfield, Simon, and the First Lien Lenders serving as the "stalking horse bidder," designed to achieve the highest or otherwise best offer for the benefit of JCPenney's stakeholders.

It is anticipated that the Company will complete the auction and emerge from the Court-supervised process operating under the JCPenney banner in advance of the 2020 holiday season.

## Additional Information

As previously announced, JCPenney entered into a restructuring support agreement with lenders holding approximately 90 percent of its first lien debt to reduce the Company's outstanding indebtedness and strengthen its financial position. To implement the financial restructuring plan, the Company filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

Additional information regarding JCPenney's financial restructuring is available at jcprestructuring.com. Court filings and information about the claims process are available at cases.primeclerk.com/JCPenney, by calling the Company's claims agent, Prime Clerk, toll-free at 877-720-6576, or by sending an email to JCPenneyinfo@primeclerk.com.

## Advisers

Kirkland & Ellis LLP is serving as legal adviser, Lazard is serving as financial adviser, and AlixPartners LLP is serving as restructuring adviser to the Company.

## Forward-Looking Statements

The Company has included statements in this communication that may constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "expect" and similar expressions identify forward-looking statements, which include, but are not limited to, statements regarding sales, cost of goods sold, selling, general and administrative expenses, earnings, cash flows and liquidity. Forward-looking statements are based only on the Company's current assumptions and views of future events and financial performance. They are subject to known and unknown risks and uncertainties, many of which are outside of the Company's

control that may cause the Company's actual results to be materially different from planned or expected results. Those risks and uncertainties include, but are not limited to, risks attendant to the bankruptcy process, including the Company's ability to obtain court approval from the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Company and its subsidiaries' Chapter 11 cases (the "Chapter 11 Cases"); the ability of the Company to negotiate, develop, confirm and consummate a plan of reorganization; the effects of the Chapter 11 Cases, including increased legal and other professional costs necessary to execute the Company's reorganization, on the Company's liquidity (including the availability of operating capital during the pendency of the Chapter 11 Cases), results of operations or business prospects; the effects of the Chapter 11 Cases on the interests of various constituents; the length of time that the Company will operate under Chapter 11 protection; risks associated with third-party motions in the Chapter 11 Cases; Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general; conditions to which any debtor-in-possession financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside the Company's control; general economic conditions, including inflation, recession, unemployment levels, consumer confidence and spending patterns, credit availability and debt levels; changes in store traffic trends; the cost of goods; more stringent or costly payment terms and/or the decision by a significant number of vendors not to sell the Company merchandise on a timely basis or at all; trade restrictions; the ability to monetize non-core assets on acceptable terms; the ability to implement the Company's strategic plan, including its omnichannel initiatives; customer acceptance of the Company's strategies; the Company's ability to attract, motivate and retain key executives and other associates; the impact of cost reduction initiatives; the Company's ability to generate or maintain liquidity; implementation of new systems and platforms; changes in tariff, freight and shipping rates; changes in the cost of fuel and other energy and transportation costs; disruptions and congestion at ports through which the Company imports goods; increases in wage and benefit costs; competition and retail industry consolidations; interest rate fluctuations; dollar and other currency valuations; the impact of weather conditions; risks associated with war, an act of terrorism or pandemic; the ability of the federal

government to fund and conduct its operations; a systems failure and/or security breach that results in the theft, transfer or unauthorized disclosure of customer, employee or Company information; legal and regulatory proceedings; the Company's ability to access the debt or equity markets on favorable terms or at all; risks arising from the delisting of the Company's common stock from the New York Stock Exchange; and the impact of natural disasters, public health crises or other catastrophic events on the Company's financial results, in particular as the Company manages its business through the COVID-19 pandemic and the resulting restrictions and uncertainties in the general economic and business environment. Please refer to the Company's Annual Report on Form 10-K for the year ended February 2, 2020, and quarterly reports on Form 10-Q filed subsequently thereto, for a further discussion of risks and uncertainties. There can be no assurances that the Company will achieve expected results, and actual results may be materially less than expectations. Investors should take such risks into account and should not rely on forward-looking statements when making investment decisions. Any forward-looking statement made by the Company in this communication is based only on information currently available to it and speaks only as of the date on which such statement is made. The Company does not undertake to update these forward-looking statements as of any future date.

