United States Courts
Southern District of Texas
FILED
AUG 11 2025
Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ERIC LYNDELL MOORE

Plaintiff,

v.

JACKSON WALKER LLP; COPPER PROPERTY CTL PASS THROUGH TRUST; PENNEY INTERMEDIATE HOLDINGS LLC; H/2 CAPITAL PARTNERS LLC; BRIGADE CAPITAL MANAGEMENT, LP; SILVER POINT CAPITAL, L.P.; OWL CREEK ASSET MANAGEMENT, L.P., ONYX PARTNERS, LLC[1]

Defendants.

C.A. No. 4:25-cv-02752

# PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

[1] Certain parties have not been named as defendants at this time as some may have already settled or are expected by Plaintiff Eric L. Moore to settle in the near future. This is not an exhaustive list of DIP Lenders who were overpaid or who misappropriated assets belonging to other J.C. Penney creditors.

**TABLE OF CONTENTS**

INTRODUCTION .......... 1
PARTIES .......... 3
STANDING .......... 5
JURISDICTION AND VENUE .......... 5
FACTUAL BACKGROUND .......... 5
The Unnecessary DIP Facility .......... 5
Rejection of Superior Offers for the DIP Facility, OpCo, and PropCo.......... 7
The DIP Facility .......... 7
The OpCo Assets .......... 8
The PropCo Assets .......... 8
Selection of Inferior Offer Reflects Coordinated Scheme.......... 10
Cancellation of the Auction .......... 11
The Settlement Agreement, Valuation, and Distribution of Assets.......... 12
Value of the Debtors' Assets .......... 12
The Settlement Agreement .......... 14
Events Surrounding the Improper Distribution of Estate Assets.......... 16
Defendant's Planned Sale of Encumbered Assets .......... 18
CLAIMS FOR RELIEF .......... 19
Count I – Declaratory Judgment: Fair Market Value of PropCo Real Estate Was Determined to Be $1.93 Billion by the PropCo Trustee.......... 19
Count II – Declaratory Judgment: Unequal Distribution of the PropCo Securities, New Term Loan, Earn-Out, and Cash Distributions Violates § 1123(a)(4) .......... 22
Count III – Declaratory Judgment: Improper Collateral Valuation in Violation of the Settlement Agreement and *T-H New Orleans* (5th Cir. 1997), and Confirmation That Plaintiff's Liens Survive Any Sale or Transfer .......... 25
Count IV – Declaratory Judgment: Non-Pro Rata Distribution of OpCo Assets to Defendant Penney Intermediate Holdings Without Consideration Constitutes a Liquidation, Not a Sale, in Violation of 11 U.S.C. §§ 1123(a)(4),1129(b)(2).... 27
Count V – Declaratory Judgment: Undisclosed Uptier Transaction Violates Distribution Requirement Confirmed by *Serta Simmons* (5th Cir. 2024) .......... 32
Count VI – Declaratory Judgment: Distributions Under the Pre-Plan Settlement Violate *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984) .......... 34

Table of Contents - continued:

PRAYER FOR RELIEF ........ 40

DEMAND FOR JURY TRIAL ........ 42

CERTIFICATE OF SERVICE ........ 43

# TABLE OF AUTHORITIES

## CASES

| | Page(s) |
|---|---|
| *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455 (5th Cir. 2012) | 36, 37 |
| *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986) | 23, 24 |
| *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997) | 20 |
| *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984) | 1–2, 28, 30-31, 34–35, 41 |
| *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015) | 36 |
| *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) | 20 |
| *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967) | 21 |
| *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) | 12, 35, 41 |
| *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir. 1980) | 30 |
| *In re eToys, Inc.*, 331 B.R. 176 (Bankr. D. Del. 2005 ) | 37 |
| *In re Keller Fin. Servs.*, 243 B.R. 806 (Bankr. N.D. Ill. 2000) | 37 |
| *In re Littleton*, 888 F.2d 90 (11th Cir. 1989) | 30 |
| *Matter of VCR I, LLC*, 922 F.3d 323 (5th Cir. 2019) | 10 |
| *In re Moore*, 608 F.3d 253 (5th Cir. 2010) | 10 |

Cases - continued:


*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) .......... 24, 28

*In re Serta Simmons Bedding, LLC,*
81 F.4th 1284 (5th Cir. 2024) .......... 1, 2, 32–34, 41

*In re Stembridge*,
394 F.3d 383 (5th Cir. 2004) .......... 20

*In re T-H New Orleans Ltd. Partnership*,
116 F.3d 790 (5th Cir. 1997) .......... 2, 20, 25, 27, 30, 41

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013) .......... 24, 27


**STATUTES AND RULES**


Bankruptcy Code, 11 U.S.C.:

§ 101(14) .......... 3, 35-36, 40, 41

§ 327 .......... 3, 35-37, 40–41

§ 363(k) .......... 16

§ 363(m) .......... 3, 19, 42

§ 506(a) .......... 20–21, 25, 27, 40

§ 726(b) .......... 28–29

§ 1101 .......... 36

§ 1106 .......... 3, 35, 36, 40–41

§ 1107 .......... 3, 35, 36, 40–41

§ 1123(a)(4) .......... 2, 22, 23, 24, 27, 31, 41

§ 1129(a)(8) .......... 15, 38

§ 1129(b)(2) .......... 2, 27, 28, 31, 41

§ 1322(a)(3) .......... 29

Statutes and Rules – continued:

Bankruptcy Code, 15 U.S.C.:

§ 77q (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) ........ 11

§ 77x (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) ........ 11

Bankruptcy Code, 18 U.S.C.:

§ 2 (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) ........ 11

§ 152 (referenced in discussion of defendants' concealment of estate assets in this case) ........ 35, 39

§ 152(6) (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) ........ 11

§ 1343 (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) ........ 11

§ 1512 (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) ........ 11

Bankruptcy Code, 28 U.S.C.:

§ 1331........ 5

§ 1332........ 5

§ 1391(b)........ 5

§ 2201........ 5, 19, 22, 24, 26, 31, 34, 35, 40

§ 2202........ 5, 19, 22, 24, 26, 31, 34, 35, 40

Fed. R. Bankr. P. 2014(a)........ 3, 3637, 40–41

**OTHER AUTHORITIES**


Bankruptcy Filings - *In re J.C. Penney Co. Inc.*, No 20-20182 (Bankr. S.D. Tex)

Dkt. 452 – Declaration and Expert Report of James A. Mesterharm................. 6

Dkt. 513-1 – JCPenney Request for Financing Proposal............................... 15

Dkt. 563 – DIP Hearing Transcript....................................................... 7

Dkt. 566 – DIP Order.................................................................................. 6

Dkt 1401 – Auction Cancellation......................................................................... 11

Dkt. 1408 – Order Directing Settlement Conference................................................ 12

Dkt. 1454 – Declaration and Expert Report of William K. Snyder.......................... 13-15

Dkt 1552 – Wind-Down Debtors' Objection to Eric L. Moore's Motion for Judicial Notice....................................................................................................... 13

Dkt 1647-1 – Disclosure Statement.............................................................. 5, 14, 21–22

Dkt 1668-1 – Asset Purchase Agreement.............................................................. 20, 21, 29

Dkt. 1789 – Statement of the Official Committee of Unsecured Creditors in Support of the Debtors' Sale Motion........................................................................ 28

Dkt. 1814 – Sale Order and Settlement Agreement....................... 3, 14, 20-21, 25-26, 35, 41

Dkt. 1822 – Sale Hearing Transcript...................................................................... 6, 15

Buccola, Vincent S.J. & Greg Nini,

*The Loan Market Response to Dropdown and Uptier Transactions*, 53 J. Legal Stud. 489 (2024) .............................................................................................. 33

Case Status Update (presented to the court, Nov. 1, 2023) ........................................... 30, 33

Confidential internal email excerpt, Dkt. 1635-1, at 2 (Exhibit C) ................................ 11

Other Authorities – continued:

*Copper Property CTL Pass Through Trust Announces Binding Purchase and Sale Agreement for Sale of Portfolio* (Press Release, July 25, 2025) .................................... 18

Email from counsel for Defendant Copper Property Trust to Plaintiff (Nov. 13, 2023) (Exhibit D) .................................................................................................... 23, 33

Hr'g Tr., Aug. 19, 2020, at 18:16–22 (Debtors' counsel rejecting $8.4 Billion valuation) .................................................................................................... 16

Hr'g Tr., Nov. 1, 2023 (Debtors alleging only $1 Billion to distribute) ........................ 30, 33

Indenture dated June 23, 2016, by and among J. C. Penney Corporation, Inc., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as Trustee, relating to $500,000,000 of 5.875% Senior Secured Notes due 2023.............................. 20

Indenture dated Mar. 12, 2018, by and among J.C. Penney Corp., Inc., the Guarantors party thereto, and Wilmington Trust, N.A., as Trustee, relating to $400,000,000 8.625% Senior Secured Second Priority Notes due 2025 .......................................................... 20

J.C. Penney Company, Inc. Form 8-K, Ex. 99.1 (Sept. 10, 2020) (Disclosure Materials), (Exhibit A) ........................................................................................ 6, 9, 13-15, 17,

*JCPenney Reaches Agreement in Principle with Brookfield Property Group and Simon Property Group to Acquire Retail and Operating Assets* (Press Release, Sept. 9, 2020), (Exhibit B) .................................................................................................... 8, 30

Unglesbee, Ben,

*J.C. Penney Signs Deal to be Taken Over by Landlords Simon and Brookfield*, Retail Dive (Oct. 29, 2020) .................................................................................... 29

Nani, James,

*Jackson Walker Lawyers Spoke of Secret Judge Romance, Texts Show*, Bloomberg Law (Oct. 9, 2024) .................................................................................... 37

Nani, James,

*Judge's Girlfriend Texts Indicate JCPenney Bankruptcy Maneuver*, Bloomberg Law (Oct. 17, 2024) .................................................................................... 16

Penney Intermediate Holdings LLC, Consolidated Financial Statements,

(Jan. 30, 2021) .................................................................................... 15, 30

Other Authorities – continued:

*Pro Rata*, Black's Law Dictionary (11th ed. 2019) .......... 28

Recovery Analysis Chart excerpted from Disclosure Materials (Sept. 2020) .......... 9

"Standardizing and Unbundling the Sub Rosa DIP Loan," *Emory Bankruptcy Developments Journal* (July 15, 2023) .......... 7

*United States v. Daniel Kamensky*, 1:21-cr-00067 (S.D.N.Y. 2020) (referenced in discussion of criminal charges arising from the Neiman Marcus bankruptcy fraud case) .......... 11, 28

*Uptier Exchange Transactions: Lawful Innovation or Lender-on-Lender Violence?*, 40 Yale J. Reg. 408 (2023) .......... 33

## I. INTRODUCTION

Plaintiff Eric Lyndell Moore ("Plaintiff") files this Second Amended Complaint and respectfully alleges as follows:

1. This action seeks declaratory relief arising from an undisclosed "Uptier Transaction" orchestrated by Defendant Jackson Walker. Through this collusive arrangement, the DIP Lender Defendants misappropriated billions of dollars in cash and assets from the J.C. Penney estate. A similar, but transparent, Uptier Transaction was recently held impermissible by the Fifth Circuit in its *Serta* decision.[1]

2. Defendants Brigade Capital and H/2 Capital spearheaded the scheme, using a pre-plan Settlement Agreement as the vehicle to divert funds far exceeding their legal entitlements to themselves and fellow DIP Lenders, including Defendants Silver Point Capital and Owl Creek Asset Management. This conduct directly violates the Fifth Circuit's ruling in *Aweco*.[2]

3. Defendants now possess collateral—and/or its proceeds—that secure the 1st Lien and 2nd Lien Bonds held by Plaintiff and other stakeholders. Defendant Onyx Partners, LLC has agreed to acquire this property and is therefore properly joined as a Defendant.

4. Plaintiff seeks judicial declarations that:

   a. the value of the secured creditors' collateral must be determined based on fair market value, and that the credit bid amount does not control or establish that value;

[1] In *Serta*, the Uptier Transaction was disclosed, giving affected creditors a meaningful opportunity to object and assert their rights. By contrast, here it was concealed, depriving stakeholders of due process and enabling the wrongful diversion of estate assets without challenge. See *In re Serta Simmons Bedding, LLC,* 81 F.4th 1284 (5th Cir. 2024)

[2] See *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) (holding that a bankruptcy court abuses its discretion if it authorizes a settlement which violates the absolute priority rule)

b. the unequal distribution of PropCo Securities, New Term Loan proceeds, Earn-Out Certificates, and PropCo Closing Cash between holders of DIP Claims and Class 4 First Lien Claims violates 11 U.S.C. § 1123(a)(4);[3]

c. the collateral valuation and resulting cash, New Term Loan and PropCo Securities distributions in this case violated both the terms of the pre-plan Settlement Agreement and the legal standard for treatment of secured creditors in a private sale established in *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997), and Plaintiffs' liens remain valid and enforceable against the collateral and its proceeds;

d. the transfer of $5.2 billion in the Debtors' OpCo assets to unsecured creditor Defendant Penney Intermediate Holdings, for zero consideration—while leaving 1st Lien and Term Loan and 2nd Lien Secured Creditors unpaid—constitutes a non-pro rata liquidation of the Debtors' assets, in violation of the absolute priority rule under 11 U.S.C. §§ 1129(b)(2) and 1123(a)(4);

e. the undisclosed "uptier" distribution scheme executed in the J.C. Penney bankruptcy violates the Fifth Circuit's holding in *In re Serta Simmons Bedding, LLC,* 81 F.4th 1284 (5th Cir. 2024);

f. distributions arising from the pre-plan Settlement Agreement violate the absolute priority rule as articulated in *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984).

