**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ERIC LYNDELL MOORE,<br><br>Plaintiff,<br><br>v.<br><br>JACKSON WALKER LLP; PENNEY INTERMEDIATE HOLDINGS LLC; H/2 CAPITAL PARTNERS LLC; BRIGADE CAPITAL MANAGEMENT, LP; SILVER POINT CAPITAL, L.P.; OWL CREEK ASSET MANAGEMENT, L.P., ONYX PARTNERS, LLC,<br><br>Defendants. | C.A. No. 4:25-cv-02752 |

**JCP INVESTORS' AND PENNEY HOLDINGS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 9

- I. J.C. Penney's Bankruptcy Filing ..... 9
- II. The Bankruptcy Court Orders ..... 9
- III. Moore's Earlier Request for Relief, the Enforcement Motion, Was Denied ..... 14
- IV. Moore's Adversary Complaint ..... 17
- V. The Instant Complaint ..... 18
- VI. The Plan Enforcement Motion ..... 21
- VII. The Motion to Dismiss Copper Trust, Motion for TRO, and Motion for Summary Judgment ..... 22

LEGAL STANDARD ..... 23

ARGUMENT ..... 25

- I. The Requested Declarations Would Require The Court To Abrogate The Bankruptcy Court's Orders. ..... 25
  - A. The Confirmation and Sale Orders are final, non-appealable Orders. ..... 25
  - B. Moore is bound by the Bankruptcy Court's final, non-appealable Orders. ..... 27
- II. Moore Is Bound By The Plan Injunction And The Releases In Both The Plan And Settlement Agreement. ..... 32
- III. The Bankruptcy Court Already Ruled On The Issues Raised In The Complaint And Interpreted Its Orders Related Thereto. ..... 36
- IV. Moore Fails to State a Claim Upon Which Relief Can Be Granted. ..... 40
- V. Moore's Claims Are Non-Justiciable And Must Be Dismissed. ..... 44

CONCLUSION ..... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2646 South Loop West Ltd. P'ship*,
494 Fed.Appx. 463 (5th Cir. 2012)....26

*Allen v. McCurry*,
449 U.S. 90 (1980)....36, 38

*In re Allison*,
No. 06-30040, 2006 WL 2620480 (Bankr. S.D. Tex. Sept. 12, 2006)....28

*In re Apex Long Term Acute Care - Katy, L.P.*,
599 B.R. 314 (Bankr. S.D. Tex. 2019)....26

*Arbuckle v. First Nat. Bank of Oxford (In re Arbuckle)*,
988 F.2d 29 (5th Cir. 1993)....26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....24, 40

*Assocs. Com. Corp. v. Rash*,
520 U.S. 953 (1997)....42

*In re AWECO*,
725 F.2d 293 (5th Cir. 1984)....17, 18

*Bauer v. Tex.*,
341 F.3d 352 (5th Cir. 2003)....45

*Bell v. Redflex Traffic Sys., Inc.*,
374 F. App'x. 518 (5th Cir. 2010)....44

*In re Blast Energy Servs., Inc.*,
396 B.R. 676 (Bankr. S.D. Tex. 2008)....28

*Cajun Elec. Power Coop., Inc. v. Central La. Elec. Co. (In re Cajun Elec. Power Coop., Inc.)*,
69 F.3d 746 (5th Cir. 1995), *withdrawn, in part, on other grounds,* 74 F.3d 599 (5th Cir. 1996)....35

*Carter v. Target Corp.*,
541 Fed. App'x. 413 (5th Cir. 2013)....24, 25

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995)....28

*Cervantes v. Ocwen Loan Servicing, LLC*,
No. 19-CV-7, 2019 WL 6003129 (S.D. Tex. Aug. 28, 2019) ....................................37, 38

*Cicalese v. Univ. of Tex. Med. Branch*,
456 F. Supp. 3d 859 (S.D. Tex. 2020) ....................................................................40, 41

*In re Cleveland Imaging & Surgical Hosp., L.L.C.*,
No. 14-34974, 2022 WL 677459 (Bankr. S.D. Tex. Mar. 7, 2022) *aff'd sub nom. Kriet v. Claro Grp., LLC* (S.D. Tex. Aug. 15, 2022)..............................................26

*In re Constructors of Fla., Inc.*,
349 F.2d 595 (5th Cir. 1965) ..........................................................................................31

*Doe v. University of Texas M.D. Anderson Cancer Center*,
653 F.Supp.3d 359 (S.D. Tex. 2023) ..............................................................................25

*Don Hanvey Oil Tr., Inc. v. Unit Texas Drilling, LLC*,
No. C-10-202, 2011 WL 606264 (S.D. Tex. Feb. 16, 2011), *aff'd sub nom. In re Reichmann Petroleum Corp*., 453 F. App'x 466 (5th Cir. 2011)...................................32

*Eubanks v. FDIC*,
977 F.2d 166 (5th Cir. 1992) ..........................................................................................28

*Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*,
644 F.3d 259 (5th Cir. 2011) ..........................................................................................28

*Fernandez-Montes v. Allied Pilots Ass'n*,
987 F.2d 278 (5th Cir. 1993) ..........................................................................................24

*Galaz v. Katona (In re Galaz)*,
841 F.3d 316 (5th Cir. 2016) ..................................................................................28, 33, 34

*Gallardo v. Marstiller*,
596 U.S. 420 (2022)........................................................................................................35

*In re Gibraltar Res., Inc.*,
210 F.3d 573 (5th Cir. 2000) ..........................................................................................29

*Great Lakes Dredge & Dock Co. v. Louisiana (In re Great Lakes Dredge & Dock Co.)*,
624 F.3d 201 (5th Cir. 2010) ..........................................................................................40

*Grossman v. Belridge Grp. (In re Lothian Oil, Inc.)*,
531 F. App'x 428 (5th Cir. 2013) ....................................................................................32

*Haaland v. Brackeen*,
599 U.S. 255 (2023)........................................................................................................45

*Howe v. Vaughan (In re Howe)*,
913 F.2d 1138 (5th Cir. 1990) ....................27

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
677 F.2d 1045 (5th Cir. 1982) ....................24

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................44

*Miller v. Meinhard-Com. Corp.*,
462 F.2d 358 (5th Cir. 1972) ....................27, 28, 31

*Montana v. United States*,
440 U.S. 147 ....................37

*In re NationsRent, Inc.*,
381 B.R. 83 (Bankr. D. Del 2009) ....................33, 34, 35

*New Falls Corp. v. LaHaye (In re of LaHaye)*,
17 F.4th 513 (5th Cir. 2021) ....................33

*Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*,
279 F.R.D. 395 (S.D. Tex. 2011)....................35, 36

*Orix Credit All., Inc. v. Wolfe*,
212 F.3d 891 (5th Cir. 2000) ....................45

*Pace v. Cirrus Design Corp.*,
93 F.4th 879 (5th Cir. 2024) ....................23

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) ....................23, 24

*Randall D. Wolcott, M.D., P.A. v. Sebelius*,
635 F.3d 757 (5th Cir. 2011) ....................23

*Rhodes v. Prince*,
360 F. App’x 555 (5th Cir. 2010) ....................40

*Rodriguez v. Texas Dep’t of Crim. Just.*,
No. H-06-820, 2007 WL 1521728 (S.D. Tex. May 24, 2007)....................38

*Rountree v. Dyson*,
892 F.3d 681 (5th Cir. 2018) ....................40

*Salon Suites Mem’l Gateway, LLC v. Davila*,
No. CV H-23-2408, 2024 WL 1996129 (S.D. Tex. May 6, 2024)....................37

*In re Serta Simmons Bedding, L.L.C*,
125 F.4th 555 (5th Cir. 2024) ....................18, 43

*In re Sherwin Alumina Co., L.L.C.*,
952 F.3d 229 (5th Cir. 2020) ....................27

*Smith v. Gartley (In re Berman-Smith)*,
737 F.3d 997 (5th Cir. 2013) ....................26

*Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*,
163 F.3d 925 (5th Cir. 1999) ....................37

*In re T-H New Orleans Ltd. Partnership*,
116 F.3d 790 (5th Cir. 1997) ....................35, 42

*In re Turnbow*,
121 B.R. 11 (Bankr. S.D. Tex. 1990) ....................41

*In re United Refining Co.*,
No. 83-03935, 2021 WL 160433 (Bankr. S.D. Tex. Jan. 16, 2021), *aff'd and remanded on other grounds sub nom. United Refining Co. v. Dorrion*, 688 F. Supp. 3d 558 (S.D. Tex. 2023) ....................28

*United States ex rel Gage v. Rolls-Royce N. Am., Inc.*,
760 F. App'x 314 (5th Cir. 2019) ....................37

*Matter of W. Texas Mktg. Corp.*,
12 F.3d 497 (5th Cir. 1994) ....................29, 37

*Williams v. Wu (In re TTC Plaza Ltd. P'ship)*,
No. 11-38381, 2014 WL 3057555 (Bankr. S.D. Tex. July 7, 2014)....................40

*Zardinovsky v. Arctic Glacier Income Fund (In re Arctic Glacier Int'l, Inc.)*,
901 F.3d 162 (3d Cir. 2018)....................28, 33, 35

**Statutes**

11 U.S.C. § 363....................3, 11, 12, 21

11 U.S.C. § 1129....................17, 18, 30, 44

11 U.S.C. § 1144....................13, 26, 27

28 U.S.C. §§ 2201....................45

28 U.S.C. §§ 2202....................45

**Rules**

Fed. R. Bankr. P. 8002 ........ 25, 26, 27

Fed. R. Civ. P. 9 ........ 27

Fed. R. Civ. P. 11 ........ 22

Fed. R. Civ. P. 12 ........ 1, 23, 24, 25, 41

Fed. R. Civ. P. 60 ........ 26

Fed. R. Evid. 201 ........ 1, 3, 4, 5, 9, 25

Brigade Capital Management, L.P., H/2 Capital Partners LLC, Owl Creek Asset Management, L.P., and Silver Point Capital, L.P. (collectively, the "JCP Investors") and Penney Intermediate Holdings, LLC ("Penney Holdings" or "OpCo") hereby submit this motion (this "Motion") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (each, a "Federal Rule"), in response to the *Plaintiff's Second Amended Complaint for Declaratory Judgment* [Dkt. No. 30] (the "Complaint") filed by Eric Lyndell Moore ("Moore").

## PRELIMINARY STATEMENT

1. The Complaint is an attempt by Moore to abrogate orders of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") in the chapter 11 cases (the "Chapter 11 Cases") of J.C. Penney Corporation, Inc. (together with certain of its direct and indirect subsidiaries, the "Debtors" or "JCP") ***that have been final and non-appealable for nearly five years***. But even more egregious than Moore's attempt to circumvent the finality of court orders is his inexorable effort to unwind the nearly completed reorganization of JCP, which raised much-needed liquidity, and saved more than 60,000 jobs and an enterprise of hundreds of retail stores. JCP's bankruptcy included a series of competitive, heavily-negotiated, court-approved transactions—including debtor-in-possession ("DIP") financing, a free and clear sale of substantially all of the Debtors' assets in bankruptcy, and a subsequent sale of certain of those assets outside of bankruptcy—that collectively resulted in the success of the Chapter 11 Cases. The court-approved distributions in JCP's plan of reorganization (the "Plan")[1] are part and parcel of those carefully designed transactions—any effort to unwind them threatens to disrupt the entire

[1] Amended Joint Chapter 11 Plan of Reorganization of J. C. Penney Company, Inc. and its Debtor Affiliates, Case No 20-20182, Dkt. 2190-A, attached as Exhibit A to the *Declaration of Melanie Westover Yanez in Support of JCP Investors' and Penney Holdings' Motion to Dismiss Plaintiff's Second Amended Complaint for Declaratory Judgment* (the "Yanez Declaration") filed contemporaneously herewith. The JCP Investors respectfully request that the Court take judicial notice of the Plan pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

reorganization to the detriment of thousands of stakeholders. One should not, and cannot, seek to unscramble the egg.