**Media Relations:**
Dione Martin
(972) 431-3400 or jcpnews@jcp.com; Follow us @jcpnews

Meaghan Repko / Jed Repko / Dan Moore
Joele Frank Wilkinson Brimmer Katcher
(212) 355-4449

**Investor Relations:**
(972) 431-5500 or jcpinvestorrelations@jcp.com

**About JCPenney:**
J. C. Penney Company, Inc. (OTCMKTS: JCPNQ), one of the nation's largest apparel and home retailers, combines an expansive footprint of stores across the United States and Puerto Rico with a powerful eCommerce site, jcp.com, to deliver style and value for all hard-working American families. At every touchpoint, customers will discover

# EXHIBIT C

To: Dunne, Dennis[DDunne@milbank.com]; ALeblanc@milbank.com[ALeblanc@milbank.com]; Reimer, Eric[EReimer@milbank.com]
Cc: Yenamandra, Aparna[aparna.yenamandra@kirkland.com]; David S. Kurtz (david.kurtz@lazard.com)[david.kurtz@lazard.com]; Marcus, Christopher[cmarcus@kirkland.com]
From: Sussberg, Josh[/O=KIRKLAND-ELLIS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOSHUA SUSSBERG]
Sent: Fri 9/11/2020 8:00:18 AM Central Daylight Time
Subject: FW: JCP -Marked TS/Illustrative recovery analysis
Attachment: Illustrative Credit Bid Exhibit.pdf
Attachment: JCP Credit Bid Term Sheet-4842-4103-9561-v10-4823-7561-5178-v3.docx
Attachment: Redline - JCP Credit Bid Term Sheet-4842-4103-9561-v10-4823-7561-5178-v1 and JCP Credit Bid Term Sheet-4842-4103-9561-v10-4823-7561-5178-v3.pdf

This is from the Akin group. I am sure this is inconsistent with how Brigade has been pushing the recovery to the DIP. We understand the DIP is trading at 170 and the prepetition traded down to 30.

This deal, and all of our trade partners who we have spent the last few days reenergizing, will fall apart in the face of an over the top pleading from Akin. And notwithstanding this, Akin has made comments that if they cannot get fair and equitable treatment and the deals fails and people get zero, so be it.

We understand Milbank has advised the steering committee that there are good arguments to support the treatment proposed in the credit bid term sheet. I personally do not see it and think the Judge is having buyer's remorse over the roll-up; as soon as he hears about this (Akin intends to raise Monday), we open up a huge can of worms. The Committee is already focused on issues relating to the DIP and the total amount of cash received vs roll-up, having mused many times that it may seek to take another look at the order.

Absent engagement and resolution today/over the weekend, we are going to reach out to chambers to line up Judge Isgur to mediate this early next week. We simply can't get let greed stand in the way of 70,000 jobs.

Josh Sussberg, P.C.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
KIRKLAND & ELLIS LLP
601 Lexington Avenue, New York, NY 10022
T +1 212 446 4029 M +1 646 522 3223
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
jsussberg@kirkland.com

From: Dublin, Philip <pdublin@AkinGump.com>
Sent: Thursday, September 10, 2020 3:13 PM
To: Sussberg, Josh <jsussberg@kirkland.com>; Yenamandra, Aparna <aparna.yenamandra@kirkland.com>; Kurtz, David (External) <david.kurtz@lazard.com>; Mesterharm, Jim <JMesterharm@alixpartners.com>; DPaganis@alixpartners.com; Weitz, Michael <michael.weitz@lazard.com>; Tempke, Christian <christian.tempke@lazard.com>
Cc: *idizengoff@akingump.com <idizengoff@akingump.com>; Fisher, Daniel <dfisher@akingump.com>; Badini, Doug <dbadini@akingump.com>
Subject: JCP -Marked TS/Illustrative recovery analysis
Subject to FRE 408
For Discussion and Settlement Purposes Only

Attached, subject to further internal and client review and comment in all respects, is a marked version of the Credit Bid Term Sheet reflecting the construct that we discussed earlier today that we believe would provide the opportunity for a fair and equitable recovery to the holders of DIP and 1L claims. Also attached is an illustrative recovery analysis based on the Credit Bid term sheet and the Company's cleansing information showing the material overpayment to the DIP Lenders under the Credit Bid term sheet. Please let us know when you are available to discuss. Thanks, Phil

**Philip C. Dublin**
**AKIN GUMP STRAUSS HAUER & FELD** LLP
One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.8083 | Internal: 38083
Fax: +1 212.872.1002 | pdublin@akingump.com | akingump.com | Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT D

On Nov 13, 2023, at 4:2

Kinney, Brian

<BKinney@milbank.con

We provided the information regarding

separate email, which Mr. Moore then

on.  Here are the questions and respo

1. What is the dollar amount per $1,00

PropCo, New Term Loan and Earn-ou

1st Lien Minority Group members?

All holders received 10 Earnout certifi

certificates, and $520 in principal take