[3] 11 U.S.C. § 1123(a)(4) requires equal treatment for all members of the same creditor class unless a claimant affirmatively accepts less favorable treatment.

g. Defendant Jackson Walker breached its fiduciary duty to creditors under 11 U.S.C. §§ 101(14), 327, 1106, 1107, and Rule 2014(a) by acting in a manner adverse to the estate and its stakeholders.

h. Defendant Onyx Partners, LLC is not entitled to the protections of a good-faith purchaser under 11 U.S.C. § 363(m), as it has both constructive and actual notice of this action, and of the fact that the liens held by the 1st Lien and Term Loan creditors remain valid and continue to encumber the PropCo assets at issue.[4]

## II. PARTIES

5. Plaintiff is an individual residing in the City of San Diego, San Diego County, California.

6. Defendant Jackson Walker LLP ("Jackson Walker") is a law firm authorized to do business in the State of Texas.

7. Defendant Copper Property CTL Pass Through Trust ("Copper Property Trust") is a real estate investment trust with a business address at 3 Second Street, Suite 206, Jersey City, New Jersey 07311.[5]

8. Defendant Penney Intermediate Holdings LLC ("Penney Intermediate") is majority co-owned and controlled by Simon Property Group ("Simon") and Brookfield Properties ("Brookfield").[6] These affiliated entities maintain principal business addresses at 225 West

[4] Pursuant to the Bankruptcy Court's orders, the 1st Lien and Term Loan Creditors' liens remain valid and continue to encumber the PropCo and OpCo assets at issue. The Settlement Agreement references, "...outstanding Term Loan Obligations and First Lien Obligations, which obligations are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law." (Dkt. 1814, at 9) (Underline added)

[5] This trust was created to receive lease payments and to liquidate roughly 160 properties owned by J.C. Penney and leased back to Defendant Penny Intermediate Holdings.

[6] Simon and Brookfield established Penny Intermediate Holdings to receive OpCo, the Debtors' operating company. During the bankruptcy, Simon and Brookfield took possession and control of J.C. Penney's operating company and now operate through Penney Intermediate as its successor entity. Penney Intermediate is the lessee of approximately 160 real estate properties spun off into Copper Property Trust, and continues to make lease payments to Copper Property Trust pursuant to a sale-leaseback arrangement structured during the bankruptcy.

Washington Street, Indianapolis, Indiana 46204, and 250 Vesey Street, 15th Floor, New York, New York 10281, respectively.

9. Defendant H/2 Capital Partners LLC ("H/2") is a hedge fund that served as a debtor-in-possession (DIP) lender to J.C. Penney and is a co-owner of Copper Property Trust. Its business address is 680 Washington Boulevard, Stamford, Connecticut 06901.

10. Defendant Brigade Capital Management, LP ("Brigade") is a hedge fund that served as a DIP lender to J.C. Penney and is a co-owner of Copper Property Trust. It is located at 399 Park Avenue, Suite 1600, New York, New York 10022.

11. Defendant Silver Point Capital, L.P. ("Silver Point") is a hedge fund that served as a DIP lender to J.C. Penney and is a co-owner of Copper Property Trust. Its business address is 20 Horseneck Lane, Suite 6300, Greenwich, Connecticut 06830.

12. Defendant Owl Creek Asset Management, L.P. ("Owl Creek") is a hedge fund that served as a DIP lender to J.C. Penney and is a co-owner of Copper Property Trust. Its business address is 640 Fifth Ave, Floor 20, New York, New York 90019.

13. Defendant Onyx Partners, LLC ("Onyx Partners") is a private equity firm that has entered into a contract to purchase property encumbered by the liens of Plaintiff and proposed intervening parties. Onyx Partners maintains its principal place of business at 220 Reservoir Street, Suite 3, Needham, Massachusetts 02494.

14. Plaintiff respectfully requests that citation be issued at this time for all Defendants.

## III. STANDING

15. Plaintiff and proposed intervening parties, Michael Wachs and Barnett Capital,[7] have standing to bring this action as the beneficial owners of J.C. Penney 1st Lien Secured Bonds, 2nd Lien Secured Bonds and Unsecured Bonds.[8]

## IV. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over the lawsuit under 28 U.S.C. § 1331 and/or § 1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

17. Declaratory relief is sought pursuant to the Federal Declaratory Judgment Act 28 U.S.C. § § 2201, 2202.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) because Jackson Walker has a principal Texas office in Houston, Texas, and the majority of the actions give rise in the Southern District.

19. A substantial portion of the acts and omissions underlying this claim occurred in Houston, Texas, and are properly subject to adjudication in the Southern District of Texas.

## V. FACTUAL BACKGROUND

**The Unnecessary Dip Facility**

20. On May 15, 2020, J.C. Penney and its subsidiaries filed for Chapter 11 bankruptcy listing over $8 Billion in assets, including $475 Million in cash. The company had no near-term debt due and had another $1.25 Billion in liquidity, bringing its cash total to more than $1.7 Billion as of the Petition Date.

---

[7] Barnett Capital and Michael Wachs, who have proposed to intervene, together with Plaintiff, collectively hold approximately $330 Million in 1st and 2nd Lien Bonds and Unsecured Bonds.

[8] Plaintiff and the proposed intervening parties hold bonds entitled to distributions from PropCo under the Chapter 11 Plan. As the Plan provides: "Pursuant to the Plan, on the Effective Date, the Debtors will transfer all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities to PropCo, on behalf of the Holders of DIP Loans and Class 4 First Lien Claims." See Dkt. 1647-1 at 70. See Dkt. 1647-1 at 70.

21. The Debtors had such a strong cash and liquidity position that they did not need, or apply for, a DIP loan on the first day. In fact, they did not require a DIP loan at any point during the proceedings.[9]

22. On or about June 2, 2020, James Mesterharm of Alix Partners, acting as the Debtors' restructuring advisor, filed a misleading expert report, falsely claiming that the Debtors were strapped for cash and required a DIP loan. In that report, Mr. Mesterharm asserted that the $475 Million in cash the Debtors held at the time of filing was insufficient to fund operations.[10] However, he failed to disclose that the Debtors had an additional $1.25 Billion in cash drawn from the ABL, and remained in possession of their operating company which was both cash-flow and income-statement positive.[11]

23. As of May 15, 2020, the Petition Date, despite having $1.725 Billion in cash, and roughly $2 Billion in inventory, the Debtors entered into a DIP loan agreement with certain of their 1st Lien and Term Loan Secured Holders.[12]

---

[9] By the time the Debtors actually drew on the DIP, their unrestricted cash position had increased to $913 Million (in addition to the $1.25 Billion from the draw on the asset-based lending (ABL) facility) See *Sale Hearing Transcript*, Dkt. 1822, at 47-48; See also J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials"), as filed with the U.S. Securities and Exchange Commission (SEC) (also attached hereto as Exhibit A)

[10] See *Declaration and Expert Report of James A. Mesterharm in Support of the Debtors' Motion for Entry of a Final Order Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code*, Dkt. 452

[11] The DIP loan that Mr. Mesterharm promoted was unnecessary as the Debtors had over $1.7 Billion in Liquidity, $2 Billion in inventory, and no near term debt due. By June of 2020 when Mr. Mesterharm made these statements, the Debtors were returning to historical EBITDAS and were referred to as "a cash machine" by CR3 Partners' William Snyder. He testified, "J.C. Penney makes over $300 million on their credit cards. They make almost $300 million on their online business. They don't have to make money at the stores. They can just break even at the stores, and they make $600 million a year...by the end of June, they had generated $900 million...And they were positive cash flow. And they were positive income statement and they had a business plan that made sense." *Sale Hearing Transcript*, Dkt. 1822, at 273-274

[12] This DIP loan was secured by the Debtors' $475 Million in cash, $1.4 Billion in previously unencumbered real estate, and substantially all other assets of the estate. See Dkt. 566.

**Rejection of Superior Offers for the DIP Facility, OpCo, and PropCo**

*The DIP Facility*

24. The accepted DIP agreement was markedly inferior to competing proposals. One group of 1st Lien Bondholders offered a DIP loan with substantially more favorable terms—including a lower interest rate and no roll-up.[13] Yet, the only DIP loan the parties were willing to accept came from the Defendant DIP Lenders. That loan required a $450 Million roll-up of their own 1st Lien and Term Loan Secured debt into DIP debt, plus an additional $450 Million placed in escrow—totaling $900 Million in DIP financing.[14] This structure was not chosen for the estate's benefit, but rather as a critical element of Defendants' broader scheme to capture and control the Debtors' assets.

25. The impropriety of the DIP loan in this case was so pronounced that it became the subject of scholarly analysis, highlighting how non-standard, bundled DIP loan structures can be strategically weaponized to subvert creditor priorities:

> In [the J.C. Penney] case, a DIP loan tied to a restructuring support agreement allowed a majority group to prime a minority group, roll up undersecured debt, and control the allocation of payoffs in the case. We find that a standardized, unbundled DIP loan would have required an interest rate of at least 545% to give the majority group the same payoff it received in the case. We argue that courts should revive and strengthen standardization and unbundling norms. This would better defend priorities by encouraging competition and increasing transparency of DIP loan terms.

*—Excerpt from "Standardizing and Unbundling the Sub Rosa DIP Loan," Emory Bankruptcy Developments Journal (July 15, 2023)*

---

[13] See In re J.C. Penney Co., Inc., Case No. 20-20182 (DRJ) (Bankr. S.D. Tex.), June 4, 2020, Hr'g Tr. [Docket No. 563] (the "DIP Hr'g Tr.") 14:13-19 (Debtors' counsel describing the competing DIP proposal as "unquestionably better on its face. Better from a terms perspective. It's less expensive. There is no rollup. The milestones are relaxed . . .[The] proposal does not force a potential sale. And again, all of the fees are very much different."); id. at 160:8 (Court describing, in approving the DIP Facility, that it was nonetheless "highly objectionable"). See also Dkt. 1532, at 10, Footnote 12

[14] The first $225 Million drawn on the DIP loan was never needed, and the second $225 Million was never even drawn, but sat in an escrow account on which the DIP Lenders received interest.

*The OpCo Assets*

26. On September 9, 2020, the Debtors announced they had an agreement in principle with Defendants Simon and Brookfield to purchase the OpCo assets for $1.75 Billion:

> Brookfield Property Group ("Brookfield") and Simon Property Group ("Simon") intend to acquire substantially all of JCPenney's retail and operating assets ("OpCo") for $1.75 billion, which includes a combination of cash and new term loan debt...Upon execution of the APA, the agreement will be binding on Brookfield, Simon, and the First Lien Lenders. JCPenney intends to file a motion seeking authorization from the U.S. Bankruptcy Court for the Southern District of Texas (the "Court") to conduct an auction pursuant to Section 363 of U.S. Bankruptcy Code. Accordingly, the motion is expected to set out the proposed bidding procedures for the auction, with Brookfield, Simon, and the First Lien Lenders serving as the "stalking horse bidder," designed to achieve the highest or otherwise best offer for the benefit of JCPenney's stakeholders.

*See J.C. Penney press release dated September 9, 2020 (attached hereto as Exhibit B).*

*The PropCo Assets*

27. On September 11, a competing group of 1st Lien and Term Loan Secured Holders made an offer that would have provided a 57% recovery to that class:

**CONFIDENTIAL**
**SUBJECT TO FRE 408**
**FOR DISCUSSION PURPOSES ONLY /**
**SUBJECT TO MATERIAL CHANGE**

**Transaction Recoveries Analysis**
***First Lien Minority Lender Group Proposal***

MOELIS & COMPANY

| *($ in millions)* | Distributable Value |
|---|---|
| Cash to Lenders (post-OpCo Sale) | $ 300 |
| OpCo Sale Take Back 1L Debt | 500 |
| PropCo Sale Cash | 1,000 |
| LiquidationCo | [TBD] |
| **Total** | **$ 1,800** |

| | Claims | % of Class | Recovery | % Recovery |
|---|---|---|---|---|
| **DIP Facility** | | | | |
| DIP Lender Group | $ 844 | 93.8% | $ 844 | 100.0% |
| Minority Lender Group | 56 | 6.2% | 56 | 100.0% |
| **Total** | **$ 900** | **100.0%** | **$ 900** | **100.0%** |
| ***Distributable Value Remaining*** | | | ***$ 900*** | |
| **1L Debt** | | | | |
| DIP Lender Group | $1,177 | 74.9% | $ 674 | 57.3% |
| Minority Lender Group | 304 | 19.4% | 174 | 57.3% |
| Other 1L Lenders | 90 | 5.7% | 52 | 57.3% |
| **Total** | **$1,571** | **100.0%** | **$ 900** | **57.3%** |

Note: Based on disclosed First Lien Minority Group holdings as of 9/18/20

[3]

*(Excerpt from Debtors' Disclosure Materials; boxed annotations added for reference)*

28. This better offer was for $1 Billion <u>for just the Debtor's PropCo assets.</u>[15] Additionally, this offer would have yielded an actual recovery of at least $2 Billion, as the Debtors' $1 Billion in unrestricted cash would have been distributed to creditors in accordance with the absolute priority rule. This offer was double the $1 Billion offer from the Defendant DIP Lenders—for both PropCo and OpCo.[16]

---

[15] See Summary Term Sheet from the Disclosure Materials, J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1.
[16] See Dkt. 1532.