2. In any event, each of the declarations Moore seeks related to the JCP Investors and Penney Holdings is unequivocally barred by the doctrines of *res judicata* and collateral estoppel. Moore attempts to distract from this unequivocal bar by making Jackson Walker LLP ("Jackson Walker") the lead defendant in this action. But that does not change the nature of the action—conduct related to Jackson Walker is not alleged in any of the counts pertaining to the JCP Investors or Penney Holdings. Further, the Complaint fails to state a claim upon which relief can be granted, and none of the claims is justiciable; there is no present injury or controversy as Moore is presumably benefiting from the distributions afforded to his claim under, and being made pursuant to, the Plan. For these reasons set forth herein, the Complaint should be dismissed.

3. In his Complaint, Moore makes extensive factual allegations about the Bankruptcy Court's orders which are unsupported and false. The JCP Investors and Penney Holdings have unassailable counterarguments based on the uncontroverted record in the Bankruptcy Court to refute each of Moore's allegations. For example, the Sale Consideration (defined herein) was the highest and best offer available to the Debtors following a competitive marketing process and provided fair value to the Debtors' estates for the assets purchased. But the JCP Investors and Penney Holdings need not waste the Court's time advancing those defenses now, because the factual issues are not relevant to the inquiry before the Court. Put simply, there is nothing left to litigate in connection with the allegations raised by Moore: in December 2020, the Bankruptcy Court addressed the underlying issues, and, in September 2024, the Bankruptcy Court unambiguously rejected Moore's allegations.

4. Moore, like all creditors of JCP, is bound by the final, non-appealable order (the "Confirmation Order")[2] confirming the Plan and other orders of the Bankruptcy Court in the JCP cases. The December 2020 Confirmation Order was the culmination of several accomplishments for the Debtors. *First*, the Confirmation Order implemented the final phase of the "free and clear" sale (the "Sale") of substantially all of JCP's assets to the Debtors' first lien term lenders, first lien noteholders, and DIP lenders (collectively, the "Secured Creditors"), Simon Property Group ("Simon"), and Brookfield Property Group ("Brookfield"), pursuant to section 363 of the Title 11 of the United States Code (the "Bankruptcy Code"). The Sale Consideration (defined *infra*) collectively provided by the Secured Creditors, Simon, and Brookfield for the Debtors assets—after an extensive and competitive bidding process—was approved by the Bankruptcy Court in the order (the "Sale Order"),[3] which Sale Order was expressly incorporated into the Confirmation Order. It was the actions of the purchasers in funding the cases and ultimately the Sale and transfer to the liquidating trust that facilitated a feasible Plan. The Secured Creditors provided the Sale Consideration and the Plan expressly provided that Copper Trust would have a finite life and the ability to distribute proceeds from an eventual sale outside of bankruptcy.

---

[2] *Amended Order Approving the Disclosure Statement For, and Confirming, the Amended Joint Chapter 11 Plan of Reorganization of J.C. Penney Company, Inc. and Its Debtor Affiliates*, Case No. 20-bk-20182, Dkt. No. 2190, attached to the Yanez Declaration as Exhibit B. The JCP Investors respectfully request that the Court take judicial notice of the Confirmation Order, and the fact that it is a final, non-appealable order, pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

[3] *Order (I) Authorizing (A) Entry Into and Performance Under the Asset Purchase Agreement and (B) the Sale of the OpCo Acquired Assets and the PropCo Acquired Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (C) Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Granting Related Relief*, Case No. 20-bk-20182, Dkt. No. 1814. The Sale Order is attached to the Yanez Declaration as Exhibit C. The JCP Investors respectfully request that the Court take judicial notice of the Sale Order, and the fact that it is a final, non-appealable order, pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

5. *Second*, the Sale Order approved a comprehensive settlement agreement (the "Settlement Agreement")[4] that resolved the objections of, and benefitted, a minority group of Secured Creditors (the "Minority Group") to the Plan and the related Sale. The Settlement Agreement was also expressly incorporated into the Plan like the Sale Order. Pursuant to the Settlement Agreement, the parties, including the Minority Group—on behalf of themselves and their respective successors and assigns (including Moore)—fully and forever released all claims against, among other parties, the JCP Investors, arising from or relating to the Plan and the Sale transaction.

6. *Third*, the Plan also included standard and customary injunctions preventing creditors from "***taking any actions to interfere with the implementation or Consummation of the Plan***" (the "Plan Injunction") to provide finality for the Debtors and their estates. The Plan went effective in January 2021 and, nearly five years later, the Debtors' estates are in the final stages of a comprehensive and arduous wind-down, with professionals working to resolve the last remaining claims.

7. Over the past year, Moore has engaged in a laborious collateral attack on the Confirmation Order. In August 2024, Moore filed a motion in the Bankruptcy Court that purported to seek to "enforce" the Confirmation Order, but which sought to fundamentally change the terms of the Plan (the "Enforcement Motion").[5] In that motion, Moore argued, like he does to this Court, that the purchase price for the Debtors' assets should have been based on his understanding of "fair

[4] Case No. 20-bk-20182, Dkt. No. 1814-B. The Settlement Agreement refers to the agreement dated as of November 5, 2020, executed by an ad hoc group of first lienholders on behalf of itself and each of its members, the first lien minority group, and the Debtors, approved by the Court as Exhibit B to the Sale Order. The Settlement Agreement is attached to the Yanez Declaration as Exhibit D. The JCP Investors respectfully request that the Court take judicial notice of the Settlement Agreement, as approved by the final, non-appealable Sale Order, pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

[5] *Copper Property CTL Pass Through Trust's Emergency Motion to Enforce the Court's Orders and for Civil Contempt*, Case No. 20-20184, Dkt. No. 1689.

market value," rather than the actual winning bid for the assets submitted by the Secured Creditors, Simon, and Brookfield, and further contended that the distributions of Sale proceeds under the Plan violated the absolute priority rule. Moore requested that the Bankruptcy Court enforce the purported "fair market value requirement" and distribute alleged surplus Sale proceeds in accordance with the absolute priority rule, along with other similar relief. Following an evidentiary hearing in September 2024, the Bankruptcy Court unequivocally denied the relief sought by Moore noting "[t]here's no evidence" of his allegations, there is "nothing to enforce under the Plan or Confirmation Order," and "[t]here's no evidence that wind-down professionals are not making distributions based on the actual terms of the Plan."[6]

8. Undeterred, Moore filed a motion for reconsideration from the order denying his Enforcement Motion.[7] He then withdrew the Reconsideration Motion in favor of filing an adversary proceeding (the "Adversary Proceeding") against Copper Property CTL Pass Through Trust ("Copper Trust"), a trust established by the Secured Creditors to hold the PropCo Acquired Assets,[8] and Penney Holdings, an entity established to hold and operate the OpCo Acquired Assets,[9] asserting the same misrepresented facts and flawed theories and seeking declaratory relief nearly identical to that sought in the instant Complaint. Copper Trust and Penney Holdings moved to dismiss that complaint, which motion was fully briefed as of March 25, 2025, and is pending a

---

6 *See also* Case No. 20-20184, Dkt. No. 1591, Bench Ruling Tr. ("Bench Ruling") at 16:19-23 ("The purchase price for the assets was the Credit Bid and additional consideration described in the sale motion, the sale hearing, the Settlement Agreement, the Sale Order, the Disclosure Statement, and the Plan."). The transcript of Bench Ruling is attached to the Yanez Declaration as Exhibit E. The JCP Investors respectfully request that the Court take judicial notice of the Bankruptcy Court's bench ruling, pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

7 *Motion for Reconsideration and/or Request for Clarification and for Ruling on Accounting of the DIP Lenders' Distributions on Their $900 Million Debt and Clarification of the Secured Status of the First Lien Noteholders*, Case No. 20-bk-20184, Dkt. No. 1602 (the "Reconsideration Motion").

8 PropCo Acquired Assets has the meaning ascribed to it in the Plan.

9 OpCo Acquired Assets has the meaning ascribed to it in the Plan.

ruling from the Bankruptcy Court. On August 18, 2025, Moore filed a motion seeking to withdraw his complaint in the Adversary Proceeding. As of the date of this Motion, however, the Adversary Proceeding remains open.

9. Now, Moore is taking his third bite at the apple by filing the instant Complaint before this Court making, once again, the same unsupported allegations and seeking the same improper declarations. Specifically, through the new Complaint, Moore continues to seek declaratory judgments regarding, for example, the value of the Secured Creditors' collateral and the approved Plan distributions, which declarations would effectively abrogate the nearly five-year old Confirmation Order. Moore is foreclosed from challenging those rulings by the doctrines of *res judicata* and collateral estoppel.

10. Moore's Complaint named Onyx Partner, LLC ("Onyx"),[10] the proposed purchaser of the last remaining assets held by Copper Trust, as a defendant, but then, today, Moore filed a (factually inaccurate) pleading to dismiss Onyx *with prejudice*. That pleading is still pending before the Court and the JCP Investors support dismissing Onyx with prejudice. Nevertheless, the timing and substance of Moore's filings continue to suggest that he is attempting to interfere with the distribution of proceeds from the pending sale to Onyx and to the Copper Trust certificateholders, despite any representations to the contrary.[11] Specifically, on July 25, 2025, Copper Trust announced a planned sale of the trust's remaining assets (the "Remaining Trust Assets")—a complex real estate portfolio of nearly 120 distinct real properties housing J.C. Penney

[10] Notwithstanding that Moore named Onyx Partners LLC in the Complaint, the proposed purchaser of the Remaining Trust Assets (as defined herein) is Onyx Partners Ltd.

[11] Although Moore has dismissed Copper Trust and moved to dismiss Onyx from the present action, that is almost of no moment because on September 5, 2025, only hours after this Court entered an order dismissing Copper Trust from the instant action with prejudice, and days before Moore filed a pleading to dismiss Onyx with prejudice, Moore took a *fourth* bite at the apple, commencing a new litigation against Copper Trust, GLAS USA LLC, *and* Onyx Partners, LLC, based on the same nucleus of facts. *See Moore v. Copper Trust, et al.*, Case No. 4:25-cv-04246.

department stores—for $947 million in cash, subject to customary closing adjustments and prorations to Onyx. After the announcement, Moore named Onyx as a defendant in this action and made the outrageous allegation that he has liens on the Remaining Trust Assets notwithstanding that the assets were transferred to Copper Trust by Debtors ***free and clear of all liens and encumbrances*** pursuant to the Sale Order, which was incorporated into the Confirmation Order. Moore has no such lien.

11. The sale of the Remaining Trust Assets is the product of an intensive process run by Newmark Group, Inc. ("Newmark"), an elite commercial real estate broker that Copper Trust hired as its advisor (following a competitive process) to consummate the sale of the Remaining Trust Assets as contemplated under the Plan. The process was particularly intense given that the Remaining Trust Assets are comprised of a complex portfolio of department store real estate, which can be complicated to market given that they are distinct commercial properties often attached to interrelated shopping malls—indeed, one of the most challenging types of real estate to sell over the last five years. After a rigorous effort, Copper Trust is now positioned to sell ***all*** of the Remaining Trust Assets within its limited remaining life as a liquidating trust and distribute the proceeds to its trust certificateholders. Copper Trust is not otherwise economically viable in its current form if it is left with a piecemeal remainder portfolio of unsold Remaining Trust Assets with which to cover its operating costs as a public company. In fact, if the Remaining Trust Assets are not sold before February 2026, there is no back up plan for Copper Trust's path forward to sell the Remaining Trust Assets and to distribute the proceeds thereof. And if Moore's reckless actions impact the pending sale and distributions to Copper Trust certificateholders, it will negatively impact what Copper Trust believes are hundreds of beneficial owners of Copper Trust certificates, including individuals and institutional investors that include family offices, mutual funds and other

institutional investors. Moore's effort to interfere with Plan consummation also puts at risk the orderly winddown of Copper Trust and impact thereof on the remaining JCP businesses.