29. By September 11, 2020, the Debtors had received offers totaling $3.75 Billion for their OpCo and PropCo assets. Notably, the $1.75 Billion OpCo offer was intended to serve as a stalking horse bid—meant to initiate a competitive auction process and attract higher bids.

**Selection of Inferior Offer Reflects Coordinated Scheme**

30. The fundamental purpose of a bankruptcy sale is to maximize value for the benefit of the debtor's estate and its creditors. See, e.g., *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("As a general matter, the [debtor in possession] must demonstrate that the proposed sale price is the highest and best offer[.]"). Upon information and belief, by early September 2020, the Debtors had received competing offers exceeding $4 billion for their OpCo and PropCo assets. These offers far surpassed the amount ultimately accepted.

31. Nevertheless, Defendant Jackson Walker, acting in collusion with the DIP Lenders, accepted a $1 Billion offer from Defendant Copper Property Trust—an offer worth less than the cash the Debtors already had on hand. This offer plainly failed to meet the standard of being the "highest and best." It provided just an 8% recovery to 1st Lien and Term Loan Secured Holders, while delivering an *undisclosed* recovery exceeding 700% to the DIP Lenders.[17]

32. This inferior outcome was not the result of sound business judgment or a legitimate competitive process. Instead, the lower offer prevailed due to a pattern of intimidation, collusion, and threats of retaliation. These tactics distorted the sale process, prevented meaningful competition, and served only to enrich the DIP Lenders at the expense of other creditors.

33. Defendant Jackson Walker rejected all higher and better offers because it was cooperating with Defendants H/2 and Brigade Capital who had devised a plan to rig the bidding and sale process and secretly divert and misappropriate billions of dollars belonging to other creditors in

[17] The law is well established that, to receive approval of a proposed sale of assets, a debtor must demonstrate that the proffered purchase price is the highest and best offer. *See e.g., Matter of VCR I, LLC.,922 F.3d 323, 327* (5th Cir 2019).

favor of the DIP Lenders. The foundation of this illegal scheme is captured in an email in which the Debtors' co-counsel references Brigade "pushing recovery to the DIP:"


Case 20-20182 Document 1635-1 Filed in TXSB on 10/26/20 Page 2 of 2

To: Duron, Dennis[DDuron@milbank.com]; ALeblanc@milbank.com[ALeblanc@milbank.com]; Reimer, Eric[EReimer@milbank.com]
Cc: Yenamandra, Aparna[aparna.yenamandra@kirkland.com]; David S. Kurtz (davidkurtz@lazard.com)[david.kurtz@lazard.com]; Marcus, Christopher[cmarcus@kirkland.com]
From: Sussberg, Josh[/O=KIRKLAND-ELLIS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOSHUA SUSSBERG]
Sent: Fri 9/11/2020 8:00:18 AM Central Daylight Time
Subject: FW: JCP - Marked TS/Illustrative recovery analysis
Attachment: Illustrative Credit Bid Exhibit.pdf
Attachment: JCP Credit Bid Term Sheet-4342-4103-9561 v10-4823-7561-5178 v3.docx
Attachment: Redline - JCP Credit Bid Term Sheet-4342-4103-9561 v10-4823-7561-5178 v1 and JCP Credit Bid Term Sheet-4342-4103-9561 v10-4823-7561-5178 v3.pdf

This is from the Akin group. I am sure this is inconsistent with how Brigade has been pushing the recovery to the DIP. We understand the DIP is trading at 170 and the prepetition traded down to

this is inconsistent with how Brigade has been pushing the recovery to the DIP.

(*Excerpt from confidential internal email, Dkt. 1635-1, boxed annotation added for reference, magnification added for legibility, See Exhibit C*)[18]

34. This is similar to the criminal behavior that led to the indictment of Daniel Kamensky in the Neiman Marcus bankruptcy case—another case overseen by Judge David R. Jones with Defendant Jackson Walker representing the Debtor and Defendant Brigade Capital acting as purchaser.[19]

**Cancellation of the Auction**

35. The Debtors were scheduled to auction substantially all of their assets in a public sale on September 14, 2020—just three days after the higher PropCo offer, referenced in the email above, was received. However, on the very day the auction was set to occur, it was abruptly canceled without explanation.[20]

---

[18] See Dkt. 1635-1, at 2 (attached hereto as Exhibit C)
[19] In that case, Mr. Kamensky was charged with violations of 15 U.S.C. §§ 77q, 77x; 18 U.S.C. §§ 152(6), 1343, 1512 & 2. See *U.S. v. Daniel Kamensky*
[20] See Dkt. 1401, at, 2 (filed on Sept. 14, 2020) "PLEASE TAKE FURTHER NOTICE that the Auction will <u>not</u> be proceeding on September 14, 2020, and the Debtors reserve the right to hold the Auction on a later date."

36. In a legitimate bankruptcy sale process, competing groups proceed to an open auction, with the highest and best offer prevailing. Here, by contrast, the emergence of materially higher bids triggered a sudden shift: the sudden and unexplained cancellation of the auction.

37. Rather than allowing the competitive process to continue, the conspiring parties diverted the matter to mediation.[21] This deviation was a critical component of a broader scheme to avoid a competitive process, conceal asset valuations and unjustly enrich the DIP Lenders, while stripping other creditors of their rightful recoveries.[22]

**The Settlement Agreement, Valuation and Distribution of Assets**

*Value of the Debtors' Assets*

38. As of September 5, 2020, the Debtors reported total assets of $8.317 Billion in their Consolidated Balance Sheets filed with the U.S. Securities and Exchange Commission (SEC):

[21] See *Order Directing Settlement Conference*, Dkt. No. 1408 (filed Sept. 14, 2020)—the same date the auction was scheduled to occur.

[22] This is precisely the kind of end-run around creditor rights that the Supreme Court rejected in *Jevic*. See *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455–65 (2017). In *Jevic*, the Supreme Court struck down a proposed "structured dismissal" that would have distributed estate assets in violation of the Bankruptcy Code's priority rules. The Court held that such a scheme could not be approved simply because it was styled as a "settlement," warning that allowing parties to circumvent the Code's procedural safeguards in this manner would encourage them to make "similar claims" in future cases, thereby eroding the integrity of the bankruptcy process. Id. at 464-65, 470-71. That is exactly what occurred here: senior creditors and insiders used the guise of a supposed "settlement" reached through mediation to sidestep the competitive sale process and unlawfully exclude junior creditors—conduct *Jevic* expressly forbids.

**J. C. PENNEY COMPANY, INC.**
**(Debtor-in-Possession)**
**CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**

| *(In millions)* | September 5, 2020 | September 7, 2019 | February 1, 2020 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash in banks and in transit | $ 219 | $ 144 | $ 108 |
| Cash short-term investments | 663 | 8 | 278 |
| Restricted cash | 529 | — | — |
| Cash, cash equivalents and restricted cash | 1,411 | 152 | 386 |
| Merchandise inventory | 1,805 | 2,514 | 2,166 |
| Prepaid expenses and other | 533 | 304 | 174 |
| Total current assets | 3,749 | 2,970 | 2,726 |
| Property and equipment, net | 3,108 | 3,567 | 3,488 |
| Operating lease assets | 786 | 920 | 998 |
| Prepaid pension | 34 | 169 | 120 |
| Other assets | 640 | 661 | 657 |
| **Total assets** | $ 8,317 | $ 8,287 | $ 7,989 |

*(Excerpt from* J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials"), *see also Exhibit A)*

39. As of both the Petition Date, May 15, 2020, and the Settlement Agreement date, November 9, 2020, the Debtors' estate had a fair market value of over $8 Billion according to multiple sources, including:

a. The Debtors' SEC Filings dated September 10, 2020[23]

b. An expert valuation report filed with the court by CR3 Partners.[24]

c. The audited financials of Defendants Copper Property Trust and Penney Intermediate Holdings, who received substantially all of the Debtor's assets[25]

[23] See Exhibit A
[24] See Dkts. 1454 and 1692
[25] In prior proceedings before the Bankruptcy Court, the Debtors objected to the Court taking judicial notice of the "Purchasers" audited financial statements, which reflect a fair market value of $1.93 Billion for the PropCo real estate. See Dkt. 1552.

*The Settlement Agreement*

40. On or about November 9, 2020, a Settlement Agreement between the Debtors, the DIP Lenders and 1st Lien and Term Loan Secured Holders was filed. The honorable Judge Marvin Isgur mediated this pre-plan Settlement Agreement.[26]

41. The Settlement Agreement states that the DIP Lenders, who were owed $900 Million, would submit a credit bid in the amount of $900 Million, and that the 1st Lien and Term Loan Holders, who were owed $1.57 Billion, would submit a credit bid of $100 Million.[27] The total credit bid amount was $1 Billion.

42. In exchange for this $1 Billion credit bid, the Settlement Agreement distributed substantially all the Debtors' assets,[28] including, among other things, the:

a. PropCo Acquired Assets, including the PropCo real estate[29] and PropCo Closing Cash[30]

---

[26] The Settlement Agreement reads in part, "...the DIP Administration Agent, and the DIP Collateral Agent have authorized and directed that PropCo Purchaser credit bid the Credit Bid Amount, on account of $900 million of DIP Obligations and an aggregate $100 million of Term Loan Obligations and First Lien Obligations, allocated ratably based on outstanding Term Loan Obligations and First Lien Obligations, which obligations are <u>not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law</u>." (Dkt. 1814, at 9) (Underline added)

[27] It is important to note that on or about September 21, 2020, the assets subject to the Settlement Agreement were valued at $8.2 Billion-$10 Billion, according to an expert valuation report by William K. Synder of CR3 partners See Dkts. 1454, and 1692. The Debtor itself reported a total asset value of $8.317 Billion to the SEC in its Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials") (also attached hereto as Exhibit A).

[28] The assets were divided into two entities: the property company ("PropCo") and the operating company ("OpCo"). Collectively, these assets were valued by the Debtors at more than $8 Billion as of September 5, 2020. See J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials") (also attached hereto as Exhibit A). The Debtors also reported holding more than $1 Billion in unrestricted cash at the time of the settlement.

[29] The fair market value of the PropCo real estate was established at $1.93 Billion—a judicially determined valuation for the PropCo collateral—not including the $360 Million in PropCo Closing Cash. This valuation was made by GLAS, the Trustee for Copper Property Trust, and has been publicly filed with the SEC. The filings confirm that the PropCo collateral securing the First Lien and Term Loans was valued at $1.93 Billion. However, this judicially-determined valuation has been disregarded by both the Debtors' attorney, Jackson Walker, and the Defendants in their collateral valuations and resulting distributions. See Dkt. 1647-1 Pg. 67, "The Beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee."

[30] Defendants acknowledge that $360 Million in cash—referred to as the "PropCo Closing Cash"—was paid to the DIP Lenders/Purchasers at closing, bringing the total value of the PropCo assets transferred to them to no less than $2.29 Billion ($1.93B in PropCo real estate + $360M in cash).

b. OpCo Acquired Assets, including the OpCo real estate,[31] inventory[32] and closing cash[33]

c. Debtor's surplus cash[34]

43. During mediation, all parties maintained the fiction that the Debtors' more than $8 Billion in assets were worth only $1 Billion, or at most, less than the $2.5 Billion in outstanding debt.[35] They ignored valuations in SEC filings, Cushman & Wakefield appraisals,[36] and the CR3 report, which was the only valuation of the Debtors' assets on the court record.[37]

44. As a result of this improper Settlement Agreement, substantially all the Debtors' assets, worth $8 Billion, were distributed to the conspiring Defendant DIP Lenders who were only owed $900 Million. The DIP Lenders then transferred the OpCo assets to Defendant Penney Intermediate Holdings for zero consideration. Defendants Penney Intermediate and Copper Property Trust closed on their "purchases" on December 7, 2020, and January 30, 2021, respectively.

[31] The OpCo real estate was valued at approximately $1.7 Billion. See *JCPenney Request for Financing Proposal*, Dkt. 513-1

[32] The Debtors' inventory was valued at approximately $2 Billion. See J.C. Penney Company, Inc., Form 8-K (Sept. 10, 2020), Ex. 99.1 (the "Disclosure Materials") (also attached hereto as Exhibit A)

[33] Defendants acknowledge that $634 Million in cash—referred to as the "OpCo Closing Payment"—was paid to the Penney Intermediate at closing, bringing the total value of the OpCo assets transferred to them to no less than $5.2 Billion. See *Penney Intermediate Holdings LLC Consolidated Financial Statements* dated January 30, 2021, at 5, as filed with the SEC.