12. Copper Trust alerted the Bankruptcy Court of Moore's behavior, and the Bankruptcy Court entered an order requiring Moore to comply with the Plan, forbidding him from litigating issues already resolved by the Bankruptcy Court, and holding him in contempt (the "Plan Enforcement Order").[12] Moore then moved to dismiss Copper Trust, first without and then with prejudice. This Court dismissed Copper Trust with prejudice on September 5, 2025. The dismissal of Copper Trust does not change the applicability of the Plan Enforcement Order. That Plan Enforcement Order remains in full force and effect against Moore, and is ***applicable to each of the JCP Investors and Penney Holdings***, regardless of whether or not Copper Trust is a defendant in this action.[13] The unambiguous terms of the Sale and Confirmation Order (including the distributions provided under the Plan, which also contemplates distributions of sale proceeds of PropCo Trust Assets to Copper Trust certificateholders) have been well-publicized and knowable since 2020. Even if those orders were previously unclear (they were not), the Bankruptcy Court has crystallized them further with the Plan Enforcement Order.

13. The Complaint should be dismissed with prejudice for the reasons stated herein. In addition, to the extent the Court is inclined to grant the Motions to Intervene,[14] the same arguments

---

[12] *Order to Enforce the Court's Orders and for Civil Contempt*, Case No. 20-20184, Dkt. No. 1690.

[13] *Copper Property CTL Pass Through Trust's Emergency Motion to Enforce the Court's Orders and for Civil Contempt*, Case No. 20-20184, ¶ 36, Dkt. No. 1689 ("His vexatious filings have forced numerous parties (including PropCo) to incur unnecessary attorneys' fees to defend against repeated, baseless litigation. Such actions are prejudicial to the Debtors, other creditors, and stakeholders who rely on the orderly and efficient reorganization process established by the Confirmation Order. And his latest maneuver puts a nearly $1 billion transaction at risk, despite the fact that his claims utterly lack merit and are in blatant disregard of this Court's Orders."); *see also* Enforcement Order.

[14] *Motion to Intervene and Statement of Joinder in Complaint* [Dkt. No. 4]; *Motion to Intervene and Statement of Joinder in Complaint* [Dkt. No. 8].

are applicable as to the proposed intervenors because they purport to hold the same type of claims as Moore. As a result, the Motions to Intervene should also be denied.

## BACKGROUND

### I. J.C. Penney's Bankruptcy Filing

14. On May 15, 2020, JCP filed for the Chapter 11 Cases to, among other things, address a liquidity crisis resulting from the closure of all of its retail stores during COVID-19, raise much-needed liquidity (provided by the Secured Creditors), and seek to reorganize and stabilize the enterprise. Pursuant to a framework agreement executed by JCP and certain of its Secured Creditors (the "Framework Agreement"), in the event the Debtors failed to produce an acceptable business plan, the Debtors would be required to conduct a robust market test (the "Market Test") for the sale of the Debtors' operating and real property assets. To fund this comprehensive process, certain of the Secured Creditors agreed to provide JCP with senior secured superpriority DIP financing, that was the product of a Debtor-run and court-approved competitive process at the onset of the cases.

### II. The Bankruptcy Court Orders

15. As contemplated under the Framework Agreement, the Debtors engaged in a Market Test process. After a five-month Market Test involving outreach to more than 100 parties, the Debtors sought approval to sell substantially all of their assets pursuant to an Asset Purchase Agreement (the "APA", and the transaction contemplated thereunder generally referred to as the Sale).[15] In connection with execution of the Sale, the parties negotiated a master lease agreement, which was a "crucial part of the integrated transaction."[16] The consideration provided pursuant to

---

15 *Notice of Executed Asset Purchase Agreement and Filing of Key Transaction Documents*, No. 20-bk-20182, Dkt. No. 1668-1, attached to the Yanez Declaration as Exhibit F. The JCP Investors respectfully request that the Court take judicial notice of the Plan pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

16 *Id.* at 2.

the APA included (1) $634 million in cash and revolver proceeds to facilitate repayment of a $1.3 billion asset-backed loan, (2) a credit bid of $1 billion (the "Credit Bid"), which was the aggregate of the $900 million of outstanding DIP financing obligations and $100 million of the outstanding first lien term loans and first lien notes obligations and (3) the assumption of certain liabilities, including debt financing payable to the Secured Creditors (collectively, the "Sale Consideration").[17] This Sale Consideration was the highest, best, and only viable option produced through the well-publicized and visible Market Test. It was also the result of extensive arm's length negotiations among the Debtors, the Secured Creditors, and Simon and Brookfield, which process was overseen and mediated by U.S. Bankruptcy Judge Marvin Isgur.

16. Before the Sale was consummated, the Minority Group filed an objection to the Sale transaction.[18] Following negotiations, including in mediation, the Debtors, the majority of Secured Creditors, and the Minority Group entered into the Settlement Agreement, pursuant to which the Minority Group agreed to withdraw its objection and support the Sale. The Settlement Agreement was approved by the Bankruptcy Court pursuant to the same order approving the Sale.

17. Pursuant to the Settlement Agreement, the Minority Group agreed to (i) withdraw any allegations of misconduct it had levied against the majority of Secured Creditors (Ex. D, Settlement Agreement ¶ 4), (ii) support the Sale (*id.* ¶ 8), and (iii) not object or support objections to the Sale (*id.*). Importantly, under the Settlement Agreement, the Minority Group, "on behalf of themselves, their affiliates and ***their respective successors and assigns***," agreed to "irrevocably and unconditionally waive, release, and forever discharge" the Debtors and the majority of Secured

---

17 *See* Ex. C (Sale Order) ¶ L; Case No. 20-bk-20182, Dkt. No. 1822, Nov. 9, 2020 Hearing Tr. at 208:15-209:11; *See also* Bench Ruling at 16:19-23 ("The purchase price for the assets was the Credit Bid and additional consideration described in the sale motion, the sale hearing, the Settlement Agreement, the Sale Order, the Disclosure Statement, and the Plan.").

18 Case No. 20-bk-20182, Dkt. No. 1621.

Creditors from any claims in connection with the Sale.[19] Each of the JCP Investors is a Released Party under the Settlement Agreement. The claims purportedly held by Moore have already benefited from the Settlement Agreement and distributions provided by the Plan.

18. After an evidentiary hearing, on November 9, 2020, the Bankruptcy Court entered the Sale Order, which approved the Settlement Agreement and provided for the sale of substantially all of the Debtors' assets. "The Sale Order expressly found [] the purchase price to be the highest and best offer."[20] Additionally, the Sale Order provided that the consideration for the assets, as contemplated in the APA, was reasonably equivalent value and fair consideration.[21] Neither the Minority Group nor any of its members appealed or otherwise challenged the Sale Order after its entry.

19. On December 16, 2020, the Bankruptcy Court entered the Confirmation Order (together with the Sale Order, the "Orders") confirming the Debtors' Plan that incorporated the Sale Order and implemented the final phase of the Sale of substantially all of JCP's assets pursuant to section 363 of the Bankruptcy Code.[22] Consistent with the Plan, the Debtors' real property and related assets, known as the PropCo Acquired Assets, were transferred "**free and clear of all**

[19] Ex. D (Settlement Agreement) ¶ 9 ("Upon, and subject to the occurrence of, the Settlement Effective Date, the Minority Group and each member thereof, on behalf of themselves, their affiliates and ***their respective successor and assigns***, shall be deemed to irrevocably and unconditionally waive, release, and forever discharge any claims they may have arising under or in connection with the Transaction, the Plan, the APA, the Credit Bid, the Sale Order, the DIP Loan, the 1L Debt, the Debtors, or the Cases against the Majority Group, its members, the Agents, the Debtors, the Debtors' estates, and their respective predecessors, successors, and assigns, and each of their respective parents, subsidiaries, affiliates, managers, present and future partners, officers, directors, employees, professionals, and agents, including any and all demands, obligations, actions, causes of action, suits, damages, accounts, judgments, liens, bonds, bills, covenants, contracts, controversies, agreements, promises, variances, costs, losses, debts, expenses and liabilities of any kind, whether known or unknown, suspected or unsuspected, asserted or unasserted, fixed or contingent, apparent or concealed, from the beginning of time through the Settlement Effective Date") (emphasis added).

[20] Ex. C (Sale Order) ¶¶ H, BB; *see also* Ex. E (Bench Ruling) at 17:6–7.

[21] Ex. E (Bench Ruling) at 17:9–11; *see* Ex. C (Sale Order) ¶ 38.

[22] The Sale was initially approved pursuant to the Sale Order. It was subsequently incorporated into the Confirmation Order.

**Liens, Claims, charges, interests, or other encumbrances**" to a trust established by the Secured Creditors.[23] Pursuant to the Plan and Confirmation Order, Copper Trust was established to hold, administer and liquidate the PropCo Acquired Assets and subsequently terminate by January 2026.[24]

20. The Plan dictated treatment of creditor classes, and as required by the Bankruptcy Code, all creditors within a class were treated equally. In the Confirmation Order, the Bankruptcy Court found that the Plan was fair and reasonable and in compliance with the Bankruptcy Code.[25] The Plan became effective in January 2021, rendering the Plan enforceable against all parties, including all claim holders.[26] Secured Creditors, including the then-holders of the claims held by Moore, received plan distributions in 2020, 2021, 2023, and most recently in 2025.[27] The Plan and Confirmation Order include a noncontroversial Plan Injunction:

> **Upon entry of this Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct**

---

[23] *Id.* As clearly stated in the final Confirmation Order, Moore has no lien, claim or other encumbrance on the Remaining Trust Assets.

> Except as otherwise specifically provided in the Plan, . . . on the Effective Date, concurrently with the Consummation of the PropCo Sale and except as otherwise set forth in the Asset Purchase Agreement, the PropCo Acquired Assets shall be transferred to and vest in [Copper Trust] free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of this Confirmation Order, the Plan, and the Asset Purchase Agreement, each as applicable.

*See* Ex. B (Confirmation Order) ¶ 108 (emphasis in original).

[24] *See* Amended and Restated Pass Through Trust Agreement, Case No. 20-bk-20182, Dkt. No. 2507-A(i) (the "Plan Supplement"), Ex. A(i) at Art. X § 10.02.

[25] Ex. B (Confirmation Order) ¶ 31.

[26] *See id.* ¶ 73 (providing that "upon the occurrence of the Effective Date, the terms of the Plan . . . shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, any and all holders of Claims or Interests (irrespective of whether holders of such Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.").

[27] *Notice of Opco Closing,* Case No. 20-20182, Dkt. No. 2094*; Notice of (I) Propco Closing and (II) Occurrence of Effective Date, Case No. 20-20182, Dkt. No. 2508; Claims Administration Status Final Report and Notice of No Distribution to Holders of General Unsecured Claims*, Case No. 20-20184, Dkt. No. 1245.

> **and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article X.F of the Plan.**[28]

The Plan also includes standard release language whereby all Secured Creditors released all claims related to the Sale and the Plan.[29]

21. The deadline to notice an appeal of the Confirmation Order was December 30, 2020. The deadline to seek revocation of the Confirmation Order for fraud under 11 U.S.C. § 1144 was June 14, 2021. Neither Moore nor his predecessors in interest timely noticed an appeal or sought revocation of the Confirmation Order.[30]

---

[28] Ex. B (Confirmation Order) ¶ 115 (emphasis in original).

[29] *See* Ex. A (Plan) X(d) ("on and after the Effective Date each of the Releasing Parties [including the Secured Creditors and unsecured creditors of JCP], in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of the foregoing entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party [same] from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, . . . based on or relating to, or in any manner arising from, in whole or in part, . . . the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, the Exit Facilities, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement . . .").

[30] Although Moore did not appeal nor seek revocation of the Confirmation Order, another *pro se* creditor did seek to revoke the Confirmation Order alleging that the bankruptcy cases were fraudulently filed. During a hearing, the Bankruptcy Court denied the motion to revoke finding that there was "no evidence of fraud or fraudulent activity in the confirmation process." *See Order Denying Motion for Revocation of Confirmation Order*, Case No. 20-20184, ¶ 2, Dkt. No. 214.

## III. Moore's Earlier Request for Relief, the Enforcement Motion, Was Denied

22. After the Orders were entered and the Plan became effective, and well after the majority of distributions had already occurred, Moore began his campaign to disrupt and interfere with implementation of the Plan. Such campaign continues to this day, even with the Plan, and its associated distributions, in its final winddown stage, with a new lawsuit filed as recently as last Friday, September 5, 2025 (*see supra* at n.11). The public docket reflects—and continues to reflect—the numerous competitive, court-approved processes (including the DIP financing, Market Test, Sale, and Plan) completed to successfully reorganize JCP and the rights and obligations afforded to claimholders as a result. Any creditor (or potential creditor) of the Debtors, may review the rights afforded to them as claimholders in JCP on the public docket and they are bound to it.