[34] By September 2020, the Debtors' unrestricted cash position had reached approximately $1.4 Billion: "JCP has $1.4B of cash, can afford to pay off the DIP loan, pay administrative costs, and continue to pay its debts in the ordinary course," See Dkt. 1454, at 17. The record confirms that the DIP Lenders received substantially all of the Debtors' assets, but does not disclose any specific transfer of this cash. In the absence of any alternative accounting, it must be presumed that the DIP Lenders received the cash as well.

[35] The DIP Debt was $900 Million and the First Lien/Term Loan Debt was $1.57 Billion.

[36] See Dkt. 513-1 *JCPenney Request for Financing Proposal*

[37] Although required by 11 U.S.C. § 1129(a)(8), no liquidation analysis was filed in this case. Despite the expert valuation filed by CR3 and the Debtors' own SEC filings—both of which valued the Debtors' assets at no less than $8 Billion—participating professionals, including the Debtors' financial advisor David Kurtz, who testified that he was unaware of the value of the Debtors' assets—uniformly disclaimed knowledge of the estate's value, facilitating a process that concealed the true value of the estate from both creditors and the Court. See Kurtz' testimony: *Sale Hearing Transcript* Dkt. 1822, at 206–207

45. Defendant Jackson Walker and Defendant Copper Property Trust allege that the value of the collateral securing the 1st and 2nd Lien Secured Bonds is controlled by, and capped by, the $100 Million credit bid submitted by the 1st Lien Holders——yet they do not treat the $900 Million credit bid submitted by the DIP Lenders as having any such limiting effect on their recovery.[38]

*Events Surrounding the Improper Distribution of Estate Assets*

46. A chronological review of events leading up to these distributions reveals a series of irregular and improper actions—orchestrated by Defendant Jackson Walker at the direction of Defendants H/2 and Brigade—that ultimately bypassed a competitive bidding process, concealed the true value of the Debtors' assets and diverted estate value away from rightful creditors:

- **May 12, 2020** – Defendant Jackson Walker takes steps to steer the J.C. Penney bankruptcy case into then–Chief Bankruptcy Judge David R. Jones' courtroom.[39]
- **May 15, 2020** – Debtors file their bankruptcy petition, reporting $8.6 Billion in total assets, including $475 Million in cash.
- **August 19, 2020** – Debtor's attorney lies in open court, asserting that an $8.4 Billion liquidation value is "absolutely ludicrous."[40]

[38]Section 363(k) of the Bankruptcy Code provides that a secured creditor may credit bid up to the amount of its allowed claim—but not beyond it. In this case, the amount of the allowed claim for the DIP Lenders was only $900 Million. However, they received distributions in excess of $8 Billion in cash and assets. See 11 U.S.C. § 363(k): "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."

[39] Jackson Walker secretly maintained an improper relationship with Judge Jones through Jones' live-in girlfriend Elizabeth Freeman, who was a partner at the firm. Text messages reveal that Jackson Walker used Freeman's relationship with Jones to forum shop and influence the outcome of cases before Judge Jones. See James Nani, *Judge's Girlfriend Texts Indicate JCPenney Bankruptcy Maneuver*, Bloomberg Law (Oct. 17, 2024). On May 12, 2020, just three days before J.C. Penney filed for bankruptcy, Ms. Freeman—a Jackson Walker partner before, during, and after Jones' oversight of the J.C. Penney bankruptcy—texted a colleague, "Talked to Jones. He's got us," and later added, "I'm keeping this down lowwwww." Id. —The messages reveal that Jackson Walker coordinated directly with Judge Jones through Freeman to ensure the case was assigned to him, compromising the neutrality of the venue selection and the integrity of the judicial process. These internal Jackson Walker text messages came to light through discovery in a court proceeding involving the firm's undisclosed and improper relationship with Judge Jones.

[40] See Hr'g Tr. at 18:16–22, Aug. 19, 2020, (Debtors' counsel Joshua Sussberg rejecting an $8.4 Billion valuation)

- **September 5, 2020** – Debtors list $8.317 Billion in assets on their 8-K.
- **September 9, 2020** – Debtors announce an agreement in principle to sell substantially all of their operating assets ("OpCo") to Simon and Brookfield for $1.75 Billion, with formal bidding procedures to follow.
- **September 11, 2020** – A materially higher and better offer for PropCo—far exceeding the DIP Lenders' $1 Billion credit bid for both OpCo and PropCo—is submitted by a competing group: $1 Billion for just the PropCo assets—plus an additional $1 Billion in cash distributions. Internal communications from Debtors' counsel acknowledge that the offer conflicts with Defendant Brigade Capital's agenda to direct value toward the DIP Lenders.
- **September 14, 2020** – On the date scheduled for the public auction, the auction is abruptly canceled. Two of the competing bidders are diverted into private "settlement" discussions.
- **November 9, 2020** – The inferior $1 Billion bid from the Defendant DIP Lenders prevails. The Settlement Agreement secretly allocates substantially all of the Debtors' $8 Billion assets to the DIP Lender group.
- **January 30, 2021** - Financial disclosures show Defendant Penney Intermediate Holdings holding $5.2 Billion in assets, while Defendant Copper Property Trust reports fair value of $1.935 Billion for the PropCo real estate assets.[41]

47. To execute this plan to embezzle distributions owed to other creditor classes, Defendants H/2, Brigade, and Jackson Walker, with the support of a compromised court, engaged in a pattern of intimidation, threats, and improper influence—including financial inducements—targeted at

[41] These figures confirm that the Debtors' assets were grossly undervalued during the bankruptcy proceedings—and that the true value was improperly diverted to insider buyers.

attorneys and other fiduciaries representing creditor groups who disagreed with the gross undervaluation of the estate and the improper transfer of cash and assets to the DIP Lenders in amounts far exceeding what they were owed.

**Defendant's Planned Sale of Encumbered Assets**

48. On July 17, 2025, counsel for Defendant Copper Property Trust, along with counsel for all other defendants (except Jackson Walker and Onyx Partners), requested and obtained Plaintiff's consent to an extension of time to respond to Plaintiff's First Amended Complaint until September 8, 2025. Jackson Walker had previously arranged an extension to September 30, 2025.

49. On July 25, 2025, Defendant Copper Property Trust issued a press release announcing that it had entered into an agreement to sell all remaining PropCo assets—assets to which Plaintiff's liens attach and which are the subject of this action—to Defendant Onyx Partners, with the closing to occur on or before September 8, 2025. In other words, Defendants planned to transfer encumbered assets in the midst of this litigation.[42]

50. On July 28, 2025, Defendant Copper Property Trust held an investor conference call regarding the proposed sale to Onyx Partners. During the call, proposed intervening party Michael Wachs asked why Copper Property Trust had failed to disclose this federal lawsuit in its SEC filings and how the pending sale might be affected by this ongoing litigation over ownership of the property. A Copper Property Trust representative responded that he regarded the lawsuit as frivolous and therefore did not believe disclosure was required.

---

[42] See *Copper Property CTL Pass Through Trust Announces Binding Purchase and Sale Agreement for Sale of Portfolio* (Press Release, July 25, 2025), available at https://d1io3yog0oux5.cloudfront.net/_5b20fdd8c76b96b9e93d802de0301c45/ctltrust/news/2025-07-25_Copper_Property_CTL_Pass_Through_Trust_Announces_149.pdf

51. Defendant Copper Property Trust—through which the overpaid DIP Lenders have been receiving distributions—has failed to disclose to the SEC this pending action, which seeks to confirm ownership and title to the remaining PropCo assets under pending sale for $947 Million.

52. Accordingly, Plaintiffs have named Onyx Partners as a Defendant to ensure it is on formal notice that the assets it has agreed to acquire are subject to Plaintiffs' and proposed intervening parties' valid and perfected liens, and are the subject of ongoing claims for wrongful transfer and overpayment.

53. Onyx has both constructive and actual notice that title to these assets—and any proceeds derived therefrom—is contested and clouded. As such, it is not entitled to the protections of a good-faith purchaser under 11 U.S.C. § 363(m) or any other legal doctrine, and may be liable for damages arising from the wrongful acquisition, transfer, or conversion of secured property.

## VI. CLAIMS FOR RELIEF

54. There now exists an actual controversy between Plaintiff and Defendants regarding Plaintiff's rights to the collateral securing the 1st Lien and Term Loan Secured, and 2nd Lien Secured Parties, and the proper distribution of that collateral. This Court has the authority to declare the contractual rights and duties of the parties under the Settlement Agreement and applicable provisions of bankruptcy law, including 28 U.S.C. §§ 2201 and 2202.

### A. Count I - Declaratory Judgment: Fair Market Value of PropCo Real Estate Was Determined to Be $1.93 Billion by the PropCo Trustee

55. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

56. An actual, substantial legal controversy exists regarding the 1st Lien and Term Loan and 2nd Lien Secured collateral being valued at the credit bid amount rather than the fair market value.

57. The primary issue in this case is straightforward: the cash and other collateral securing the claims of the 1st and 2nd Lien Secured Bondholders must be valued at Fair Market Value,[43] not Foreclosure Value.[44] This requirement is established and consistently affirmed by controlling authority, including:

a. the United States Supreme Court,[45]

b. the Fifth Circuit Court of Appeals,[46]

c. Section 506(a) of the Bankruptcy Code,[47]

d. the governing bond indentures,[48] and

[43] The discrepancy between the two valuation standards arises because an asset's fair market value reflects "a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property.'" *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 (1994) (quoting BLACK'S LAW DICTIONARY 971 (6th ed. 1990)). By contrast, foreclosure value—the "very antithesis" of fair market value—involves a forced sale for "'*the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner.*'" Id. at 537-38 (same). There is a "glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other." Id. at 538

[44] See the Sale Order, Dkt. 1814, at 47; See also the Asset Purchase Agreement, Dkt. 1668-1, at 97, Section 9.2 "Allocation Of Purchase Price," both of which contain fair market value requirements.

[45] The Supreme Court has held that "foreclosure value" does not accurately reflect a secured creditor's interest in collateral. See *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 955–56, 960–65 (1997); *In re Stembridge*, 394 F.3d 383, 386–88 (5th Cir. 2004). The bankruptcy court's reliance on foreclosure value was erroneous, as foreclosure value is typically substantially lower than fair market, going concern, or replacement value. See *Rash*, 520 U.S. at 957–58.

[46] In *In re T-H New Orleans Ltd. Partnership,* 116 F.3d 790 (5th Cir. 1997), the Fifth Circuit held that, under Section 506(a) of the Bankruptcy Code, a secured creditor's interest must be valued according to the fair market value of the collateral at the time of bankruptcy—not the price offered in a private or credit bid sale. The court determined that this applies regardless of the sale price in a private transaction, emphasizing that the creditor's lien attaches to the value of the collateral itself, not merely the price it may fetch in a transaction.

[47] Section 506(a)(1) states: An allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

[48] The bond indentures for both the 1st Lien and 2nd Lien Secured Bonds contain "Appraised Value" provisions requiring the use of a Cushman & Wakefield appraisal, or an equivalent from a nationally recognized, unaffiliated appraiser, based on an "estimated market rent" methodology. See *Indenture* dated Mar. 12, 2018, by and among J.C. Penney Corp., Inc., the Guarantors party thereto, and Wilmington Trust, N.A., as Trustee, relating to $400,000,000 8.625% Senior Secured Second Priority Notes due 2025; and *Indenture* dated June 23, 2016, by and among J. C. Penney Corporation, Inc., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as Trustee, relating to $500,000,000 of 5.875% Senior Secured Notes due 2023.

e. the operative documents in this case, including the Sale Order, Asset Purchase Agreement, and Disclosure Statement.[49]

58. The fair market value requirement is codified in 11 U.S.C. § 506(a) and is a matter of binding Fifth Circuit precedent. Moreover, the bankruptcy record reflects that the $1 Billion credit bid amount does not control the valuation of the assets for tax purposes.[50] The Sale Order and related documents expressly require the Debtors and the PropCo asset beneficiaries to report consistently with the fair market value as determined by the PropCo Trustee. [51]

59. The $360 Million in PropCo Closing Cash must be assigned its full face value of $360 Million, and the $1.93 Billion fair market value assigned to the PropCo real estate is a <u>judicially determined valuation</u>.[52] Although this judicially determined valuation exists, the Debtors and Defendants have disregarded it entirely, refusing to pay the 1st Lien and Term Loan Secured Creditors, 2nd Lien Secured Holders, and Unsecured Holders their distributions according to the fair market value of the assets acquired. Instead, they allege that the fair market value of the assets is the Credit Bid Amount.

---

[49] See the Sale Order, Dkt. 1814, at 47: "PropCo Trust will, for tax reporting purposes, report PropCo as owning the assets it acquires at their fair market value at the time of the PropCo closing (<u>and the face amount of the underlying Credit Bid Amount shall not be determinative of fair market value</u>) and such fair market value shall be used by PropCo Trust and the Debtors for the purpose of determining the aggregate value used for the PropCo allocation as such term is used in Section 9.2 of the asset purchase agreement." (underlining added). See also the Asset Purchase Agreement, Dkt. 1668-1, at 103, Section 9.2: "Allocation of Purchase Price. For U.S. federal and applicable state and local income Tax purposes, Purchasers, Sellers, and their respective Affiliates shall, consistent with the requirements of Section 1060 of the Code and the regulations promulgated thereunder and any similar provision of applicable Law, allocate the purchase price (and any Assumed Liabilities and other items treated as part of the purchase price for U.S. federal, and applicable state and local, income Tax purposes) among the Acquired Assets." See also the Disclosure Statement, Dkt. 1647-1, at 67: "The Beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee."