23. While Moore has not alleged the exact size or nature of his holdings, it appears from previous filings in the Bankruptcy Court, unchallenged by Moore, that he purchased his claims from Cetus Capital ("Cetus"), a member of the settling Minority Group, nearly three years after the Confirmation Order was entered.[31] Cetus was a member of the Minority Group and thus party to the Settlement Agreement.[32] Pursuant to the express terms of the publicly filed—and approved—Settlement Agreement, Cetus and all of its successors and assigns—***including Moore***—forever and unequivocally ***released*** any claims against the Secured Creditors related to the Sale and Plan.[33] Seeking to alter those terms and Orders years after the fact puts at risk the

---

[31] Ex. E (Bench Ruling) at 13:13–17; *see also Wind-Down Debtors' Objection to Enforcement Motion*, Case No. 20-bk-20184, Dkt. No. 1554, Ex. A at 4–5. To the extent Moore holds any second lien or unsecured debt, such interest holders are similarly precluded from challenging the Bankruptcy Court's prior final rulings for reasons discussed herein, have released claims pursuant to the Plan, or cannot show harm from the Sale even under Moore's, albeit incorrect, allegations.

[32] *See* Ex. E (Bench Ruling) at 8:15–9:5 ("Cetus is member of the minority group, the Minority Lender group.").

[33] Ex. D (Settlement Agreement) ¶ 9.

recoveries for all, including the distributions of the proceeds of the sale of the Remaining Trust Assets to Copper Trust certificateholders during a critical point in time.

24. Nearly another year later and more than three and one-half years after the Confirmation Order was entered, on August 8, 2024, Moore filed his Enforcement Motion seeking: one, "full disclosure, and fair and equitable distribution of what he believes are the [surplus sale proceeds] according to applicable laws, including the absolute priority rule; two, enforcement of the Court's fair market value requirement; three, equitable subordination of the DIP lending parties' first and second lien bonds and unsecured notes; and four, turnover and distribution of cash or property beyond the one billion Credit Bid amount."[34] The Debtors objected (Case No. 20-bk-20184, Dkt. No. 1554), and Copper Trust joined in the Debtors' objection (Case No. 20-bk-20184, Dkt. No. 1555). Moore thus began his campaign to alter the rights afforded to his claims despite risking the completion of the Plan and its associated distributions for all stakeholders.

25. On September 9, 2024, the Bankruptcy Court issued a bench ruling, denying the Enforcement Motion in its entirety and making several key findings, relevant to the current proceeding.[35]

- ***First***, despite Moore's faulty assertions regarding the "fair market value" of the assets transferred to Copper Trust, the Bankruptcy Court found that the value of the Debtors' assets was equal to the Sale Consideration (including the credit bid, cash component, and the assumption of certain liabilities) for those assets made by the Secured Creditors, and explained that "the Credit Bid and the proposed purchase price was fair value and the highest and best offer," after a fulsome marketing process that yielded no other bidders.[36]

[34] Ex. E (Bench Ruling) at 14:23–15:6; *see also* Enforcement Motion, Case No. 20-bk-20184, Dkt. No. 1533; *see also* Case No. 20-bk-20184, Dkt. No. 1565 (reply submitted in support).

[35] Ex. E (Bench Ruling) at 20:24; *see also* Case No. 20-bk-20184, Dkt. No. 1576 (order denying Enforcement Motion).

[36] *Id.* at 17:15-24 ("The purchase price for the assets was the Credit Bid and additional consideration described in the sale motion, the sale hearing, the Settlement Agreement, the Sale Order, the Disclosure Statement, and the Plan").

- ***Second***, the Bankruptcy Court found, contrary to the allegations in the Enforcement Motion, "[t]here's not billions [] to distribute . . . [t]here never was" and "[t]here's no evidence that wind-down professionals are not making distributions based on the actual terms of the Plan."[37] Accordingly, there is "nothing [] to enforce under the Plan or the Confirmation Order."[38]

- ***Third***, the Bankruptcy Court held that any challenges regarding the Plan's compliance with the absolute priority rule and *Jevic* were without merit as such challenges were "resolved in connection with Plan confirmation years before Moore became a debt holder."[39]

- ***Fourth***, the Court determined that there was an absence of "facts that even warrant []consideration [of the equitable subordination claim]. ***There are no bad facts***."[40]

- ***Fifth***, the Court found that, should the Enforcement Motion seek additional direct claims against other first lien debtholders (such as the JCP Investors), then such claims would have been waived under the Settlement Agreement given that "Moore acquired Cetus's debt years after it settled and agreed to the releases under the Settlement Agreement and [years after] the Plan was confirmed."[41]

- ***Sixth***, the Court determined that "because consideration for the Debtors' assets under the Sale Order [was] not valued at the multi-billion valuation Moore alleges," Moore did not have any viable claims for turnover or distribution of additional cash or property as a holder of a first lien debt claim.[42]

26. Following the Bankruptcy Court's denial of the Enforcement Motion, Moore sought reconsideration of the order denying his Enforcement Motion. He then withdrew that Reconsideration Motion in favor of filing the Adversary Proceeding against Copper Trust and Penney Holdings.

---

[37] *Id.* at 18:15–21.

[38] *Id.*

[39] *Id.* at 18:22–19:18.

[40] *Id.* at 19:19–20:7 (emphasis added).

[41] *Id.* at 20:8–18.

[42] *Id.* at 20:19–23.

## IV. **Moore's Adversary Complaint**

27. Moore initiated the Adversary Proceeding on October 31, 2024,[43] against Copper Trust, a trust originally established by the Secured Creditors to hold the PropCo Acquired Assets, and Penney Holdings, an entity originally established by Simon and Brookfield to hold and operate the OpCo Acquired Assets. First, the Adversary Complaint, like the present Complaint, seeks a declaration that the fair market value of the PropCo real estate was no less than $1.93 billion, not the $1 billion Credit Bid Amount.[44] Second, the Adversary Complaint, like the present Complaint, seeks a declaration that the absolute priority rule and *In re AWECO*, 725 F.2d 293 (5th Cir. 1984), are applicable to the distribution of Debtors' assets.[45] Third, the Adversary Complaint, like the present Complaint, seeks a declaration that the distributions to Secured Creditors and other creditors violates 11 U.S.C. § 1129(b)(2).[46]

28. On February 20, 2025, Copper Trust filed a motion to dismiss the Adversary Complaint asserting, among other things, that the Adversary Complaint seeks to relitigate claims settled by final, non-appealable orders based on allegations made in direct contradiction of prior Bankruptcy Court findings. Penney Holdings also filed a motion to dismiss and joined Copper Trust's motion to dismiss on March 14, 2025. Copper Trust's motion to dismiss has been fully briefed before the Bankruptcy Court since March 25, 2025, upon filing a reply in support of its motion to dismiss.

---

[43] *Complaint for Declaratory Judgment*, Case No. 20-20184, Dkt. No. 1627 ("Adversary Complaint").

[44] *See* Adv. Compl. Count I, ¶ 92; Compl. Count I, Count II, ¶¶ 59, 73, 127(a-b).

[45] *Id*. Prayer for Relief, ¶ b; Compl. Count VI, ¶¶ 107-111.

[46] *Id*. Count III, ¶ 106; Compl. Count IV, ¶¶ 84-97.

29. On August 18, 2025, Moore filed a *Notice of Withdrawal of Adversary Proceeding* (the "Notice"),[47] in what appears to be an effort to avoid an adverse ruling from the Bankruptcy Court. In the Notice, Moore alleges that the Bankruptcy Court does not have jurisdiction to hear the Adversary Proceeding because he did not name the Debtors as a defendant in the Adversary Complaint and he alleged that his claims will not affect the bankruptcy estate.[48]

## V. **The Instant Complaint**

30. While the motions to dismiss the Adversary Proceeding remained pending before the Bankruptcy Court, on June 12, 2025, Moore filed the original complaint (the "Original Complaint") in this Court against Copper Trust, Penney Holdings, the JCP Investors, and Jackson Walker. Moore filed an amended complaint on July 18, 2025, adding a claim against Jackson Walker.

31. On August 11, 2025, Moore filed a second amended complaint. The Complaint is based on previously debunked allegations to seek the same declarations previously sought, including that the Debtors' assets were not properly valued, that the Plan distributions are in violation of 11 U.S.C. § 1129(b), and that the distributions are in violation of the absolute priority rule and *In re AWECO*. Moore claims that the court-approved Sale was an improper "uptier" transaction.[49] Moore's Complaint also includes Onyx as a defendant without asserting any claims against it. On September 5, 2025, Copper Trust was dismissed from this action with prejudice.[50]

---

[47] Case No. No. 24-02006, Dkt. No. 23.

[48] Notice ¶ 2 n. 2. The JCP Investors dispute Moore's assertions regarding jurisdiction.

[49] Notwithstanding that there was no "uptier" involved in the Sale Transaction, it appears Moore asserts this new allegation because the decision in *In re Serta Simmons Bedding, L.L.C*, 125 F.4th 555 (5th Cir. 2024), in which the Fifth Circuit rejected a prepetition "uptier" transaction, was published between the filing of the Adversary Complaint and the instant Complaint. *See* Compl. ¶ 104.

[50] *See Order Dismissing Copper Trust with Prejudice* [Dkt No. 47].

On September 8, 2025, Moore also moved to dismiss Onyx with prejudice.[51] Although the JCP Investors dispute various false representations by Moore in that pleading, they support the relief sought therein.

32. The Plan is now entering its final wind-down phase, which contemplates the pending sale of the remaining PropCo Acquired Assets held—free and clear of all encumbrances—by Copper Trust and the distribution of the sale proceeds to Copper Trust certificateholders.[52] As of the filing of this Motion, the primary Remaining Trust Assets (a subset of the PropCo Acquired Assets) that have not been liquidated are nearly 120 real properties housing JCP department stores. In or about December 2024, Newmark, a premier commercial real estate advisor, began marketing the Remaining Trust Assets on behalf of Copper Trust.[53] The marketing and negotiation process for the sale of the Remaining Trust Assets has been an intensive effort for the last eight months.[54] The intensity was driven, in part, by the fact that the Remaining Trust Assets are comprised of a complex portfolio of department store real estate, which can be

---

[51] *See Motion to Dismiss Onyx Partners LLC with Prejudice* [Dkt. No. 49].

[52] *See* Plan Supplement § 10.02 ("Termination of the Trust. The Trustee and the Trust shall be discharged or terminated, as the case may be, no later than ninety (90) days after the later of (x) the final tax returns required to be filed by the Trust have been duly filed and (y) the final reports required to be filed by the Trust pursuant to Section 6.06(c) have been duly filed, in each case, after: (a) all Trust Assets have been sold pursuant to Agreed Sales and/or Strategic Disposition Transactions; and (b) all distributions required to be made by the Trustee to the Certificateholders have been made (including any reserve previously required to be maintained pursuant to Section 5.02(f)) and the Balance of each Account is $0; but in no event shall the Trust be terminated later than five (5) years from the date hereof unless the Trustee (in consultation with the Manager) and the Majority Certificateholders determine that a fixed period extension is necessary to facilitate or complete the recovery on, and liquidation of, the Trust Assets. The Trust may not be terminated at any time by the Certificateholders. In connection with the termination of the Trust, notwithstanding other provisions hereof, any remaining Trust Assets that are of inconsequential value or otherwise insufficient to support the cost of a distribution may be transferred by the Trustee to a non-profit charitable organization qualifying under section 501(c)(3) of the IRC.").

[53] *See* News | Newmark preps J.C. Penney sale of stores estimated to raise more than $1 billion (available at https://www.costar.com/article/1928918760/newmark-preps-jc-penney-sale-of-stores-estimated-to-raise-more-than-1-billion).