[50] See *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967) (establishing the "Danielson Rule"), which bars parties from asserting inconsistent positions—such as claiming a certain value or characterization for tax benefits while denying that same value or characterization to creditors or other stakeholders. Here, because the bankruptcy record confirms that the $1 Billion credit bid does not control the value of the assets for tax purposes, the Danielson Rule precludes Defendants from asserting that it controls the value for creditor recoveries.

[51] See Dkts. 1668-1, at 103 Section 9.2; 1814, at 47; and 1647-1, at 67

[52] See Dkt. 1647-1, at 67

60. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the PropCo cash and collateral securing the DIP Debt, 1st Lien and Term Loan Secured Debt, and 2nd Lien Secured Debt must be valued at fair market value, as determined by the PropCo Trustee to be $1.93 Billion for the PropCo real estate, and totaling $2.29 Billion—and that the Credit Bid Amount does not control or determine the value of the acquired assets.

**B. Count II - Declaratory Judgment: Unequal Distribution of the PropCo Securities, New Term Loan, Earn-Out and Cash Distributions Violates 1123(a)(4)**

61. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

62. An actual, substantial legal controversy exists regarding the secret non-*pro rata* distributions of the PropCo, Earn Out, cash and New Term Loan securities.

63. The Plan and Disclosure Statement both provide that the PropCo Acquired Assets would be transferred to the DIP Claims and Class 4 First Lien Claims. This fact is not in dispute by any party. The Disclosure Statement reads in part:

> Pursuant to the Plan, on the Effective Date, the Debtors will transfer all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities to PropCo, on behalf of the Holders of DIP Loans and Class 4 First Lien Claims. (Dkt. 1647-1, at 67)

64. The holders of DIP claims, owed $900 Million, and the holders of Class 4 First Lien Claims, owed roughly $1.57 Billion, were required to contribute these assets to PropCo in exchange for the PropCo Securities. The Disclosure Statement provides:

> All parties (including without limitation, the Debtors, the PropCo Trustee and Holders of DIP Loans and Holders of First Lien Claims receiving the New PropCo Securities pursuant to the plan) will be required to treat the Debtors' transfer to PropCo as (1) a transfer of assets (subject to any obligations relating to such assets) directly from the Debtors to Holders of DIP Loans and Class 4 First Lien Claims in full or partial satisfaction of such Claims, followed by (2) such Holders' contribution of the assets to PropCo in exchange for New PropCo Securities. (underline added) (Dkt. 1647-1, at 58)

65. Defendants do not dispute that the Class 4 First Lien Claim Holders exchanged their bonds for PropCo Securities. However, treatment of the DIP Claims and the Class 4 claims was drastically different.

66. On November 13, 2023, counsel for Defendant Copper Property Trust, Brian Kinney, admitted in writing that distribution of the New PropCo Securities, and New Term Loan and Earn Out Certificates was not *pro rata* as required by the Settlement Agreement.[53]

67. His email confirms that $1,000 of DIP Debt was exchanged for:

- 75 PropCo Certificates
- $520 in principle of Take-Back Debt
- 10 Earn-Out Certificates
- Cash-distribution not disclosed

68. By contrast, the same email shows that $1,000 of Class 4 1st Lien Debt was exchanged for:

- 4.772771 PropCo Certificates
- $32.76 in principle of Take Back debt
- .63637 of Earn-Out Certificates
- Cash distribution not disclosed

69. This constitutes a clear violation of 11 U.S.C § 1123(a)(4), which requires that "a plan must provide the same treatment for each claim or interest in a particular class, unless a holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest."

70. The Bankruptcy Code does not define what "equal treatment" under § 1123(a)(4) requires. Courts have consistently held that it means equality in value. *In re AOV Indus., Inc.*, 792

[53] A copy of the email is attached hereto as Exhibit D.

F.2d 1140, 1152 (D.C. Cir. 1986) (equal treatment "prohibits disparate treatment with respect to value"); In re Quigley Co., Inc., 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution."). The Third Circuit has further explained that equal treatment does not require precise equivalence, only approximate equality, and that minor procedural differences do not constitute a violation. *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).

71. Here, the PropCo beneficiaries were the DIP Lenders and the Class 4 Claim Holders—both Secured Creditors subject to the same settlement agreement. Yet for each $1,000 of debt exchanged, they received unequal distributions—depending upon if their 1st Lien Claims were rolled up and converted into DIP Debt.

72. DIP Lenders secretly received more than 14 times the consideration—including PropCo Securities—that Class 4 First Lien Holders received. This disparate distribution constitutes impermissible unequal treatment under § 1123(a)(4). See *Cf. AOV Indus.*, 79 F.2d at 1152; *Quigley*, 437 B.R. at 146.

73. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the PropCo Acquired assets—including, without limitation, the $360 Million in PropCo Closing Cash, $520 Million in New Term Loan (or cash equivalent), Earn-out Certificates (or cash equivalent), PropCo Securities valued at $1.93 Billion (or cash equivalent), and PropCo rental income since closing, and the $30 Million wind-down distribution sent on or about December 23rd, 2023—must be distributed on a pro rata basis in compliance with § 1123(a)(4) and the Settlement Agreement.

**C. Count III - Declaratory Judgment: Improper Collateral Valuation in Violation of the Pre-Plan Settlement Agreement and *T-H New Orleans* (5th Cir. 1997), and Confirmation That Plaintiff's Liens Survive Any Sale or Transfer**

74. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

75. An actual, substantial legal controversy exists regarding whether Defendants violated the terms of the Settlement Agreement and controlling Fifth Circuit precedent by valuing the collateral underlying the 1st and 2nd Lien Bonds based on the Credit Bid Amount, rather than fair market value.

76. The Settlement Agreement explicitly provides that the transaction was a private sale, and that, for purposes of valuing the collateral subject to the settlement, the Credit Bid Amount does not control the value of the property. It states, in part:

> Notwithstanding that the Transaction provides fair and reasonable value for the Acquired Assets, the face amount underlying **the Credit Bid Amount does not control the value of the Acquired Assets for tax reporting purposes,** which shall be determined pursuant to paragraph 49 of this order. (Dkt. 1814, at 7-8, Section K. Private Sale is Appropriate)[54] (emphasis added)

77. There is no legal basis for using the Credit Bid Amount as a proxy for fair market value. In *In re T-H New Orleans Ltd. Partnership,* 116 F.3d 790 (5th Cir. 1997), the Fifth Circuit held that, under Section 506(a) of the Bankruptcy Code, a secured creditor's interest must be valued according to the fair market value of the collateral at the time of bankruptcy—not the price offered in a private or credit bid sale. The court determined that this applies regardless of the sale

[54] Paragraph 49 of the sale order reads in part, "PropCo Trust will, for tax reporting purposes, report PropCo as owning the assets it acquires at their fair market value at the time of the PropCo Closing (and the face amount underlying the Credit Bid Amount shall not be determinative of fair market value) and such fair market value shall be used by PropCo Trust and the Debtors for purposes of determining the aggregate value used for the PropCo Allocation as such term is used in Section 9.2 of the Asset Purchase Agreement" (Dkt 1814, at 47) (Underline added)

price in a private transaction, emphasizing that the creditor's lien attaches to the value of the collateral itself, not merely the price it may fetch in a transaction.

78. Despite these legal and contractual requirements, Defendant Jackson Walker secretly used the Settlement Agreement to distribute roughly $8 Billion of the Debtors' assets to the DIP Lenders who were only entitled to $900 Million. This improper distribution was justified by the false premise that the Debtors' assets were worth only $1 Billion—the amount of the credit bid in this private sale. However, because the transaction was not a true market sale, fair market value—not the Credit Bid Amount—must govern.

79. The pre-plan Settlement Agreement expressly provides that the liens of the 1st Lien and Term Loan Holders survive and are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The DIP Lending Defendants, however, have failed to comply with this provision.

80. The pre-plan Settlement Agreement states, in relevant part:

> The DIP Administrative Agent, and the DIP Collateral Agent have authorized and directed that PropCo Purchaser credit bid the Credit Bid Amount, on account of $900 million of DIP Obligations and an aggregate $100 million of Term Loan Obligations and First Lien Obligations, allocated ratably based on outstanding Term Loan Obligations and First Lien Obligations, which obligations are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Transaction is one single integrated transaction and the various components thereof are nonseverable. (Dkt. 1814 at 9)

81. Accordingly, Plaintiffs' and proposed intervenors' liens remain valid and enforceable, and continue to attach to both the OpCo and PropCo assets, as well as all proceeds derived therefrom, up to the amount of the unpaid debt, plus accruing interest from the Effective Date.

82. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the PropCo cash and collateral securing the DIP Debt, 1st Lien and Term Loan Secured Debt, and 2nd Lien

Secured Debt must be valued at fair market value, as determined by the PropCo Trustee to be $2.29 Billion. Plaintiff seeks a declaratory judgment that Defendant's treatment of the Credit Bid Amount as controlling violated both the Settlement Agreement and binding precedent, including *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997), which holds that secured collateral must be valued at fair market value under 11 U.S.C. § 506(a), not merely the price offered in a private or credit bid sale.

**D. Count IV - Non-*Pro Rata* Distribution of OpCo Assets to Defendant Penney Intermediate Holdings Without Consideration Constitutes a Liquidation, Not a Sale, in Violation of 11 U.S.C. §§ 1123(a)(4), 1129(b)(2)**

83. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

84. An actual, substantial legal controversy exists regarding whether Defendants violated 1123(a)(4) and 1129(b)(2) by transferring more than $5 Billion in OpCo Assets to two preferred Unsecured Creditors—Simon and Brookfield, through their entity Penney Intermediate Holdings—for zero consideration, while all other Unsecured Creditors recovered virtually nothing on the class's $3 Billion claim.

85. Section 1123(a)(4) requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[55] Here, the remaining Unsecured Creditors did not agree to less favorable treatment than Simon and Brookfield; rather they were denied comparable recovery because they were not gifted estate assets as Simon and Brookfield were.

86. Their diminished recoveries were the result of material concealment of the Debtors' $8 Billion in assets and the false representation that Simon and Brookfield were paying nearly $2

[55] See *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)

Billion for what they received. In truth, no outside consideration was paid. These misrepresentations were orchestrated by Defendants Jackson Walker, Simon, Brookfield and Penney Intermediate Holdings in order to defraud stakeholders and evade the Code's equal treatment requirements.

87. Section 1129(b)(2) prohibits unequal treatment of creditors within the same class. In this case, the Debtors distributed billions of dollars in estate assets to two favored Unsecured Creditors—Simon and Brookfield—while providing virtually nothing to other creditors within the same class.[56] Compounding the violation, the Debtors filed no liquidation analysis to justify or even explain these distributions. Without such an analysis, there is no basis for concluding that the plan met the requirements of 1129(b)(2), and the lopsided treatment of similarly situated creditors cannot be defended as either fair or equitable.[57]

88. As chair of the Unsecured Creditors' Committee, Simon Property Group breached its fiduciary duty to advocate for the equal and proportional treatment of all Unsecured Creditors.[58] Instead, it prioritized its own recovery at the direct expense of others within the same class. Under 11 U.S.C. § 726(b), a *pro rata* distribution requires that each creditor be compensated "[p]roportionately; according to an exact rate, measure, or interest." *Pro Rata*, BLACK'S LAW DICTIONARY (11th ed. 2019). The Bankruptcy Code further mandates equal treatment of

[56] The Unsecured Creditors Committee accepted a nominal $1.5 Million settlement after being told that no assets remained in the estate to distribute toward the class's $3 Billion claim—because the 1st Lien Creditors had accepted a below-par recovery under the Settlement Agreement, thereby eliminating any recovery for junior creditors. See Dkt. 1789, *Statement of the Official Committee of Unsecured Creditors in Support of the Debtors' Sale Motion*. This is precisely the type of scenario the Fifth Circuit addressed in *In re AWECO, Inc.*, which exists to prevent higher-priority creditors from using settlements to improperly exclude lower-priority classes from recovery outside of a confirmed plan.

[57] See *In re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.") Here, members of the class of Unsecured Creditors did not receive equal value. Unsecured Creditors Simon and Brookfield received more than $5 Billion in estate assets for no outside consideration, while all other members of the Unsecured Creditor class received virtually nothing—despite having equal legal entitlement to a *pro rata* distribution.

[58] Similar breach of fiduciary duty by a member of the Unsecured Creditors Committee led to the indictment and conviction of Daniel Kamensky.

creditors within the same class. See 11 U.S.C. §§ 726(b), 1322(a)(3). Accordingly, each unsecured creditor must receive the same percentage recovery until those with smaller claims are paid in full. See 11 U.S.C. §§ 726(b), 1322(a)(3).

89. Defendants Jackson Walker and Simon and Brookfield allege that Simon and Brookfield, through Defendant Penney Intermediate Holdings, were the purchasers of the Debtors' operating company assets ("OpCo"), which were valued at over $5 Billion. The term "purchaser" implies that meaningful consideration was paid into the Debtors' estate. However, the audited financial statements of both Penney Intermediate and Simon/Brookfield demonstrate that no external consideration was ever provided to the Debtors for these assets.