[54] *See* JCPenney Retail Portfolio Landing Page | Real Capital Markets (available at https://my.rcm1.com/handler/modern.aspx?pv=m-WsN4-CGxP6OcGrwLGDmPYLJocCC-q0bGrFihwmrag#_section_4).

particularly complicated to market given that they are distinct commercial properties often attached to interrelated shopping malls – one of the most challenging types of real estate to sell over the last five years. Newmark obtained a substantial number of offers for the Remaining Trust Assets consisting of individual property offers, sub-portfolio offers, in addition to offers for the entire portfolio offers. Copper Trust evaluated all of these offers and determined to sell the entire portfolio, meaning all of the Remaining Trust Assets at one time, given Copper Trust's limited remaining life as well as the transactional complexity and extended timeline, among many other considerations, that would accompany a sale of only part of the portfolio. In particular, Copper Trust is not economically viable in its current form if it is left with a piecemeal remainder portfolio of unsold Remaining Trust Assets with which to cover its operating costs as a public company. On July 25, 2025, Copper Trust announced that Onyx had entered into an amended agreement to purchase *all* the Remaining Trust Assets for $947 million and made a non-refundable deposit towards the sale.[55] Today, Copper Trust announced an amendment to the purchase and sale agreement between Copper Trust and Onyx that extended the scheduled closing date to October 8, 2025.[56] The proceeds of the sale will be distributed to Copper Trust certificateholders, including individuals and institutional investors that include family offices, mutual funds and other institutional investors.

33. Days after the announcement of the sale to Onyx, Moore asserted in his Complaint that he possesses valid and perfected liens over the assets subject to the sale – this accusation is absurd given clear, public findings in the Confirmation Order:

---

55 *See* Press Release, Copper Property CTL Pass Through Trust, Copper Property CTL Pass Through Trust Announces Binding Purchase and Sale Agreement for Sale of Portfolio (July 25, 2025) (available at https://www.ctltrust.net/press-releases/detail/149/copper-property-ctl-pass-through-trust-announces-binding).

56 *See* Press Release, Copper Property CTL Pass Through Trust Announces Purchase and Sale Agreement Amendment (Sept. 8, 2025) (available at https://www.ctltrust.net/press-releases/detail/154/copper-property-ctl-pass-through-trust-announces-purchase).

> Except as otherwise specifically provided in the Plan, . . . on the Effective Date, concurrently with the Consummation of the PropCo Sale and except as otherwise set forth in the Asset Purchase Agreement, ***the PropCo Acquired Assets shall be transferred to and vest in [Copper Trust] free and clear of all Liens, Claims, charges, interests, or other encumbrances*** pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of this Confirmation Order, the Plan, and the Asset Purchase Agreement, each as applicable.[57]

As clearly stated in the final Confirmation Order, Moore has no lien, claim or other encumbrance on the Remaining Trust Assets.[58] Anything but an orderly liquidation of the Remaining Trust Assets held by Copper Trust could, in addition to all other damages, impact the remaining operating department stores operating under the master lease and the OpCo enterprise.

## VI. The Plan Enforcement Motion

34. On August 18, 2025, Copper Trust also alerted the Bankruptcy Court of Moore's flagrant disregard for its final, non-appealable orders and violation of the Plan Injunction by filing an emergency motion (the "Plan Enforcement Motion") seeking to enforce the Plan Injunction and hold Moore in civil contempt.[59] Counsel for Copper Trust both emailed and mailed a copy of the Plan Enforcement Motion to Moore on August 18, 2025. The Bankruptcy Court granted that motion in the Plan Enforcement Order and ordered Moore to comply with the Confirmation Order and halt his continued litigation of matters already resolved by the Bankruptcy Court. The

[57] Ex. B (Confirmation Order) ¶ 108 (emphasis in original).

[58] Moore has told the JCP Investors' counsel that he intends to dismiss Onyx from the instant action. The JCP Investors agree that Onyx should be dismissed *with prejudice*. Notwithstanding the foregoing, Moore has already filed a new complaint which names Onyx as a defendant.

[59] See Copper Property CTL Pass Through Trust's Emergency Motion to Enforce the Court's Orders and for Civil Contempt, Case No. 20-20184, Dkt. No. 1689.

Bankruptcy Court also held Moore in contempt, but did not issue any fines or other relief related to that contempt finding.[60]

## VII. The Motion to Dismiss Copper Trust, Motion for TRO, and Motion for Summary Judgment

35. Following the Plan Enforcement Order, Moore responded with a flurry of filings. First Moore filed *Plaintiff's Motion to Dismiss Copper Property CTL Pass Through Trust (Without Prejudice and Under Duress)* [Dkt. No. 36] and then subsequently *Plaintiff's Motion to Dismiss Copper Property CTL Pass Through Trust (With Prejudice and Under Duress)* [Dkt. No. 44]. The Court dismissed Copper Trust the instant action ***with prejudice*** on September 5, 2025.[61] The very same day, Moore filed a new action in the District Court against Copper Trust, GLAS USA LLC, and Onyx seeking the appointment of a receivership in connection with the pending sale to Onyx and the distribution of proceeds thereof claiming he has liens on the Remaining Trust Assets.

36. Moore also filed an emergency motion (the "TRO Motion") seeking to (i) issue a temporary restraining order enjoining the defendants from (a) seeking to enforce the Plan Enforcement Order or (b) seeking additional sanctions against Moore and (ii) vacate the Plan

[60] On August 18, the JCP Investors served Moore with a letter informing him of their intent to file a motion pursuant to Federal Rule of Civil Procedure 11 ("Rule 11"), seeking sanctions for Moore's filing of the First Amended Complaint. On August 27, this Court permitted Moore to file the Second Amended Complaint. Accordingly, the JCP Investors intend to serve Moore with an updated letter informing him of their intention to file a Rule 11 Motion with regard to Moore's Second Amended Complaint. If Moore does not withdraw his Second Amended Complaint within the safe harbor period, the JCP Investors will move this Court pursuant to Rule 11 to sanction Moore.

[61] *See Order Dismissing Copper Trust with Prejudice* [Dkt No. 47].

Enforcement Order as *ultra vires*.[62] The Court denied Moore's motion in its entirety on September 5, 2025.[63]

37. On September 4, 2025, Moore filed a purported Motion for Partial Summary Judgment.[64] Moore's factual assertions—though wrong—are not relevant because the time to challenge Plan provisions has long since passed. Moore is bound by the holdings of the final, non-appealable Orders, which Orders directly refute his allegations.

## **LEGAL STANDARD**

38. Federal Rule of Civil Procedure 12(b) enumerates certain defenses that may warrant dismissal of a complaint, including lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12 (1)-(2), (6).

39. For a court to issue a binding judgment against a defendant it must have subject matter jurisdiction over the defendant. *Pace v. Cirrus Design Corp*., 93 F.4th 879, 894 (5th Cir. 2024). Parties "may challenge the subject matter jurisdiction of the district court to hear a case" pursuant to Federal Rule 12(b)(1). *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "A trial court may find that subject matter jurisdiction is lacking based on '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) (citing *Ramming*, 281 F.3d at

---

62 *Emergency Motion for Temporary Restraining Order and for Immediate Vacatur of Ultra Vires* [Dkt. No. 39] ¶ 59.

The JCP Investors filed *JCP Investors' Opposition to (I) Plaintiff's Motion to Dismiss Copper Property CTL Pass Through Trust Without Prejudice and (II) Plaintiff's Emergency Motion For Temporary Restraining Order and for Immediate Vacatur of Ultra Vires Order and Request for Emergency Hearing*, [Dkt. No. 43] and a supplement there to [Dkt. No. 45] in response to the TRO Motion.

63 *See Order*, Case No, 25-02752, Dkt. No. 48.

64 *Plaintiff's Motion for Partial Summary Judgment* [Dkt. No. 46].

161). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming* 281 F.3d at 161.

40. In addition, where a party fails to state a claim upon which relief may be granted, dismissal of the claim is proper. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, when accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court must take all factual allegations in the complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* Conclusory statements with insufficient factual basis are not sufficient to survive a motion to dismiss. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) ("Although we must accept as true the well-pleaded allegations of a complaint dismissed for failure to state a claim, we do not accept as true conclusionary allegations in the complaint."); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").

41. The Court may consider the Confirmation Order, Sale Order, and Settlement Agreement, attached as exhibits hereto, because each is integral to the claims in the Complaint and referenced therein. *Carter v. Target Corp.*, 541 Fed. App'x. 413, 416-17 (5th Cir. 2013) ("It is well-established that documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim. In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated.") (internal citations and quotations omitted); *see also Doe v. University of Texas M.D. Anderson Cancer*

*Center*, 653 F.Supp.3d 359, 370 (S.D. Tex. 2023) ("When considering a motion to dismiss under Rule 12(b)(6), the Court's review is limited to the complaint; any documents attached to the complaint; any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint; and matters subject to judicial notice under Federal Rule of Evidence 201.").

42. Lastly, "[i]f the plaintiff's allegations are contradicted by facts disclosed by a document attached to the complaint or by facts disclosed by a document attached to the motion to dismiss that is central to the claim and referenced by the complaint, then the plaintiff's contradicted allegations are not accepted as true." *University of Texas M.D. Anderson Cancer Center*, 653 F.Supp.3d at 370; *see also Carter*, 541 Fed. Appx at 417 (holding that the court may consider documents attached to the motion to dismiss, which contradicted plaintiff's factual allegations). The Court may also take judicial notice of certain documents or facts pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201.

## ARGUMENT

### I. The Requested Declarations Would Require The Court To Abrogate The Bankruptcy Court's Orders

#### A. The Confirmation and Sale Orders are final, non-appealable Orders.

43. The Confirmation and Sale Orders are final and non-appealable. Appeals of final bankruptcy court orders are governed by Federal Rule of Bankruptcy Procedure 8002 ("Bankruptcy Rule 8002"), which provides appellants 14 days to file a notice of appeal following entry of the order. Fed. R. Bankr. P. 8002(a)(1) ("a notice of appeal must be filed with the bankruptcy clerk within 14 days after the judgment, order, or decree to be appealed is entered."). Courts have repeatedly held that failure to comply with this requirement, absent limited exceptions, deprives the appellate court jurisdiction to hear appeals of the types of orders challenged in the

Complaint. *Smith v. Gartley (In re Berman-Smith)*, 737 F.3d 997, 1003 (5th Cir. 2013) ("the failure to file a timely notice of appeal in the district court leaves the district court, and this court, without jurisdiction to hear the appeal."); *Arbuckle v. First Nat. Bank of Oxford (In re Arbuckle)*, 988 F.2d 29, 31 (5th Cir. 1993) (holding the district court lacked jurisdiction over an appeal of an order approving a settlement because the notice of appeal was not timely filed under Rule 8002); *In re 2646 South Loop West Ltd. P'ship*, 494 Fed.Appx. 463, 466-67 (5th Cir. 2012) (affirming district court's dismissal of appeals of final orders, including a confirmation order, for failure to timely appeal under Rule 8002).

44. In addition, section 1144 of the Bankruptcy Code requires a movant to demonstrate (1) no later than 180 days after the entry of the challenged confirmation order that (2) the order "was procured by fraud." 11 U.S.C. § 1144. While section 1144 generally pertains to revocation of confirmation orders, it operates to preclude other actions when the relief requested would have the same practical effect as revocation. *See In re Apex Long Term Acute Care - Katy, L.P.*, 599 B.R. 314, 319–20 (Bankr. S.D. Tex. 2019) ("While on its face, § 1144 appears to apply only to efforts to revoke a confirmation order, courts have adopted a wider approach and have applied the bar in § 1144 when the complaint in question appears to do indirectly what [the plaintiffs] no longer may do directly because of the statutory bar.") (internal quotations omitted); *In re Cleveland Imaging & Surgical Hosp., L.L.C.,* No. 14-34974, 2022 WL 677459, at *3 (Bankr. S.D. Tex. Mar. 7, 2022) *aff'd sub nom. Kriet v. Claro Grp., LLC* (S.D. Tex. Aug. 15, 2022) ("Federal Rule of Civil Procedure 60 is incorporated into bankruptcy proceedings under rule 9024. Rule 9024, however, is also explicitly clear: 'a complaint to revoke an order confirming a plan may be filed only within the time allowed under § 1144.' This time limit is strictly enforced.")