90. According to the Asset Purchase Agreement, Penney Intermediate Holdings was supposed to provide the following consideration for OpCo:[59]

a. OpCo Credit Bid Amount[60]

b. $692 Million Cash[61]

c. $1.3 Billion ABL Payoff Amount

d. $520 Million Term Loan

e. Earnout (contingent consideration)

91. However, none of these payments were made to the Debtor. There was no OpCo Credit Bid Amount–the entire $1 Billion credit bid was allocated to the PropCo purchase. No portion remained for, or was applied to, the acquisition of OpCo. The $692 Million in cash, labeled "OpCo Closing Cash," came from the Debtors' estate and was given to the alleged purchaser at

[59] See the Asset Purchase Agreement, Dkt. 1668-1, at 25, Section 2.1

[60] There was no OpCo credit bid because unsecured debt cannot be used to credit bid, and Simon and Brookfield held only unsecured claims.

[61] Misleading press reports circulated promoting the impression that this amount would be paid to the Debtors. See e.g., Ben Unglesbee, *J.C. Penney Signs Deal to be Taken Over by Landlords Simon and Brookfield*, Retail Dive. (Oct. 29, 2020).

closing.[62] The Debtors themselves paid off the ABL. The new $520 Million Term Loan was merely a lien against inventory that was already owned by the Debtors and the 1st Lien Holders. Finally, the required milestones to trigger any earnout consideration for the Unsecured Creditors were not met.[63] In short, no consideration whatsoever was provided in exchange for the Debtors' operating company assets. [64]

92. Nevertheless, misleading official statements were released to the public in order to discourage potential competitors and conceal misappropriation of the OpCo assets. These statements claimed that Simon and Brookfield were providing nearly $2 Billion to the Debtors to acquire its operating company—despite the fact that no such consideration was ever paid.[65]

93. Misleading testimony and court filings have also falsely asserted that the Debtors' $1.3 Billion ABL debt would be repaid by the OpCo "purchaser." In reality, accounting records confirm that the Debtor received no consideration for its operating company assets. Even the largely misleading Case Status Update submitted by the Wind-Down Debtor on November 1, 2023, reflects no such payment from the alleged OpCo purchaser to the Debtor. [66]

---

[62] Due to various closing requirements, the amount was reduced to $634 Million. See *Penney Intermediate Holdings LLC Consolidated Financial Statements*, dated Jan. 30, 2021, at 13

[63] "'Unsecured Claims Earnout Pool" means 50% of any incremental amounts payable under Section 1 of the Earnout Agreement between $110,000,000 and $140,000,000,' Dkt. 1788, at 20

[64] In *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980), the Fifth Circuit held that a foreclosure sale yielding only 57% of fair market value did not constitute "reasonably equivalent value," and observed that no court had upheld a transfer for less than 70% of fair value. This observation—often referred to as the "Durrett rule"—has been cited by other courts evaluating whether transfers may be avoided under the Bankruptcy Code for failure to provide fair consideration. See, e.g., *In re Littleton*, 888 F.2d 90, 92 n.5 (11th Cir. 1989). Here, the DIP Lender Defendants and Penney Intermediate provided zero consideration for the Debtors' operating company assets—an amount not only far below the *Durrett* threshold, but in direct violation of the Settlement Agreement's requirements and the Fifth Circuit's mandate in *In re T-H New Orleans Ltd. Partnership, 116 F.3d 790 (5th Cir. 1997),* that asset transfers in bankruptcy must reflect reasonably equivalent value. Technically, no good faith purchase of the assets has occurred, as no consideration for the operating business was ever received by the Debtors.

[65] See J.C. Penney press release dated September 9, 2020, (also attached hereto as Exhibit B)

[66] See Case Status Update (Nov. 1, 2023), and Hr'g Tr. (Nov. 1, 2023)

94. Transfer of the Debtors' OpCo assets without consideration constitutes a liquidation, not a sale. In essence, there was no good faith purchase—only a liquidation of the Debtors' assets in violation of §§ 1123(a)(4), 1129(b)(2) and the absolute priority rule.[67]

95. Defendants assert that 1st Lien and Term Loan Secured Holders are entitled to recover only 8%, and 2nd Lien Secured Holders nothing at all, while two unsecured creditors are entitled to windfalls exceeding ten times the amount of their claims—without paying a single dollar to the secured creditors ahead of them.

96. All of this misconduct was part of Defendant Jackson Walker's scheme to use the Settlement Agreement as a vehicle to enable the other Defendants to misappropriate more than $7 Billion in assets belonging to other creditors. Defendant Penney Intermediate provided no consideration for the $5.2 Billion in OpCo assets it received, and the DIP Lender Defendants likewise provided no consideration beyond their $900 Million credit bid. The Defendants are therefore improperly in possession of embezzled assets rightfully belonging to other creditors.

97. Accordingly, Plaintiff seeks a declaration from this Court under 28 U.S.C. §§ 2201 and 2202 that the transfer of more than $5 Billion in operating company assets to two preferred Unsecured Creditors—without any outside consideration—violated 11 U.S.C. §§ 1123(a)(4) and 1129(b)(2). Such a declaration is necessary to confirm that the Bankruptcy Code prohibits unequal treatment of similarly situated creditors and the covert transfer of estate assets under false pretenses. Without this judicial determination, Defendants' misconduct will remain shielded by the very scheme that deprived creditors of their rightful recoveries and undermined the integrity of the bankruptcy process. Declaratory relief is therefore warranted to redress the unlawful

---

[67] The absolute priority rule mandates that creditors be paid in order of priority–and that they may receive no more than the full value of their allowed claims. Any remaining value must flow down to satisfy the claims of lower-priority creditors. This prevents senior creditors from capturing surplus value at the expense of others, which is what happened in this case. See *11 U.S.C. § 1129(b)(2)(B)*; *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984).

conduct, prevent further harm, and ensure compliance with the Code's fundamental principles of fairness, transparency, and equal treatment.

**E. Count V - Declaratory Judgment: Undisclosed Uptier Transaction Violates Distribution Requirement Confirmed by *Serta Simmons* (5th Cir. 2024)**

98. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

99. An actual, substantial legal controversy exists regarding the permissibility of an undisclosed "Uptier Transaction" that steered disproportionate recovery to the DIP Lenders, to the detriment of other creditor classes, and those in the same class who were not allowed to "uptier" their 1st Lien Debt into DIP debt.

100. The $8 Billion in cash, real estate, and other assets disposed of through the Settlement Agreement were distributed neither in accordance with the absolute priority rule nor on a *pro rata* basis. Counsel for the Defendant DIP Lenders admitted in writing that the DIP Lenders received 75 PropCo securities per $1,000 of DIP Debt while the 1st Lien and Term Loan Secured Creditors received only 4.77 PropCo certificates per $1,000 of debt. The PropCo Closing Cash was allocated on the same disproportionate basis. Per Defendant Copper Property Trust's attorney:

> **On Nov 13, 2023, at 4:26 PM, Kinney, Brian <BKinney@milbank.com> wrote:**
>
> We provided the information regarding Cetus in a separate email, which Mr. Moore then raised questions on. Here are the questions and responses:
>
> 1. What is the dollar amount per $1,000 in face value of PropCo, New Term Loan and Earn-out distributed to the 1st Lien Minority Group members?
> All holders received 10 Earnout certificates , 75 Propco certificates, and $520 in principal take back loan for each $1,000 of DIP Loan. Noteholders received 0.63637 Earnout Certificates, 4.772771 Propco certificates, and $32.760302 in principal take back term loan for each $1000 of 1L notes.

(*Excerpt from email to Plaintiff, see Exhibit D*)

101. The Settlement Agreement references only the $1 Billion Credit Bid Amount and fails to disclose the fair market value of substantially all of the Debtors' assets.[68]

102. Without providing a valuation of the Debtors' assets—or relying on existing valuation data—Defendants assert that the 1st Lien and Term Loan Secured Parties, who were owed $1.57 Billion, should receive distributions based solely on, and equaling, their $100 Million credit bid.

103. Defendants assert that the remaining $7.9 Billion in asset distributions should go to the DIP Lending Parties who were only owed $900 Million for their DIP Debt.

104. This type of unfair and improper transaction is called an "Uptier Transaction."[69] In the J.C. Penney bankruptcy, the Uptier Transaction was undisclosed.[70] However, even when such

[68] The fair market value of the assets was reported to the SEC by the two entities that received them—Penney Intermediate Holdings and Copper Property Trust. However, those valuations were never filed with the Bankruptcy Court. The only dollar figure referenced in connection with the transaction was the Credit Bid Amount. See Case Status Update (Nov. 1, 2023), and Hr'g Tr. (Nov. 1, 2023).
[69] See *Uptier Exchange Transactions: Lawful Innovation of Lender-on-Lender Violence?* 40 Yale J. Reg. 408, 413–414 (2023) and Vincent S.J. Buccola & Greg Nini, *The Loan Market Response to Dropdown and Uptier Transactions, 53* J. Legal Stud. 489, 501 (2024) (restyled).
[70] In the Serta Simmons bankruptcy–overseen by Judge David R. Jones, as was the J.C. Penney bankruptcy–the Uptier Transaction was disclosed, allowing parties the opportunity to object and ultimately appeal to the Fifth

schemes are disclosed to other creditors and parties in interest, the Fifth Circuit recently held in *Serta* that overpaying DIP Lenders and favored creditors through an Uptier Transaction is unlawful and improper.

105. On December 31, 2024, the U.S. Court of Appeals for the Fifth Circuit ruled in *In re Serta Simmons Bedding, LLC,* 81 F.4th 1284 (5th Cir. 2024) that mattress company Serta Simmons Bedding, LLC ("Serta") violated the "*sacred right*" of its lenders to ratable repayment by placing more than $1 Billion of new super-priority debt that would have priority over its existing indebtedness for such new indebtedness.

106. Plaintiff contends the J.C. Penney transaction violates the principles established by the Fifth Circuit in *Serta*, and seeks a declaratory judgment that such a transaction is impermissible under controlling precedent. Specifically, Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that the non *pro-rata* distributions–through which the DIP Lenders secretly received more than seven times the amount owed on their $900 Million DIP loan–are improper in light of the *Serta* ruling.

**F. Count VI - Declaratory Judgment: Distributions Under the Pre-Plan Settlement Violate *In re AWECO, Inc.*, 725 F. 2d 293 (5th Cir. 1984)**

107. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

108. An actual and substantial legal controversy exists regarding the permissibility of distributions made pursuant to the pre-plan Settlement Agreement. Specifically, Plaintiff contends that these distributions violate the absolute priority rule as articulated by the Fifth Circuit in *Aweco*.

Circuit. By contrast, in the J.C. Penney case, the extreme overpayment of the DIP Lenders was concealed: no liquidation analysis was filed, and no financial disclosures were submitted to the Bankruptcy Court reflecting the value of the assets the DIP Lenders received.

109. The pre-plan settlement between the DIP Lenders and the 1st Lien and Term Loan Secured Parties distributed substantially all the Debtors' assets–valued at no less than $8 Billion. Under this settlement, Defendants assert that only $100 Million of those assets belong to the 1st Lien and Term Loan Secured Holders, while approximately $7.9 Billion is allocated to the DIP Lenders.[71] Defendants have argued that, because the distribution occurred via a pre-plan settlement agreement, rather than a confirmed plan, the absolute priority rule does not apply.

110. However, in *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984), the Fifth Circuit held that pre-plan settlements must comply with the absolute priority rule. That decision remains binding precedent in this Circuit.[72]

111. Plaintiff therefore seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that distributions made under the pre-plan settlement (Dkt. 1814) must comply with *Aweco.*

### G. Count VII - Declaratory Judgment: Jackson Walker Breached Its Fiduciary Duties to Creditors in Violation of 11 U.S.C. §§ 101(14), 327, 1106, and 1107

112. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

113. An actual and substantial legal controversy exists regarding whether Jackson Walker breached its fiduciary duties to Plaintiff and other creditors by concealing its relationship with Judge Jones and by committing multiple additional acts that were adverse to the interest of the estate and its creditors, including Plaintiff, in violation of 11 U.S.C. § 101(14), 327, 1106 and 1107.

---

[71] This grossly improper distribution was never disclosed to the Bankruptcy Court, the U.S. Trustee, or other parties in interest. This conduct violates 18 U.S. § 152, which prohibits concealment of assets in connection with a bankruptcy proceeding. The assets and resulting distributions were concealed under the guise of a $1 Billion credit bid for substantially all of the Debtor's assets–the value of which was intentionally concealed, disregarded and denied to subvert the statutory repayment scheme and evade the absolute priority.

[72] See also *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), in which the Supreme Court held that structured dismissals or settlements that deviate from the Bankruptcy Code's priority scheme without the consent of affected parties are impermissible.

114. Upon the filing of a Chapter 11 petition, the Debtor becomes a debtor-in-possession with fiduciary duties to its creditors. *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 271 (5th Cir. 2015) (citing 11 U.S.C. § 1101, 1106-08) (explaining that a debtor-in-possession assumes fiduciary duties to creditors upon filing and must act in the best interest of the estate).