45. There is nothing left to litigate in connection with the Orders. There is no question that Moore fails to meet Bankruptcy Rule 8002's 14-day requirement. The Sale Order was entered on November 9, 2020, and the Confirmation Order was entered on December 16, 2020. As a result, Moore is forever precluded from collaterally attacking these Orders. Moore is similarly precluded from challenging the Confirmation Order under section 1144 of the Bankruptcy Code. The Complaint—filed ***1,639 days*** after the Bankruptcy Court's entry of the Confirmation Order—is barred.

46. The belated nature of the Complaint alone is sufficient to deny any relief that would have the practical effect of disrupting the finality of the Plan. And despite Moore's claims of purported fraud throughout the bankruptcy cases (*e.g.*, Compl. ¶¶ 1-2, 30-34, 46-47), these spurious and conclusory allegations are not sufficient to adequately plead fraud nor do they overcome the heightened pleading requirements of the Federal Rule 9(b). *In re Sherwin Alumina Co., L.L.C.*, 952 F.3d 229, 235 (5th Cir. 2020) (affirming dismissal of fraud claim under section 1144, with prejudice, for failure to satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b)). Because Moore is in violation of Bankruptcy Rule 8002 and section 1144 of the Bankruptcy Code, the Complaint should be dismissed.

**B. Moore is bound by the Bankruptcy Court's final, non-appealable Orders.**

47. The Complaint must be dismissed because it amounts to an improper collateral attack on the Confirmation Order, which incorporated both the Sale Order and Settlement Agreement. Indeed, it is "well settled that a plan is binding upon all parties once it is confirmed and all questions that could have been raised *pertaining to such plan are res judicata*." *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138, 1143 (5th Cir. 1990) (emphasis in original); *Miller v. Meinhard-Com. Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("An arrangement confirmed by a bankruptcy court has the effect of a judgment rendered by a district court, and any attempt by the

parties or those in privity with them to relitigate any of the matters that were raised or could have been raised therein is barred under the doctrine *res judicata*") (internal citations omitted); *In re United Refining Co.*, No. 83-03935, 2021 WL 160433, at *6 (Bankr. S.D. Tex. Jan. 16, 2021) (citations omitted) ("[A] bankruptcy court confirmation order is binding and final and has the weight of a final judgment for res judicata purposes."), *aff'd and remanded on other grounds sub nom. United Refining Co. v. Dorrion*, 688 F. Supp. 3d 558 (S.D. Tex. 2023). A final confirmed plan cannot be collaterally attacked by aggrieved parties. *Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*, 644 F.3d 259, 265 (5th Cir. 2011); *see also Eubanks v. FDIC*, 977 F.2d 166, 170 (5th Cir. 1992) ("It has long been recognized that a bankruptcy court's order confirming a plan of reorganization is given the same effect as a district court's judgment on the merits for claim preclusion purposes."); *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 694 (Bankr. S.D. Tex. 2008) ("[A] claimant is precluded from bringing a collateral attack on an issue already litigated in, and decided by a confirmation order of, the bankruptcy court."); *In re Allison*, No. 06-30040, 2006 WL 2620480, at *10 (Bankr. S.D. Tex. Sept. 12, 2006) ("The confirmation order is a final judgment that is protected from collateral attack."); *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) ("[I]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decisions are to be respected.") (citation and quotation omitted).

48. Confirmed plans are also binding on any secondary purchaser or assignee of claims—assignees are not assigned rights greater than those afforded to the original claim holder of record. *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 320 (5th Cir. 2016) (applying *res judicata* to the purchaser of claims); *Zardinovsky v. Arctic Glacier Income Fund (In re Arctic Glacier Int'l,*

*Inc.)*, 901 F.3d 162, 168 (3d Cir. 2018) (finding that assignees of bankruptcy claims are subject to *res judicata* in pre-purchase settlement agreements).

49. Further, the Settlement Agreement was approved by the Sale Order, and incorporated into the Plan, and, thus, is similarly shieled from collateral attack. *In re Gibraltar Res., Inc.,* 210 F.3d 573, 576 (5th Cir. 2000) ("A settlement agreement approved and embodied in a judgment by a court is entitled to full res judicata effect") (internal citations omitted); *Matter of W. Texas Mktg. Corp.*, 12 F.3d 497, 500 (5th Cir. 1994) ("The bankruptcy court was correct when it refused to hear the government's attempt to relitigate issues already decided in the previous settlement judgment.").

50. As it relates to the JCP Investors and Penney Holdings, the Complaint seeks declarations from this Court that are in direct contradiction with the Orders, which have been final and non-appealable for ***nearly five years***. In particular, each of the declarations sought as to the JCP Investors and Penney Holdings, directly implicates rulings made by the Bankruptcy Court regarding the Sale, the Plan and distributions thereunder.

51. ***First***, Moore asks this Court to declare that the PropCo Acquired Assets were improperly valued and should be valued at "$1.93 billion" (*see* Counts I, III). The value of the PropCo Acquired Assets, however, was already determined to be part of the Sale Consideration, which included the Credit Bid, and the additional consideration described in and approved by the Orders.[65]

---

[65] Ex. C (Sale Order) ¶ 38 ("The consideration provided by the Purchasers (including the Credit Bid Amount) for the Acquired Assets under the Asset Purchase Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law"); Ex. B (Confirmation Order) ¶ 74 ("On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Administrator, and subject to the Asset Purchase Agreement, the Sale Order, and the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules").

52. ***Second***, Moore seeks a declaration that the distributions made pursuant to the Plan and Settlement Agreement (approved by the Sale Order) violate the absolute priority rule and class treatment requirements under the Bankruptcy Code (*see* Counts II, IV). The distributions, however, are being made in accordance with the Plan, which was already been approved by the Bankruptcy Court and found in the Confirmation Order to be in compliance with the absolute priority rule and sections 1123 and 1129 of the Bankruptcy Code.[66]

53. ***Third***, Moore asks this Court to declare that he has valid liens on the PropCo Acquired Assets pursuant to the same Settlement Agreement (Count III).[67] Despite the contradictory statements, neither is true. The PropCo Acquired Assets were unequivocally sold ***free and clear*** of all liens and other encumbrances pursuant to the Sale Order and Confirmation Order, not subject to those liens.[68]

54. ***Fourth***, Moore asks this Court to declare that the court-approved Sale was an "Undisclosed Uptier Transaction." (Count V). The transactions in these Chapter 11 Cases were the opposite of "undisclosed"—the Debtors went through a public bankruptcy process. Each of the transactions in the Chapter 11 Cases was subject to an extensive court process and ultimately approved by the Bankruptcy Court in final orders. Further, none of the transactions were "uptier transactions," which are out-of-court financing transactions that are ***not*** subject to Court approval or oversight, nor explicitly contemplated by the Bankruptcy Code.

---

[66] Notice of Opco Closing, Case No. 20-20182, Dkt. No. 2094; Notice of (I) Propco Closing and (II) Occurrence of Effective Date, Case No. 20-20182, Dkt. No. 2508; Claims Administration Status Final Report and Notice of No Distribution to Holders of General Unsecured Claims, Case No. 20-20184, Dkt. No. 1245.

[67] Complaint ¶¶ 79-81 ("[pursuant to the Settlement Agreement] Plaintiffs' and proposed intervenors' liens remain valid and enforceable, and continue to attach to both the OpCo and PropCo assets, as well as all proceeds derived therefrom, up to the amount of the unpaid debt, plus accruing interest from the Effective Date.").

[68] Ex. C (Sale Order) ¶ Q; Ex. A (Plan) Art. X(B).

55. In truth, the success of JCP's bankruptcy is attributed to a series of carefully formulated and integrated transactions (entered into following competitive Court-approved processes) that secured desperately-needed liquidity for the Debtors in the form of DIP financing and a path forward for the estates to reorganize the enterprise and preserve thousands of jobs. Moore is seeking to dissect portions of a *global* Plan that would not have been successful but for the sum of all its parts, putting at risk recoveries for numerous stakeholders abiding by the carefully negotiated terms of the Plan.

56. Moreover, Moore persists in his collateral attacks notwithstanding the Bankruptcy Court's Plan Enforcement Order (a) directing Moore to comply with its Orders, (b) precluding him from relitigating issues previously adjudicated, and (c) finding him in contempt on account of his vexatious litigation.[69] That order remains in full force and effect against Moore.[70]

57. For these reasons alone, the counts relevant to the JCP Investors and Penney Holdings in the Complaint must be dismissed because they are an attempt "to relitigate any of the matters that were raised or could have been raised [at confirmation] [and are] barred under the doctrine *res judicata*." *Port of Corpus Christi Auth. v. Sherwin Alumina Co. (Miller v. Meinhard-Com. Corp.)*, 462 F.2d 358, 360 (5th Cir. 1972); *In re Constructors of Fla., Inc.*, 349 F.2d 595, 601 (5th Cir. 1965) (confirming the preclusive effect of bankruptcy plan confirmations). Moore's frivolous attacks on the Confirmation and Sale Orders must come to an end. The Debtors, and all creditors of their estates, should enjoy the peace of finality that the law is meant to give them in the final Orders.

---

[69] Enforcement Order.

[70] *See Order*, Case No, 25-02752, Dkt. No. 48.

## II. <u>Moore Is Bound By The Plan Injunction And The Releases In Both The Plan And Settlement Agreement</u>

58. As is standard and customary in plans of reorganization, the Plan Injunction enjoins Moore from "**taking any actions to interfere with the implementation or Consummation of the Plan**." Ex. A Plan at 53; Ex. B, Confirmation Order ¶ 115. By the Complaint, Moore is actively trying to change the distributions already approved by the Plan (Compl. ¶¶55-73) and to interfere with the pending sale of the Remaining Trust Assets to Onyx (*Id.* ¶¶ 49-53) and the distribution of proceeds therefrom. This is exactly the type of behavior from which the Plan Injunction is intended to immunize the estates. *Grossman v. Belridge Grp. (In re Lothian Oil, Inc.)*, 531 F. App'x 428, 446 (5th Cir. 2013) (affirming bankruptcy court's imposition of contempt sanctions against a plaintiff who violated the plan injunction by filing claims which were barred); *Don Hanvey Oil Tr., Inc. v. Unit Texas Drilling, LLC*, No. C-10-202, 2011 WL 606264, at *11 (S.D. Tex. Feb. 16, 2011), *aff'd sub nom. In re Reichmann Petroleum Corp.*, 453 F. App'x 466 (5th Cir. 2011) (finding that a party to a settlement agreement which was part of a bankruptcy plan could not bring related state claims due to the plan injunction). Moore is indisputably in violation of the Plan Injunction and the Complaint must be dismissed.[71]

59. In addition, Moore is bound by the releases in both the Plan and the Settlement Agreement, which, for the reasons set forth herein, foreclose Moore from asserting claims against the JCP Investors and Penney Holdings, or any other creditors, related to the Plan or Sale. Those releases were approved in the Sale Order and the Confirmation Order, which, as discussed *supra* Section II, are now final, non-appealable orders.

---

[71] Moore is also precluded from pursuing this action by the Bankruptcy Court's Injunction Enforcement Order. *See infra* ¶ Section VI.