115. As court-appointed counsel to the debtor-in-possession, Defendant Jackson Walker was an officer of the court with fiduciary and statutory obligations to the bankruptcy estate, including to Plaintiff as a secured creditor. Under 11 U.S.C. §§ 101(14) and 327, attorneys representing debtors-in-possession must be "disinterested persons" and may not act in a manner adverse to the interests of the estate or its creditors, including by representing or favoring any party—such as themselves—with a materially adverse interest.

116. However, during the course of Jackson Walker's representation of the Debtors, Jackson Walker partner Elizabeth Freeman engaged in an undisclosed, ongoing intimate relationship with former Judge Jones, who was presiding over the J.C. Penney cases. A concealed personal relationship with the presiding judge constitutes a material conflict that violates both the spirit and purpose of 11 U.S.C. § 327 and Rule 2014(a), as well as applicable ethical duties. See *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 462 (5th Cir. 2012) (Full and timely disclosure of all facts is essential to the bankruptcy process.)

117. Defendant Jackson Walker knowingly failed to disclose the relationship, choosing instead to exploit it to gain strategic advantages for itself and favored insiders—including the other named Defendants—while causing harm to the estate and its creditors, including Plaintiff.

118. A substantial portion of Jackson Walker's fees during Elizabeth Freeman's tenure at the firm arose from its role as co-counsel to global law firms that retained Jackson Walker

specifically for its influence over the Bankruptcy Court for the Southern District of Texas, which stemmed from the undisclosed relationship between Elizabeth Freeman and Judge Jones.

119. This relationship was not merely tolerated within the firm—it was viewed as a strategic business advantage. In one internal text message, Jackson Walker attorney Veronica Polnick asked colleague Matthew Cavenaugh, "You think we get out of this with 1) Freeman still at JW, 2) Jones still on the bench and panel, and 3) still working with KE [Kirkland & Ellis]?" Cavenaugh replied, "All 3." [73] This exchange confirms Jackson Walker's awareness that its access to Kirkland & Ellis and other lucrative co-counsel arrangements depended on its secret judicial connection—a conflict it chose to conceal rather than correct.

120. The Bankruptcy Code, Federal Rules of Bankruptcy Procedure, Local Rules, and applicable ethical standards impose an ongoing duty of full and candid disclosure on professionals employed under 11 U.S.C. § 327. See Fed. R. Bankr. P. 2014(a).[74] Despite being aware of the relationship, Jackson Walker failed to disclose it at any point during its engagement or throughout the J.C. Penney bankruptcy proceedings, in clear violation of these mandatory disclosure obligations. The conscious decision not to disclose the relationship, despite its obligation to do so, constitutes willful misconduct on the part of Jackson Walker.[75]

121. Beyond its failure to disclose the Jones–Freeman relationship, Jackson Walker breached its fiduciary duty by exploiting that relationship to shield misconduct and by acting in a manner

---

[73]See James Nani, *Jackson Walker Lawyers Spoke of Secret Judge Romance, Texts Show*, Bloomberg Law (Oct. 9, 2024), https://news.bloomberglaw.com/bankruptcy-law/jackson-walker-lawyers-spoke-of-secret-judge-romance-texts-show (discussing text messages revealed in *Professional Fee Matters Concerning the Jackson Walker Law Firm,* Bankr. S.D. Tex., No. 23-00645, hearing held Oct. 8, 2024)

[74] Although Rule 2014(a) does not explicitly list judges among the connections requiring disclosure, courts interpret the rule broadly to require disclosure of any relationship that may create a perception of partiality or conflict. See *In re Keller Fin. Servs.*, 243 B.R. 806, 815 (Bankr. N.D. Ill. 2000) (The duty of professionals is not to decide what connections are relevant to disclose; it is to disclose all connections so the court can decide whether a conflict exists.). See also *In re American International Refinery, Inc.*, 676 F.3d 455, 461–62 (5th Cir. 2012) (nondisclosure of a personal relationship relevant to § 327 disinterestedness requires disqualification and potential disgorgement.)

[75]See *In re eToys, Inc.*, 331 B.R. 176, 187 (Bankr. D. Del 2005) (holding a knowing failure to disclose a conflict of interest "constitutes willful misconduct").

adverse to the estate and its stakeholders, including by:

a. Failing to disclose the non-*pro rata* distribution scheme to the court, creditors, shareholders or other stakeholders at any time during the bankruptcy process

b. Failing to provide a liquidation analysis of the Debtors' assets as required by 11 U.S.C. § 1129(a)(8)

c. Violating the indenture agreements governing the Secured 1st and 2nd Lien Bonds by willfully ignoring the explicit "Appraised Value" requirements

d. Rejecting a better DIP loan offer with no roll-up, instead advocating for a DIP loan with much higher interest and a $450 Million roll-up

e. Rejecting higher and better offers for the Debtors' more than $8 Billion in assets

f. Failing, during the settlement conference, to disclose to Judge Isgur that the Debtors' assets were valued at $8 Billion rather than $1 Billion

g. Colluding with Brigade Capital and other named Defendants, among others, to conceal the true value of the Debtors' assets and secretly overpay the DIP Lenders

h. Knowingly misrepresenting the structure of the transaction on the court record by falsely stating in the Asset Purchase Agreement that the $1.3 Billion ABL balance would be paid by the OpCo "Purchasers," when in fact it was repaid by the Debtors themselves; and deliberately allowing that material falsehood to remain uncorrected, thereby concealing key facts from the court and stakeholders, including Plaintiff

i. Gifting over $5 Billion cash, assets and real estate to Defendants Simon and Brookfield through their entity, Defendant Penny Intermediate Holdings,[76] while

[76] Simon Property Group (NYSE: SPG) and Brookfield Asset Management Inc. (NYSE: BAM) are public companies. Through their jointly controlled entity, Penny Intermediate Holdings, they executed an Asset Purchase Agreement in which they committed to provide an OpCo credit bid amount, $692 Million in cash, and other

perpetuating the falsehood that these Defendants paid nearly $2 Billion for those assets

j. Filing a false financial report with the court on November 1, 2023, in violation of 18 U.S.C. § 152, and falsely asserting at a hearing before Judge Christopher Lopez on the same date, that only $1 Billion was available for distribution, when in fact more than $8 Billion in assets—including $1 Billion in cash—were ultimately distributed

k. Misleading Secured Creditors, including Plaintiff, by falsely representing that only $1 Billion was available for distribution.

122. Plaintiff, as a creditor of the bankruptcy estate, reposed confidence and trust in Defendant Jackson Walker to fulfill its fiduciary duties and to report accurate and complete information regarding the value of the assets securing the 1st and 2nd Lien Secured Bonds, and Unsecured Bonds.

123. By concealing a material relationship with the presiding judge, withholding critical financial information, making misrepresentations to the court and creditors, and advancing a bankruptcy plan designed to enrich insiders at the expense of the estate, Jackson Walker violated its statutory and fiduciary duties. The law does not shield court-appointed counsel who abuse their position to carry out a corrupt scheme cloaked in the authority of the bankruptcy process. Jackson Walker is liable for the resulting harm to Plaintiff and other creditors.

124. This pattern of concealment, misrepresentation, and strategic deception was adverse to the estate and its creditors and violated the duty of loyalty, the duty of candor to the court, and the

consideration—none of which was delivered. Brookfield Asset Management is majority-owned by Brookfield Corporation (NYSE: BN), with the remaining shares held by public investors.

duty to act in the best interest of the estate. As a result, Jackson Walker is subject to a judicial declaration of breach of fiduciary duty.

125. Plaintiff therefore seeks declaratory relief pursuant to 28 U.S.C. § § 2201, 2202, that Jackson Walker breached its fiduciary duties under 11 U.S.C. §§ 101(14), 327, 1106, and 1107, and Rule 2014(a).

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that:

126. Defendants be cited to appear and answer herein;

127. The Court enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, determining the rights and obligations of the parties under the Settlement Agreement and applicable bankruptcy law, including but not limited to the following declarations that:

a. the value of the cash and collateral, including the PropCo real estate collateral, securing the 1st Lien and Term Loan Secured Debt, as well as the 2nd Lien Secured Debt must be determined based on fair market value, not foreclosure or credit bid value; and that such fair market value for the PropCo real estate was judicially determined by the PropCo Trustee to be $1.93 Billion, which controls for purposes of creditor distributions and tax reporting under 11 U.S.C. § 506(a), applicable plan documents, and governing precedent;

b. the distribution of the PropCo Acquired Assets—including, without limitation, the $360 Million in PropCo Closing Cash, the $520 Million New Term Loan (or its cash equivalent), the Earn-Out Certificates (or their cash equivalent), the PropCo Securities valued at $1.93 Billion (or their cash equivalent), the PropCo rental income since closing, and the $30 Million wind-down distribution issued on or about December 23, 2023—must be made on a pro rata basis to holders of DIP and Class 4 First Lien Claims in compliance with

11 U.S.C. § 1123(a)(4), the Settlement Agreement, and applicable plan documents;

c. The pre-plan Settlement Agreement and controlling precedent, including *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997), require that substantially all of the Debtor's assets be valued based on their fair market value—not the Credit Bid Amount—and that Plaintiffs' and proposed intervenors' liens remain valid and enforceable against the collateral and its proceeds;

d. the transfer of $5.2 Billion of the Debtors' OpCo assets to unsecured creditor Defendant Penney Intermediate Holdings, for zero consideration constitutes a non-*pro rata* liquidation of the Debtors' assets, in violation of the absolute priority rule under 11 U.S.C. §§ 1129(b)(2) and 1123(a)(4), and therefore these assets must be distributed to creditors according to absolute priority;

e. the undisclosed, non-*pro rata* distributions to the DIP Lenders—resulting in recoveries exceeding seven times the amount owed on the $900 Million DIP facility—are improper pursuant to *In re Serta Simmons Bedding, LLC*, 81 F.4th 1284 (5th Cir. 2024);

f. the distributions made under the pre-plan settlement (Dkt. 1814) which disposed of substantially all of J.C. Penney's more than $8 Billion in assets, must comply with the absolute priority rule set forth in *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) and In re *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).

g. Jackson Walker breached its fiduciary duties to Creditors in violation of 11 U.S.C. §§ 101(14), 327, 1106, and 1107, and Rule 2014(a).

h. Defendant Onyx Partners is not entitled to the protections afforded to good-faith purchasers under 11 U.S.C. § 363(m) or any other legal doctrine, as it has both constructive and actual notice that title to the PropCo assets is contested; and title to said assets and any proceeds derived therefrom remains clouded by Plaintiffs' and proposed intervenors' valid and perfected liens.

128. Jackson Walker's breach of fiduciary duties caused damages to Plaintiff and proposed intervening parties in an amount not less than $330 Million, plus additional damages to be determined at trial.

129. Plaintiff and agreed intervening parties, Michael Wachs and Barnett Capital are granted such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

130. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 8, 2025

Respectfully submitted,

ERIC L. MOORE
/s/ *Eric L. Moore*
202 Island Avenue
San Diego, CA 92101
Telephone: (336) 671-2193
Email: moorelyndell7@gmail.com
*Pro se*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2025, I caused a copy of the foregoing document to be served by the Court's CM/ECF system for the United States District Court for the Southern District of Texas.

/s/ *Eric L. Moore*

Eric L. Moore
202 Island Avenue
San Diego, CA 92101
Telephone: (336) 671-2193
Email: moorelyndell7@gmail.com
*Pro se*

# EXHIBIT A

# J. C. PENNEY COMPANY, INC.
## (Debtor-in-Possession)
## CONSOLIDATED BALANCE SHEETS
(Unaudited)

| *(in millions)* | September 5, 2020 | September 7, 2019 | February 1, 2020 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash in banks and in transit | $ 219 | $ 144 | $ 108 |
| Cash short-term investments | 663 | 8 | 278 |
| Restricted cash | 529 | — | — |
| Cash, cash equivalents and restricted cash | 1,411 | 152 | 386 |
| Merchandise inventory | 1,805 | 2,514 | 2,166 |
| Prepaid expenses and other | 533 | 304 | 174 |
| Total current assets | 3,749 | 2,970 | 2,726 |
| Property and equipment, net | 3,108 | 3,567 | 3,488 |
| Operating lease assets | 786 | 920 | 998 |
| Prepaid pension | 34 | 169 | 120 |
| Other assets | 640 | 661 | 657 |
| **Total assets** | $ 8,317 | $ 8,287 | $ 7,989 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Merchandise accounts payable | $ 189 | $ 1,033 | $ 786 |
| Other accounts payable and accrued expenses | 829 | 924 | 931 |
| Current operating lease liabilities | — | 84 | 68 |
| Debtor-in-possession financing | 900 | | - |
| Current portion of long-term debt, net | 1,256 | 197 | 147 |
| Total current liabilities | 3,174 | 2,238 | 1,932 |
| Noncurrent operating lease liabilities | | 1,083 | 1,108 |
| Long-term debt | — | 3,591 | 3,574 |
| Deferred taxes | 40 | 122 | 116 |
| Other liabilities | 251 | 362 | 430 |
| **Total liabilities not subject to compromise** | 3,465 | 7,396 | 7,160 |
| Liabilities subject to compromise | 5,053 | | - |
| **Stockholders' (deficit) equity** | | | |
| Common stock | 161 | 159 | 160 |
| Additional paid-in capital | 4,721 | 4,721 | 4,723 |
| Reinvested earnings/(accumulated deficit) | (4,725) | (3,675) | (3,667) |
| Accumulated other comprehensive income/(loss) | (358) | (314) | (387) |
| **Total stockholders' (deficit) equity** | (201) | 891 | 829 |
| **Total liabilities and stockholders' (deficit) equity** | $ 8,317 | $ 8,287 | $ 7,989 |

Note: The financial statements presented are internal monthly financial statements within a fiscal quarter, do not include certain quarterly adjustments and other important explanatory notes, and have not been audited or reviewed by any independent public accounting firm. Quarterly financial statements are subject to internal controls over financial reporting performed only with respect to quarterly financial statements. Consequently, these monthly financial statements may be subject to future reconciliation or adjustments to conform to generally accepted accounting principles or reporting requirements of the SEC and may not be representative of our financial position or indicative of future operating results or cash flows.