60. It is well established that all creditors are explicitly bound by the releases in a confirmed plan of reorganization. *See New Falls Corp. v. LaHaye (In re of LaHaye)*, 17 F.4th 513, 518 (5th Cir. 2021) ("Indeed, a [chapter 11 plan] confirmation order binds every entity that holds a claim or interest in the planned reorganization, regardless of whether they assert those interests before the bankruptcy court"); *In re Arctic Glacier Int'l, Inc.*, 901 F.3d at 168 (holding that post-confirmation transferees of claims were bound to the broad releases in the plan because they "took the shares with all their associated benefits and burdens, including the releases"); *see also In re NationsRent, Inc.*, 381 B.R. 83, 95 (Bankr. D. Del 2009) (interpreting a 9019 settlement in a chapter 11 case as binding on subsequent purchasers); *In Matter of Galaz*, 841 F.3d at 325-326 (finding that a transferee of claims that had been released pursuant to a settlement approved by the bankruptcy court in a chapter 13 proceeding, took the claims subject to the releases). Here, under the confirmed Plan, all secured and unsecured creditors—including Moore—have explicitly released claims against all other creditors:

> Each of the Releasing Parties [including Moore], in each case on behalf of itself and its respective successors, assigns, and representatives . . . shall be deemed to have ***conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party [including the JCP Investors and Penney Holdings]*** [72] from any and all Claims . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors . . . the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out-of-court restructuring efforts, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases . . . the DIP Facility, the Sale

[72] The definition of "Released Parties" in the Plan includes the "Purchaser Group" (as defined in the APA) and any of its "current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies." Plan § 1.A.167. The definition of the "Purchaser Group" under the APA includes the OpCo Purchaser—Copper Retail JV LLC—a indirect wholly-owned subsidiary of Defendant Penney Holdings. Accordingly, Penney Holdings is a Released Party under the APA. Exhibit F (APA) § XI.11.1.

> Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents . . . release, or other agreement or document created or entered into in connection with the . . . Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement . . . [73]

As a result, the Confirmation Order explicitly forecloses Moore from bringing the claims in this Complaint against the JCP Investors and Penney Holdings.

61. Further, as an assignee of a member of the Minority Group, Moore is expressly bound by the terms of the Settlement Agreement, including the releases therein. *In re NationsRent, Inc.*, 381 B.R. at 95 (interpreting a court-approved settlement in a chapter 11 case as binding on assignee); *In Matter of Galaz*, 841 F.3d at 325-26 (finding that a purchaser of claims settled in a bankruptcy had the same rights as the initial claimholder and thus releases bound the purchaser). The Minority Group, the Debtors, and the majority of the Secured Creditors (including the JCP Investors) entered into the Settlement Agreement to resolve certain disputes relating to the then-contemplated Sale. The Settlement Agreement expressly provided, among other things, that the Minority Group's ratable distributions were to be "calculated and distributed on the basis of a $1 billion Credit Bid and the Current Credit Bid Allocation" (Ex. D, Settlement Agreement ¶ 6), that

---

[73] Ex. A (Plan) X. d.(emphasis added). *See also* Ex. B (Confirmation Order) ¶¶ 35-37:

> The Third-Party Release provides finality for the Debtors, the Wind-Down Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Wind-Down Debtors. The Confirmation Hearing Notice sent to holders of Claims and Interests and published in *The New York Times* and the *Houston Chronicle* on October 30, 2020 and the Ballots sent to all holders of Claims entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release. Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all holders of Claims and Interests. Also, the Third-Party Case Release is: (a) specific in language and scope; (b) given in exchange for the good and valuable consideration provided by the Released Parties; (c) a good faith settlement and compromise of the claims released by the Third-Party Release; (d) in the best interests of the Debtors and all holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

the Minority Group would withdraw "any allegations or implications of misconduct by the members" of the majority group of Secured Creditors (Settlement Agreement, Exhibit A ¶ 4), and most critically here, that the Minority Group "on behalf of themselves, their affiliates and ***their respective successors and assigns***" would "irrevocably and unconditionally waive, release, and forever discharge" the Debtors and the Secured Creditors from any claims in connection with the Sale.[74] This Settlement Agreement was approved by the Bankruptcy Court pursuant to the final Sale Order and its terms were implemented through the final, confirmed Plan. As a result, Moore is bound by the terms of the Settlement Agreement, including the releases therein, and is, therefore, precluded from pursuing claims against the JCP Investors.[75]

62. It is of no moment that Moore purchased his claims well after the approval of the Settlement Agreement and confirmation of the Plan. Secondary purchasers are not given more rights than primary purchasers—and certainly are not given a license to double dip on the value of claims that was established well before their purchase. As an assignee-claimant, Moore is bound by the same releases as all other similarly situated creditors. *See In re Arctic Glacier Int'l, Inc.*, 901 F.3d at 168; *In re NationsRent, Inc.*, 381 B.R. at 95 (interpreting a court-approved bankruptcy settlement and noting that "[t]he Assignee Claimant, is not entitled to more than the rights Lenders had to assign."). It is a well-established legal principle that assignees do not possess greater rights than their assignors. *Gallardo v. Marstiller*, 596 U.S. 420, 434 (2022) ("it is blackletter law that assignments typically cover "only [those] rights possessed by the assignors at the time of the assignments") (internal citation omitted) (alternation in original); *Newby v. Enron Corp. (In re*

[74] Ex. D, Settlement Agreement ¶ 9 (emphasis added).

[75] Moore astoundingly asserts that the Settlement Agreement has been "violated" and asks this Court to declare as such. *See* Compl. ¶ 82 (seeking "declaratory judgment that Defendant's treatment of the Credit Bid Amount as controlling violated both the Settlement Agreement and binding precedent, including *In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir. 1997)"). Moore cannot wield the Settlement Agreement as a sword while ignoring its preclusive effect on his claims.

*Enron Corp. Sec., Derivative & ERISA Litig.),* 279 F.R.D. 395, 405 (S.D. Tex. 2011) ("[I]t is elementary ancient law that an assignee never stands in any better position than his assignor.") (internal citation omitted).

63. As a result, the claims against the JCP Investors and Penney Holdings should be dismissed as Moore is barred from bringing claims against the JCP Investors and Penney Holdings, as approved by the final Orders of the Bankruptcy Court.[76]

## III. The Bankruptcy Court Already Ruled On The Issues Raised In The Complaint And Interpreted Its Orders Related Thereto

64. Even if the Bankruptcy Court had not already entered Orders refuting Moore's arguments—it did in the Sale and Confirmation Orders—the Bankruptcy Court explicitly ruled on the claims raised in this instant action in connection with the Enforcement Motion; and thus, Moore is precluded from pursuing such claims again pursuant to the related doctrines of *res judicata* and collateral estoppel. The doctrines of *res judicata* and collateral estoppel exist to preclude the exact scenario this action presents: "res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

65. The doctrine of res judicata precludes subsequent litigation where (1) the same parties are involved in both actions, (2) the prior judgment was rendered by a court of competent jurisdiction, (3) there was a final judgment on the merits, and (4) the same cause of action was involved in both cases. *See In re of W. Texas Mktg. Corp.,* 12 F.3d at 500 (finding settlement

---

[76] Further, the Secured Creditors, presumably including Moore, already received distributions under the Plan. Moore cannot now claim that he is not bound by the Confirmation Order or the Settlement Agreement (each precluding him from filing this instant action) after having received the benefits of each. *Cajun Elec. Power Coop., Inc. v. Central La. Elec. Co. (In re Cajun Elec. Power Coop., Inc.)*, 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn, in part, on other grounds,* 74 F.3d 599 (5th Cir. 1996) (providing that a "person aggrieved" for purposes of appealing an order of the bankruptcy court must "show that it was 'directly and adversely affected pecuniarily by' the order, or the order diminished its property, increased its burdens or impaired its rights.") (internal citation omitted).

approved by bankruptcy court "carries res judicata effect and precludes relitigation of the merits of the claims decided in that agreement"). For purposes of prong one, courts consider parties identical where they are in privity. *See Salon Suites Mem'l Gateway, LLC v. Davila,* No. CV H-23-2408, 2024 WL 1996129, at *5 (S.D. Tex. May 6, 2024) ("The Fifth Circuit has stated the privity test in practical terms, asking whether the relationship 'is close enough to justify the application of *res judicata* so as to bar a second suit based on the same cause of action as the first suit'") (quoting *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1176 (5th Cir. 1992)). And the *res judicata* prohibition applies to all claims that were raised or could have been raised during a previous suit. *See Cervantes v. Ocwen Loan Servicing, LLC,* No. 19-CV-7, 2019 WL 6003129 at *5 (S.D. Tex. Aug. 28, 2019), *report and recommendation adopted*, 2019 WL 13190649 (S.D. Tex. Oct. 7, 2019). Adding additional claims is not enough to defeat the *res judicata* bar, as courts look to "whether the plaintiff bases the two actions on the same nucleus of operative facts." *Id at* *4 (internal quotation omitted).

66. The doctrine of collateral estoppel precludes relitigating an issue of fact or law previously decided by another court of competent jurisdiction. *See id.* at *3; *Montana v. United States*, 440 U.S. 147, 153 ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."). Courts evaluate collateral estoppel by using a three-prong test: "(1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action." *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925, 932 (5th Cir. 1999); *United States ex rel Gage v. Rolls-Royce N. Am., Inc.*, 760 F. App'x 314, 317 (5th Cir. 2019) (same);

*Cervantes* 2019 WL 6003129 at *6 (same). Collateral estoppel, unlike *res judicata,* does not require mutuality between the parties in the prior action and the parties (or their privities) in the subsequent action. *See Allen,* 449 U.S. at 94–95. Collateral estoppel is more expansive than res judicata and will apply even where the factual nucleus is different, as long as the issues are the same. *See Rodriguez v. Texas Dep't of Crim. Just.*, No. H-06-820, 2007 WL 1521728, at *3 (S.D. Tex. May 24, 2007) ("For collateral estoppel to apply, it is not necessary that the two cases involve the same causes of action or the same nucleus of operative fact.").

67. The Bankruptcy Court undoubtedly has ruled on issues presently before this Court—that is the interpretation, implementation, and the finality of the Confirmation and Sale Order. ***First***, as it relates to Moore's request for a declaration that the PropCo assets be valued differently than as provided for under the Confirmation and Sale Orders (Counts I, II, IV), the Bankruptcy Court already ruled that "[t]he purchase price for the assets was the Credit Bid and additional consideration described in the sale motion, the sale hearing, the Settlement Agreement, the Sale Order, the Disclosure Statement, and the Plan."[77] In fact, the Bankruptcy Court flatly rejected Moore's proposed valuation: "Moore's motion presumes that the actual purchase price for the assets was the, quote/unquote, 'fair market value,' which he says is about three billion, but . . . that's not accurate."[78] Similarly, the Bankruptcy Court expressly rejected Moore's baseless allegation that the OpCo Acquired Assets were purchased for "zero consideration" for the benefit of "preferred creditors" Simon and Brookfield (Compl. ¶ 84), noting that among other consideration, the "cash component" for the acquired assets "included $300 million cash from Simon and Brookfield."[79] ***Second***, despite Moore's allegations (*see, e.g.* Compl. ¶¶ 30, 31, 37,

77 Ex. E (Bench Ruling) at 16:19–23.

78 *Id.* at 16:16-19.

79 *Id.* at 6:6–6:9.

101), the Bankruptcy Court determined that the "Sale Order expressly found . . . the purchase price to be the highest and best offer . . . Thus, the purchase price is the consideration detailed in the APA, and the Bankruptcy Court found that it was fair value and for a consideration."[80] ***Third***, as it relates to the request for declarations that the Debtors' distributions made pursuant to the Plan are improper and violate the absolute priority rule (Counts II, VI), the Bankruptcy Court ruled that "[t]here's no evidence that wind-down professionals are not making distributions based on the actual terms of the Plan" and "[t]here's no violation of the absolute priority rule or *Jevic* either."[81] To that end, the Bankruptcy Court noted:

> the absolute priority and *Jevic* issues were resolved in connection with Plan confirmation years before Moore became a debt holder, and a Motion to Enforce the Plan cannot be used as a back-door effort to make Plan confirmation objections. The confirmation has been a Final Order for years.[82]

68. ***Fourth***, Moore's claims against the JCP Investors were "waived under the Settlement Agreement approved in connection with the Sale Order" and Moore "is entitled to no greater rights than Cetus.[83] ***Fifth***, the Bankruptcy Court ruled that "there are no viable claims for turnover or distributions of additional cash or property as a holder of a 1L debt claim." [84] And ***finally***, while evaluating Moore's equitable subordination claim the Court determined that there was an absence of "facts that even warrant []consideration [of the equitable subordination claim].

---

[80] *Id.* at 17:6-14.

[81] *Id.* at. 18:18-23.

[82] *Id.* at 18:22-19:3.

[83] *Id.* at 20:13-18.

[84] *Id.* at 20:21-23.