# EXHIBIT B

# JCPenney Reaches Agreement in Principle with Brookfield Property Group and Simon Property Group to Acquire Retail and Operating Assets

**Intends to Establish Separate "OpCo" and "PropCo" Entities to Maximize Value for Stakeholders and Maintain JCPenney Banner for Decades to Come**




PLANO, Texas (Sept. 9, 2020) – J. C. Penney Company, Inc. (OTCMKTS: JCPNQ) today announced that it has reached an agreement in principle to sell JCPenney through a court-supervised sale process. The Company plans to seek approval of a disclosure statement and, ultimately, confirmation of a plan of reorganization in parallel with the sale process. Related to the sale process, JCPenney expects to execute a "stalking horse" asset purchase agreement ("APA"), which will track an executed letter of intent, outlining the following:

- Brookfield Property Group ("Brookfield") and Simon Property Group ("Simon") intend to acquire substantially all of JCPenney's retail and operating assets ("OpCo") for $1.75 billion, which includes a combination of cash and new term loan debt.
- The agreement contemplates the formation of a separate real estate investment trust and a property holding company ("PropCos"), which will include 161 of the Company's real estate assets and all of its owned distribution centers. The PropCos will be owned by the Company's Ad Hoc Group of First Lien Lenders ("First Lien Lenders").
- The OpCo and PropCos will enter into a master lease with respect to the properties and distribution centers moved into the PropCos.

"We have determined that an agreement with Brookfield and Simon, as well as the formation of separate real estate investment trusts owned by our First Lien Lenders, is the best path forward to maximize value for our stakeholders, ensure we keep the most stores open and associates employed, and position JCPenney to build on our over 100-year history," said Jill Soltau, chief executive officer of JCPenney. "The interest in our operations reflects our Company's strength and our loyal customer base. It is a testament to the hard work and dedication of our talented associates and the progress we have made in implementing our Plan for Renewal to Offer Compelling Merchandise, Drive Traffic, Deliver an Engaging Experience, Fuel Growth, and Build a Results-Minded Culture."

Ms. Soltau continued, "As we continue to move through the sale process, our focus will remain on serving our customers and working seamlessly with our vendor partners. We have been a trusted partner to all of our stakeholders since 1902, and we expect to continue that track record for decades to come under the JCPenney banner."

Upon the execution of the APA, the agreement will be binding on Brookfield, Simon, and the First Lien Lenders. JCPenney intends to file a motion seeking authorization from the U.S. Bankruptcy Court for the Southern District of Texas (the "Court") to conduct an auction pursuant

to Section 363 of U.S. Bankruptcy Code. Accordingly, the motion is expected to set out the proposed bidding procedures for the auction, with Brookfield, Simon, and the First Lien Lenders serving as the "stalking horse bidder," designed to achieve the highest or otherwise best offer for the benefit of JCPenney's stakeholders.

It is anticipated that the Company will complete the auction and emerge from the Court-supervised process operating under the JCPenney banner in advance of the 2020 holiday season.

### Additional Information

As previously announced, JCPenney entered into a restructuring support agreement with lenders holding approximately 90 percent of its first lien debt to reduce the Company's outstanding indebtedness and strengthen its financial position. To implement the financial restructuring plan, the Company filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

Additional information regarding JCPenney's financial restructuring is available at jcprestructuring.com. Court filings and information about the claims process are available at cases.primeclerk.com/JCPenney, by calling the Company's claims agent, Prime Clerk, toll-free at 877-720-6576, or by sending an email to JCPenneyinfo@primeclerk.com.

### Advisers

Kirkland & Ellis LLP is serving as legal adviser, Lazard is serving as financial adviser, and AlixPartners LLP is serving as restructuring adviser to the Company.

### Forward-Looking Statements

The Company has included statements in this communication that may constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "expect" and similar expressions identify forward-looking statements, which include, but are not limited to, statements regarding sales, cost of goods sold, selling, general and administrative expenses, earnings, cash flows and liquidity. Forward-looking statements are based only on the Company's current assumptions and views of future events and financial performance. They are subject to known and unknown risks and uncertainties, many of which are outside of the Company's

control that may cause the Company's actual results to be materially different from planned or expected results. Those risks and uncertainties include, but are not limited to, risks attendant to the bankruptcy process, including the Company's ability to obtain court approval from the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") with respect to motions or other requests made to the Bankruptcy Court throughout the course of the Company and its subsidiaries' Chapter 11 cases (the "Chapter 11 Cases"); the ability of the Company to negotiate, develop, confirm and consummate a plan of reorganization; the effects of the Chapter 11 Cases, including increased legal and other professional costs necessary to execute the Company's reorganization, on the Company's liquidity (including the availability of operating capital during the pendency of the Chapter 11 Cases), results of operations or business prospects; the effects of the Chapter 11 Cases on the interests of various constituents; the length of time that the Company will operate under Chapter 11 protection; risks associated with third-party motions in the Chapter 11 Cases; Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general; conditions to which any debtor-in-possession financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside the Company's control; general economic conditions, including inflation, recession, unemployment levels, consumer confidence and spending patterns, credit availability and debt levels; changes in store traffic trends; the cost of goods; more stringent or costly payment terms and/or the decision by a significant number of vendors not to sell the Company merchandise on a timely basis or at all; trade restrictions; the ability to monetize non-core assets on acceptable terms; the ability to implement the Company's strategic plan, including its omnichannel initiatives; customer acceptance of the Company's strategies; the Company's ability to attract, motivate and retain key executives and other associates; the impact of cost reduction initiatives; the Company's ability to generate or maintain liquidity; implementation of new systems and platforms; changes in tariff, freight and shipping rates; changes in the cost of fuel and other energy and transportation costs; disruptions and congestion at ports through which the Company imports goods; increases in wage and benefit costs; competition and retail industry consolidations; interest rate fluctuations; dollar and other currency valuations; the impact of weather conditions; risks associated with war, an act of terrorism or pandemic; the ability of the federal

government to fund and conduct its operations; a systems failure and/or security breach that results in the theft, transfer or unauthorized disclosure of customer, employee or Company information; legal and regulatory proceedings; the Company's ability to access the debt or equity markets on favorable terms or at all; risks arising from the delisting of the Company's common stock from the New York Stock Exchange; and the impact of natural disasters, public health crises or other catastrophic events on the Company's financial results, in particular as the Company manages its business through the COVID-19 pandemic and the resulting restrictions and uncertainties in the general economic and business environment. Please refer to the Company's Annual Report on Form 10-K for the year ended February 2, 2020, and quarterly reports on Form 10-Q filed subsequently thereto, for a further discussion of risks and uncertainties. There can be no assurances that the Company will achieve expected results, and actual results may be materially less than expectations. Investors should take such risks into account and should not rely on forward-looking statements when making investment decisions. Any forward-looking statement made by the Company in this communication is based only on information currently available to it and speaks only as of the date on which such statement is made. The Company does not undertake to update these forward-looking statements as of any future date.

**Media Relations:**
Dione Martin
(972) 431-3400 or jcpnews@jcp.com; Follow us @jcpnews

Meaghan Repko / Jed Repko / Dan Moore
Joele Frank Wilkinson Brimmer Katcher
(212) 355-4449

**Investor Relations:**
(972) 431-5500 or jcpinvestorrelations@jcp.com

**About JCPenney:**
J. C. Penney Company, Inc. (OTCMKTS: JCPNQ), one of the nation's largest apparel and home retailers, combines an expansive footprint of stores across the United States and Puerto Rico with a powerful eCommerce site, jcp.com, to deliver style and value for all hard-working American families. At every touchpoint, customers will discover

# EXHIBIT C

**To:** Dunne, Dennis[DDunne@milbank.com]; ALeblanc@milbank.com[ALeblanc@milbank.com]; Reimer, Eric[EReimer@milbank.com]
**Cc:** Yenamandra, Aparna[aparna.yenamandra@kirkland.com]; David S. Kurtz (david.kurtz@lazard.com)[david.kurtz@lazard.com]; Marcus, Christopher[cmarcus@kirkland.com]
**From:** Sussberg, Josh[/O=KIRKLAND-ELLIS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=JOSHUA SUSSBERG]
**Sent:** Fri 9/11/2020 8:00:18 AM Central Daylight Time
**Subject:** FW: JCP -Marked TS/Illustrative recovery analysis
**Attachment:** Illustrative Credit Bid Exhibit.pdf
**Attachment:** JCP Credit Bid Term Sheet-4842-4103-9561-v10-4823-7561-5178-v3.docx
**Attachment:** Redline - JCP Credit Bid Term Sheet-4842-4103-9561-v10-4823-7561-5178-v1 and JCP Credit Bid Term Sheet-4842-4103-9561-v10-4823-7561-5178-v3.pdf

---

This is from the Akin group. I am sure this is inconsistent with how Brigade has been pushing the recovery to the DIP. We understand the DIP is trading at 170 and the prepetition traded down to 30.

This deal, and all of our trade partners who we have spent the last few days reenergizing, will fall apart in the face of an over the top pleading from Akin. And notwithstanding this, Akin has made comments that if they cannot get fair and equitable treatment and the deals fails and people get zero, so be it.

We understand Milbank has advised the steering committee that there are good arguments to support the treatment proposed in the credit bid term sheet. I personally do not see it and think the Judge is having buyer's remorse over the roll-up; as soon as he hears about this (Akin intends to raise Monday), we open up a huge can of worms. The Committee is already focused on issues relating to the DIP and the total amount of cash received vs roll-up, having mused many times that it may seek to take another look at the order.

Absent engagement and resolution today/over the weekend, we are going to reach out to chambers to line up Judge Isgur to mediate this early next week.

We simply can't get let greed stand in the way of 70,000 jobs.

Josh Sussberg, P.C.

KIRKLAND & ELLIS LLP
601 Lexington Avenue, New York, NY 10022
T +1 212 446 4829 M +1 646 522 3223

jsussberg@kirkland.com

**From:** Dublin, Philip <pdublin@AkinGump.com>
**Sent:** Thursday, September 10, 2020 3:13 PM
**To:** Sussberg, Josh <jsussberg@kirkland.com>; Yenamandra, Aparna <aparna.yenamandra@kirkland.com>; Kurtz, David (External) <david.kurtz@lazard.com>; Mesterharm, Jim <JMesterharm@alixpartners.com>; DPaganis@alixpartners.com; Weitz, Michael <michael.weitz@lazard.com>; Tempke, Christian <christian.tempke@lazard.com>
**Cc:** *idizengoff@akingump.com <idizengoff@akingump.com>; Fisher, Daniel <dfisher@akingump.com>; Badini, Doug <dbadini@akingump.com>
**Subject:** JCP -Marked TS/Illustrative recovery analysis

Subject to FRE 408
For Discussion and Settlement Purposes Only

Attached, subject to further internal and client review and comment in all respects, is a marked version of the Credit Bid Term Sheet reflecting the construct that we discussed earlier today that we believe would provide the opportunity for a fair and equitable recovery to the holders of DIP and 1L claims. Also attached is an illustrative recovery analysis based on the Credit Bid term sheet and the Company's cleansing information showing the material overpayment to the DIP Lenders under the Credit Bid term sheet. Please let us know when you are available to discuss. Thanks, Phil

**Philip C. Dublin**
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.8083 | Internal: 38083
Fax: +1 212.872.1002 | pdublin@akingump.com | akingump.com | Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT D

# On Nov 13, 2023, at 4:26 PM, Kinney, Brian <BKinney@milbank.com> wrote:

We provided the information regarding Cetus in a separate email, which Mr. Moore then raised questions on. Here are the questions and responses:

1. What is the dollar amount per $1,000 in face value of PropCo, New Term Loan and Earn-out distributed to the 1st Lien Minority Group members?
All holders received 10 Earnout certificates , 75 Propco certificates, and $520 in principal take back loan for each $1,000 of DIP Loan. Noteholders received 0.63637 Earnout Certificates, 4.772771 Propco certificates, and $32.760302 in principal take back term loan for each $1000 of 1L notes.

2. Do the enclosed numbers include payment of the cash on the DIP Loans owned by Cetus?
The information was the aggregate number of certificates and principal of term loan issued to Cetus.

3. Was the total amount of the credit bid $1 Billion Dollars or was it increased or decreased?
It remained $1 billion.

Brian Kinney | Milbank | Special Counsel
55 Hudson Yards | New York, NY 10001-2163
T: +1 212.530.5392
BKinney@milbank.com | milbank.com