***There are no bad facts***,"[85] which strongly coaches against Moore's allegation that there was an improper, undisclosed sale transaction.[86]

69. The Bankruptcy Court's Bench Ruling, and the principles of *res judicata* and collateral estoppel require dismissal of the Complaint as it relates to the allegations against the JCP Investors.

## IV. Moore Fails to State a Claim Upon Which Relief Can Be Granted.

70. Pleadings that are "no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679; *Rhodes v. Prince*, 360 F. App'x 555, 559 (5th Cir. 2010) (finding under the *Iqbal* standard that a recitation of the law in a pleading without factual support was insufficient to sustain a claim). The Supreme Court held that "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 556 U.S. at 679; *see also, Rountree v. Dyson,* 892 F.3d 681, 685 (5th Cir. 2018) (affirming dismissal of plaintiff's claim for failing to allege any legally significant facts). When considering a Rule 12(b)(6) motion, the court is not required to strain to accept conclusory allegations or unwarranted factual inferences. *See Great Lakes Dredge & Dock Co. v. Louisiana (In re Great Lakes Dredge & Dock Co.)*, 624 F.3d 201, 210 (5th Cir. 2010) ("We do not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'") (internal quotation omitted); *Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 872 (S.D. Tex. 2020) ("When considering a Rule

[85] *Id.* at 20:2-4 (emphasis added).

[86] Compl. ¶ 99.

12(b)(6) motion, the court is not required to strain to accept conclusory allegations or unwarranted factual inferences.").

71. Indeed, Moore jumps to several legal conclusions without any factual support. ***First***, Moore fundamentally misconstrues the valuation of PropCo Acquired Assets in the context of a sale process. He demands that the "PropCo real estate collateral" be valued at "fair market value not foreclosure or credit bid value[.]"[87] But neither valuation (that is, neither foreclosure value nor Moore's understanding of fair market value) is applicable as the PropCo Acquired Assets were valued by the market in a robust sale process that sought bids from over 100 parties for both the PropCo Trust Assets and the OpCo Trust Assets.[88] The PropCo Acquired Assets were sold in conjunction with the OpCo Acquired Assets—the value is not only the Credit Bid, but the value of selling substantially ***all*** of the Debtors assets (both the PropCo Acquired Assets and OpCo Acquired Assets) for the entire Sale Consideration. For this reason, the PropCo Acquired Assets cannot be viewed in a vacuum. Further, a sale, where the market actually speaks, is the best way to value assets. *In re Turnbow*, 121 B.R. 11, 13 (Bankr. S.D. Tex. 1990) ("the purchase price is the best evidence of the fair market value of the property."); *Williams v. Wu (In re TTC Plaza Ltd. P'ship)*, No. 11-38381, 2014 WL 3057555, at *4 (Bankr. S.D. Tex. July 7, 2014) ("The best evidence of the fair market value of the [ ] property […] is the [] purchase price obtained for the property in 2012."). The market spoke, and the Bankruptcy Court ruled that the sale process was fair and reasonable, and the value of the assets was the Sale Consideration.

72. Moore instead looks to valuation performed for a different purpose after the assets were transferred from the Debtors to Copper Trust in a different year than the Debtors' marketing

---

87 Compl. ¶ 127.

88 Case No. 20-bk-20182, Dkt. No. 1822, Nov. 9, 2020 Hearing Tr at 20:1-2;13-14

process (which was conducted in the middle of the COVID-19 pandemic). This reasoning is flawed in myriad ways. The best way to actually value assets at any point in time is by what willing buyers will actually pay for those assets. The value of certain assets, a year after the arms-length sale, during different economic conditions, and after a buyer already put up substantial consideration to purchase the assets as part of a complex integrated set of transactions, is not an appropriate nor comparable measure of the valuation of the assets.

73. Moore also asserts that the Credit Bid is not properly valued on account of the following statement in the Settlement Agreement: "[T]he Credit Bid Amount does not control the value of the Acquired Asserts for ***tax reporting purposes***" (Compl. ¶ 76) (emphasis in original). But as the text clearly states, and as is a matter of practice, that statement is only relevant for ***tax reporting purposes***—it has absolutely no bearing on the valuation of the assets pursuant to the Sale Order.[89]

74. Nevertheless, the facts are not relevant because the Bankruptcy Court already approved the value of the Sale Consideration in the Orders.[90] The Bankruptcy Court has now spoken no less than four times on the value of the Sale, including in the Sale Order, the Confirmation Order, the Bench Ruling (specifically addressing Moore), and the Plan Enforcement

[89] Moore's references to *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790 (5th Cir. 1997) and *Assocs. Com. Corp. v. Rash*, 520 U.S. 953 (1997) are inapposite. In *In re T-H New Orleans*, the Fifth Circuit was not evaluating a sale process or credit bid submitted therein, but the value and priority of a creditor's allowed claim—which hinged on valuing the amount of the property securing that claim—under section 506 of the Bankruptcy Code. *See* 116 F.3d at 796. That type of valuation is not relevant or applicable to the instant action. In *Rash*, the Supreme Court was opining on a cram-down plan, and determined that the replacement-value, rather than the foreclosure-value, standard for determining the value of creditor's claim, was appropriate ***for cram down purposes*** in that Chapter 13 case. *See* 520 U.S. at 953. Again, this is not applicable to issues raised in the Complaint.

[90] Ex. C (Sale Order) ¶ K ("A private sale of the Acquired Assets to the Purchasers represents the sound business judgment of the Debtors and is appropriate in light of the facts and circumstances surrounding the Transaction and the Debtors' chapter 11 cases because (i) it provides fair and reasonable value for the Acquired Assets for the benefit of the Debtors' estates[.]"); Ex. B (Confirmation Order) ¶ 64 ("The Debtors and their respective directors, officers, management, counsel, advisors, and other agents have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.").

Order (also specifically addressing Moore)—each time endorsing the Sale Consideration as the highest and best value available for the assets. Enough is enough.

75. ***Second***, Moore asserts, without support, that the Plan distributions are in violation of the absolute priority rule and creditor treatment under the Bankruptcy Code. But there is not a single true fact to support for these statements, and clear evidence—that is, final Orders and interpretations of those Orders by the Bankruptcy Court—shows otherwise. As the Bankruptcy Court addressed, the Plan was approved, including in accordance with the absolute priority rule, and distributions have been properly distributed in accordance with the Plan.[91] The Bankruptcy Court ordered Moore to comply with the Plan, including by ordering him to halt this litigation, and holding him in contempt.[92]

76. ***Third***, Moore states without support that there was an undisclosed "uptier" transaction in the Chapter 11 Cases. Moore is attempting to capitalize off what the Fifth Circuit deemed to be an improper transaction in *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555 (5th Cir. 2024), *as revised* (Feb. 14, 2025) ("Serta"). But none of the transactions in the JCP Chapter 11 Cases were uptier transactions; the ruling in *In re Serta Simmons Bedding, L.L.C.* is not relevant here. All of the transactions in these Chapter 11 Cases were ***court-approved and specifically contemplated by the Bankruptcy Code.*** Contrary to Moore's unsupported assertions, there was no "uptier," or reprioritization of debt as a result of the Sale Order or the Plan and no claims exist with respect to that issue.

91 Ex. E (Bench Ruling) at 18:18-23. (Finding "[t]here's no evidence that wind-down professionals are not making distributions based on the actual terms of the Plan" and "[t]here's no violation of the absolute priority rule or Jevic either.")

92 *See* Enforcement Order.

77. ***Fourth***, Moore states that Simon and Brookfield "orchestrated" a scheme to defraud creditors to evade the Bankruptcy Code's "equal treatment requirements" by purchasing the OpCo Assets through Penney Holdings for "no consideration" and that in so doing, Simon breached its fiduciary duty to other creditors.[93] Moore's inaccurate factual assertions which the Bankruptcy Court already rejected[94] in no way give rise to a claim that the Plan did not comply with sections 1129(b)(2) or 1123(a)(4) of the Bankruptcy Code, even if this collateral attack on the Plan and Confirmation Order were appropriate at this stage (which, for the reasons described herein, it is not).

## V. <u>Moore's Claims Are Non-Justiciable And Must Be Dismissed</u>

78. The Complaint fails to identify an actual injury or a present controversy—Moore seemingly seeks declarations with faulty interpretations of the Orders. But a federal court does not have subject-matter jurisdiction to adjudicate an action if the party who brought suit does not have standing under Article III, Section 2 of the U.S. Constitution. *Bell v. Redflex Traffic Sys., Inc.*, 374 F. App'x. 518, 520 (5th Cir. 2010) ("When a plaintiff cannot satisfy the standing requirements imposed by Article III, courts lack subject matter jurisdiction over a case."). To meet the standing requirements, a plaintiff must establish the following: (1) an "injury in fact," otherwise known as "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," (2) "causal connection between the injury and the [adversary's] conduct complained of," and (3) it is "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted).

---

93 Compl. ¶¶ 86, 88.

94 *See, e.g.*, Ex. E (Bench Ruling) at 9:11–9:24.

79. For all counts in the Complaint, Moore seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202.[95] Within the Fifth Circuit, "[a] declaratory judgment action is ripe for adjudication only where an 'actual controversy' exists." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000) (internal citations omitted); *see also* 28 U.S.C. §§ 2201(a). An "actual controversy" is when "a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests." *Orix Credit All., Inc.*, 212 F.3d at 896 (internal citations omitted). It cannot be a controversy that is "conjectural, hypothetical, or contingent" as it "must be real and immediate, and create a definite, rather than speculative threat of future injury." *Bauer v. Tex.*, 341 F.3d 352, 358 (5th Cir. 2003) (internal citations omitted).

80. Declaratory judgments must have preclusive effect in order to meet redressability requirements, or they are "little more than advisory opinions." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023). The point of a declaratory judgment "is to establish a binding adjudication that enables the parties to enjoy the benefits of reliance and repose secured by *res judicata*." *Id.* In *Brackeen* the requested declaratory judgment would not have defined the rights of the plaintiff and the defendant and only would have provided a blueprint for future disputes between the plaintiff and third parties. *Id. at* 292. The same is true here. Granting the declaratory judgments in the Complaint would not have the effect of changing distributions under the plan—those declarations would only open the door to another dispute regarding the import of Moore's allegations.

81. None of the requested declarations would redress any actual or imminent harm to Moore. In fact, Moore has not been injured at all—he is presumably receiving distributions, like all other similarly-situated Secured Creditors, for his claims under the Plan. Moore knew, or should have known, his exact rights when he bought those claims. In reality, this action is nothing

---

[95] Compl. ¶ 127.

more than a thinly veiled attempt to overturn a five-year old final Confirmation and Sale Order under the guise of seeking declaratory relief. It presents no actual controversy, no imminent harm, and no cognizable injury. Instead, it is a direct affront to established legal principles and a misuse of judicial process, designed to relitigate what has already been conclusively resolved.

82. Accordingly, there is no actual case or controversy properly before this Court.

## CONCLUSION

83. For the foregoing reasons, the JCP Investors and Penney Intermediate respectfully request that the Court dismiss the Complaint against the JCP Investors and Penney Intermediate with prejudice. For the same reasons, the Motions to Intervene should also be denied.

Dated: September 8, 2025
Washington, D.C.

**MILBANK LLP**

By: /s/ *Andrew M. Leblanc*
Dennis F. Dunne (admitted *pro hac vice*)
Brian Kinney (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: DDunne@milbank.com
BKinney@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
Melanie Westover Yanez (admitted *pro hac vice*)
Danielle Lee Sauer (admitted *pro hac vice*)
1101 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 835-7500

Facsimile: (202) 263-7586
Email: ALeblanc@milbank.com
MWYanez@milbank.com
DLee@milbank.com

*Counsel to H/2 Capital Partners LLC; Brigade Capital Management, LP; Silver Point Capital, L.P.; Owl Creek Asset Management, L.P.*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Gregory F. Laufer (admitted *pro hac vice*)
Vida J. Robinson (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
E-mail: glaufer@paulweiss.com
virobinson@paulweiss.com

*Counsel to Penney Intermediate Holdings LLC*

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2025, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record. I also sent the foregoing document by e-mail and first-class mail to the last known address of Plaintiff Eric L. Moore.

Danielle Lee Sauer