United States Courts
Southern District of Texas
FILED
SEP 29 2025
Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ERIC LYNDELL MOORE )
)
Plaintiff, )
)
v. )
) C.A. No. 4:25-cv-02752
JACKSON WALKER LLP; COPPER PROPERTY CTL PASS THROUGH TRUST; PENNEY INTERMEDIATE HOLDINGS LLC; H/2 CAPITAL PARTNERS LLC; BRIGADE CAPITAL MANAGEMENT, LP; SILVER POINT CAPITAL, L.P.; OWL CREEK ASSET MANAGEMENT, L.P., ONYX PARTNERS, LLC[1] )

Defendants.

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

## I. INTRODUCTION

1. This case presents a post-confirmation intercreditor controversy that Defendants attempt to mischaracterize as already resolved. It is not. All of the governing documents—the Plan, the Asset Purchase Agreement ("APA"), the Sale Order and Settlement Agreement, and related rulings—established a $1 billion distribution structure: $900 million to satisfy the DIP claim and $100 million to First Lien Term Loan holders. That $1 billion has already been distributed. The present dispute concerns what happens with the additional $1 billion-plus in liquidating trust proceeds. This is surplus value. The Fifth Circuit in *In re AWECO, Inc.*

[1] Certain parties have not been named as defendants at this time as some may have already settled or are expected by Plaintiff Eric L. Moore to settle in the near future. This is not an exhaustive list of DIP Lenders who were overpaid or who misappropriated assets belonging to other J.C. Penney creditors.

confirmed that bankruptcy courts lack discretion to bless distributions that violate priority or *pro rata* mandates.[2] This action seeks enforcement of those very limits.

2. The Second Amended Complaint ("SAC") alleges a concrete, ongoing injury. DIP Lender Defendants have already been repaid the $900 million they were owed as DIP lenders, yet continue to capture surplus value that, under the Plan, APA, Sale Order and Settlement Agreement and Bankruptcy Code, must flow downstream to creditors such as Plaintiff.

3. A critical legal distinction underscores this controversy: the J.C. Penney transaction was a negotiated private sale under 11 U.S.C. § 363—not a public auction. The Sale Order and Settlement Agreement states:

> "Private Sale is Appropriate. The sale of the Acquired Assets to the Purchasers pursuant to a private sale is authorized pursuant to section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f)." [3]

4. Defendants nevertheless attempt to invoke the benefits of an auction, claiming their $1 billion credit bid reflects fair market value and entitles them to retain surplus proceeds. That argument is legally untenable. In a private § 363 sale, secured creditors are capped at the amount of their allowed claim, and any surplus must be distributed according to the Plan and the Bankruptcy Code's priority waterfall:

> "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." (11 U.S.C. § 363(k))

---

[2] *In re AWECO, Inc.*, 725 F.2d 293, 298–99 (5th Cir. 1984) (holding that a bankruptcy court lacks discretion to approve distributions that violate the absolute priority rule; reversing approval of a settlement that allowed senior creditors to recover at the expense of others).

[3] See Sale Order and Settlement Agreement, Dkt. 1814, at 7, § K ("Private Sale is Appropriate"). All docket citations (e.g., "Dkt. 1814") refer to the bankruptcy proceedings *In re J.C. Penney Company, Inc., et al.*, Case Nos. 20-20182 and 20-20184 (Bankr. S.D. Tex.), unless otherwise noted.

5. Here, the "JCP Investors"—as the Defendant DIP lenders now style themselves—were owed $900 million in DIP debt. They credit bid that amount in a private sale, extinguishing their claim and entitling them to repayment up to that amount only. Having not prevailed in a competitive auction, they cannot avail themselves of the benefits awarded to winners of auctions, including retaining surplus value. In a private sale, as here, that surplus must flow to the next creditors in line, including Plaintiff. Defendants' attempt to keep it is an effort to improperly import auction benefits into a transaction that was not one.

6. The SAC easily states plausible claims for relief. Plaintiff holds a perfected, unavoidable lien interest that attaches to the very proceeds Defendants now seek to retain. Those proceeds cannot lawfully bypass Plaintiff under the governing documents, the Bankruptcy Code's absolute priority scheme, or under *In re Aweco*. Because Plaintiff's entitlement arises directly from secured creditor protections embedded in the Code, Defendants' motion to dismiss must be denied.

7. Defendants' reliance on *res judicata*, collateral estoppel, plan injunctions, releases, and a 2024 bench ruling is misplaced. As shown below, those doctrines neither extinguish Plaintiff's claims nor insulate Defendants from ongoing violations of the Plan, APA, Sale Order and Settlement Agreement, and the Code. The SAC satisfies Rules 8 and 12(b)(6) and presents a live controversy concerning hundreds of millions of dollars in surplus distributions.

8. The following sections set forth the issues presented, the relevant background, the governing legal standards, and the reasons why Defendants' motion should be denied.

## II. ISSUES PRESENTED

9. **Private Sale vs. Auction Presumption.** Whether Defendants can invoke the presumption of fair market value and surplus retention *that attaches to public auctions* when the

Sale Order expressly designated the J.C. Penney transaction as a negotiated private sale under 11 U.S.C. § 363.[4]

10. **Market Test vs. Auction.** Whether the J.C. Penney transaction must be treated as a private § 363 sale rather than an auction—where the Sale Order expressly designated it as such—and where Defendants' reliance on a "market test" is immaterial because courts hold that a marketing process or solicitation of offers does not convert a private sale into an auction or confer auction-related presumptions (e.g., *Redus Fla. Com. v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187 (11th Cir. 2014)).

11. **Limits on Credit Bids.** Whether § 363(k) permits DIP lenders in a private sale to recover more than their $900 million allowed claim, thereby retaining surplus value in contravention of the Plan's "Credit Bid Distributions" and "Credit Bid Pro Rata" and the Bankruptcy Code's absolute priority rule. *See* 11 U.S.C. § 363(k); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 316–17 (3d Cir. 2010).

12. **DIP Lenders' Control of Copper Property Trust.** Whether the DIP Lender Defendants, as DIP lenders capped at a $900 million recovery, may continue to direct Copper Property Trust's monetizations and retain surplus proceeds beyond that cap, when no court order has ever authorized them to do so, and the Plan, APA, Sale Order and Settlement Agreement, and § 363(k) require downstream *pro rata* distribution.

13. **Live, Ongoing Controversy.** Whether the SAC plausibly alleges a live controversy where Plaintiff continues to receive impaired, non-*pro rata* distributions due to Defendants' over-recovery of surplus value, and where Copper Property Trust distributions remain ongoing.

[4] See Sale Order, Dkt. 1814 at 7, § K ("Private Sale is Appropriate").

14. **Effect of Finality and Preclusion Doctrines.** Whether doctrines of finality, release, or preclusion bar Plaintiff's claims when no court has ever adjudicated the allocation of surplus distributions above $1 billion, and where Plaintiff seeks enforcement—not modification—of the Plan, APA, Sale Order and Settlement Agreement. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980).

## III. THRESHOLD: ARTICLE III & DECLARATORY JUDGMENT

15. The SAC alleges a continuing diversion of surplus distributions above the $900 million DIP cap, including proceeds from Copper Property Trust's pending asset sales (e.g., the $947 million portfolio sale). Those diversions presently impair Plaintiff's pro-rata distributions. A declaration that (i) the Sale was a private § 363 sale, (ii) the DIP lenders' recovery is capped at $900 million, and (iii) surplus must flow downstream per the Plan/APA/Sale Order and Settlement Agreement will bind the parties and govern ongoing distributions, thereby redressing the injury. See 28 U.S.C. §§ 2201–02. That is not conjectural or backward-looking. It is a live, concrete dispute about current and impending distributions. The MTD's suggestion that this is "advisory" misunderstands declaratory relief: the declarations sought will have preclusive effect on the parties' rights in current and future distributions, resolving the controversy rather than "blue-printing" another one.[5]

16. Copper Property Trust is not an indispensable party under Rule 19. The Trust functions only as a pass-through for distributions, which are directed and controlled by the DIP Lender Defendants. These parties are before the Court and will be bound by the declaratory judgment. Complete relief can therefore be accorded without the Trust's joinder.

[5] *See In re AWECO, Inc.*, 725 F.2d 293, 298–99 (5th Cir. 1984) (holding that a bankruptcy court lacks discretion to approve distributions that violate the absolute priority rule; reversing approval of a settlement that allowed senior creditors to recover at the expense of others).

## IV. BACKGROUND AND PROCEDURAL HISTORY

17. **J.C. Penney Bankruptcy Filing and Sale Order.** J.C. Penney filed for Chapter 11 in May 2020.

18. There was discussion about a possible auction, however it was cancelled on September 14, 2020. [6]

19. On November 9, 2020, the Bankruptcy Court entered the Sale Order and Settlement Agreement (Dkt. 1814), authorizing a negotiated private § 363 sale structured around a $1 billion credit bid: $900 million to satisfy the DIP lenders' claim and $100 million to First Lien Term/Loan holders. The Asset Purchase Agreement ("APA") governed allocation and distribution of proceeds.

20. **Plan Confirmation and Distribution Structure.** On December 16, 2020, the Bankruptcy Court confirmed the Plan (Dkt. 2190), incorporating the APA and Sale Order and Settlement Agreement. The Plan contemplated a capped $1 billion distribution, with $900 million to the DIP lenders and $100 million to First Lien/Term Loan holders. First Lien/Term Loan holders had extended approximately $1.57 billion in credit but recovered only $100 million under the Plan's estimated $1 billion distribution framework.[7] The Plan and APA required "Credit Bid Distributions" to be allocated "Credit Bid Pro Rata," and deferred to the Bankruptcy Code where the governing documents were silent, ensuring any value above the DIP claim flowed downstream, per the Code's priority scheme.

---

[6] See Notice of Cancellation of Auction, In re J.C. Penney Co., No. 20-20182 (DRJ) (Bankr. S.D. Tex. Sept. 14, 2020), Dkt. 1401, at Ex. A.

[7] See *Claims Administration Status Final Report and Notice of No Distribution to Holders of General Unsecured Claims*, Dkt. 1245 at 5 (Nov. 17, 2023) (reporting that, "[b]ased on the assets available for recovery, Class 4 Claims cannot be paid in full") (Ex. B)

21. **Valuations of PropCo Assets.** Per the Bankruptcy Court's prior order, the Copper Property Trust Trustee, GLAS, valued the PropCo assets at just over $1.9 billion as of the Effective Date—almost double the $1 billion credit bid amount disclosed in the Plan, APA and Sale Order and Settlement Agreement. However, Defendants have reported this $1.9 billion value in SEC and tax filings. These disclosures confirm that the assets were expected to generate proceeds well above the $900 million DIP credit bid amount and $100 million First Lien credit bid amount.

22. **Ongoing Asset Sales and Surplus Proceeds.** After the transfer of the PropCo assets to the DIP Lenders and First Lien/Term Loan Holders, including Plaintiff, Copper Property Trust (controlled by the DIP lenders) continued selling PropCo assets. In July 2025, Copper Property Trust agreed to sell all remaining 119 PropCo properties for $947 million, generating substantial additional proceeds.[8] To date, Copper Property Trust admits to having distributed $1.06 billion in sale proceeds plus $400 million in lease proceeds in addition to the anticipated sale of remaining 119 properties.[9] According to Copper Property Trust, distributions to date, plus proceeds from the upcoming October 8, 2025 sale total over $2 billion. Clearly, these distributions include surplus well beyond the $900 million DIP claim, yet Defendants continue to retain those funds, impairing Plaintiff's *pro rata* share.

23. **Plaintiff's Allegations and Injury.** Plaintiff alleges Defendants exceeded the DIP cap, diverted surplus distributions, and violated the Plan, APA, Sale Order and Settlement Agreement:

---

[8] For consistency across Plaintiff's filings, this Opposition continues to refer to the anticipated sale price of $947 million for Copper Property Trust's remaining assets, as reflected in prior disclosures and pleadings. Copper Property Trust has more recently reported an amended anticipated sale price of $935 million. The precise amount ultimately realized does not affect the legal issues presented here, which turn on Defendants' over-recovery above the $900 million DIP cap.

[9] See Copper Property CTL Pass-Through Trust, Current Report (Form 8-K) (Aug. 11, 2025) at 7 (PDF 10) (reporting $1.06 billion in cumulative PropCo distributions and $394 million in rental income distributions). (Ex. C)

a. **DIP Cap Exceeded.** The DIP claim was capped at $900 million, yet Defendants have secretly retained proceeds far beyond that limit, in direct contravention of the governing documents.

b. **Surplus Misallocated.** Rather than allocating surplus downstream to First Lien holders as required, Defendants diverted it to themselves. Defendants cannot, and have not in their Motion to Dismiss, identified any order, provision, or authority authorizing retention above the $900 million cap.

c. **Ongoing Misallocations.** Copper Property Trust has misallocated prior proceeds and asserts the right to do so again in the pending $947 million transaction, leaving Plaintiff's distributions impaired.

d. **Lien Rights Preserved.** Plaintiff's liens were preserved under the Plan, APA, and Sale Order and Settlement Agreement, and continue to attach to surplus distributions. These liens survive until Plaintiff is fully repaid and are not subject to subordination, avoidance, or extinguishment.[10]

24. Taken together, these allegations show a live, ongoing injury-in-fact: Plaintiff has a contractual and statutory right to surplus distributions, Defendants have unlawfully retained them, and the SAC states plausible claims for relief.

25. The Class 4 First Lien/Term Loan Holders have received only 8-10% of their contractual *pro-rata* share to date–despite full recovery being available—as a result of

[10] The Sale Order and Settlement Agreement provides: "...the DIP Administrative Agent, and the DIP Collateral Agent have authorized and directed that PropCo Purchaser credit bid the Credit Bid Amount, on account of $900 million of DIP Obligations and an aggregate $100 million of Term Loan Obligations and First Lien Obligations, allocated ratably based on outstanding Term Loan Obligations and First Lien Obligations, which obligations are not subject to avoidance, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law." (Dkt. 1814 at 9).

Defendants' retention above the $900 million cap. Upcoming distributions will repeat that misallocation absent relief.

26. **Prior Rulings and Procedural Posture.** In September 2024, Judge Lopez denied Plaintiff's motion to enforce the Sale Order against certain wind-down professionals, finding "nothing to enforce" as to those actors. That ruling did not address surplus allocations to the DIP Lender Defendants (H/2 Capital Partners LLC; Brigade Capital Management, LP; Silver Point Capital, L.P. and Owl Creek Asset Management, L.P.), Jackson Walker, or Penney Intermediate Holdings. They were not parties to that dispute, and no order has adjudicated Plaintiff's rights to surplus distributions. Copper Property Trust's continuing distributions, including the anticipated $947 million sale, demonstrate an ongoing injury with present consequences.

27. **Credit Bid Mechanics.** Section 363(k) permits a secured creditor to credit bid only up to the amount of its allowed claim. If a creditor is owed $1 million, it may bid $1 million, but not $1.2 million. Here, the DIP lenders' claim was capped at $900 million. Their credit bid extinguished that claim, but conferred no right to surplus. Defendants' attempt to retain value beyond the cap contradicts the Plan, APA, Sale Order and Settlement Agreement and § 363(k). Pursuant to U.S.C. § 363(k):

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

28. ***Pro Rata*** **Distribution Was Mandated by the Governing Documents.** The Plan, APA, Sale Order and Settlement Agreement all required that distributions to DIP Lenders and

First Lien Holders be allocated on a *pro rata* basis. This was not an afterthought — it was the core distribution mechanism.

29. **The Plan** defines "Credit Bid Pro Rata" to mean each Holder receives distributions in proportion to its allowed claim and the credit bid allocation, both for DIP and First Lien Claims:

> "'Credit Bid Pro Rata' shall mean, in accordance with the Asset Purchase Agreement and Sale Order and subject to the Minority First Lien Group Settlement, (a) with respect to DIP Claims, the proportion (x) each Holder's Allowed DIP Claims bears to all Allowed DIP Claims and (y) the DIP Credit Bid bears to the Aggregate Credit Bid and (b) with respect to First Lien Claims, the proportion (x) each Holder's Allowed First Lien Claims bears to all Allowed First Lien Claims and (y) the Prepetition First Lien Credit Bid bears to the Aggregate Credit Bid." (Plan, Dkt. 2190 at 94).

**The Plan** further provides:

> "...each such Holder of an Allowed DIP Claim shall receive, pursuant to the Sale Order and the Confirmation Order, its Credit Bid Pro Rata share of the Credit Bid Distributions." (Plan, Dkt. 2190 at 110).

30. **The APA** echoes this structure:

> "BidCo credit bid... (i) $900,000,000 of DIP Obligations and (ii) an aggregate of $100,000,000 of Term Loan Obligations and First Lien Notes Obligations to be allocated ratably based on relative outstanding obligations..." (APA, Dkt. 1668-1 at 7).

> "Any PropCo Acquired Assets to be distributed by or on behalf of PropCo Purchaser shall be proportionately allocated between the DIP Collateral Agent and the Term Loan/First Lien Notes Collateral Agent based upon the amount of the Credit Bid made on behalf of each such agent for its holders at such time." (APA, Dkt. 1668-1 at 26 § 2.1 (c)).

31. **The Settlement Agreement** (incorporated into the Sale Order) reinforces this principle, making clear that all distributions were to be ratable and non-discriminatory:

> "The Parties agree that all distributions that the members of the Minority Group are entitled to receive in connection with the Transaction, whether under the Plan,

> the APA or otherwise... will be calculated and distributed on the basis of a $1 billion Credit Bid and the Current Credit Bid Allocation..." (Sale Order & Settlement Agreement, Dkt. 1814 at 80, ¶ 6).
>
> "Neither the Debtors nor the Majority Group shall amend, modify, create, file, or execute any document or agreement related to the Transaction, APA, or the Plan that targets or disproportionately adversely impacts a member of the Minority Group as compared to another holder... that holds an entitlement to an equal amount or percentage of credit bid consideration." (Id.).

32. Taken together, these provisions foreclose Defendants' suggestion that they were free to retain surplus distributions above the $900 million DIP cap. The governing documents mandate that distributions flow ratably, and once a class's allowed claim is fully satisfied, its entitlement ends and any further recovery must waterfall to the remaining creditors in accordance with the Bankruptcy Code's absolute priority rule.

## V. LEGAL STANDARDS AND PRINCIPLES

33. **Rule 12(b)(6).** To survive dismissal under Rule 12(b)(6), a complaint must allege facts that, accepted as true, state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a Rule 12(b)(6) motion, the burden rests with the movant, and courts must draw all reasonable inferences in favor of the plaintiff. Conclusory assertions are insufficient, but the complaint need not prove the case at the pleading stage—only allege facts that, if true, would entitle relief. *See Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). Rule 8 requires only a "short and plain statement" showing entitlement to relief; plausibility, not probability, is the standard.

34. **Rule 12(b)(1).** A Rule 12(b)(1) motion may present a facial or factual jurisdictional challenge. On a facial challenge, courts accept allegations as true unless contradicted by judicially noticeable materials. *See Ramming v. United States*, 281 F.3d 158, 161

(5th Cir. 2001). Federal jurisdiction under the Declaratory Judgment Act requires a live, concrete controversy. *See Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000).

35. On a Rule 12(b)(6) motion, the burden rests with the movant. Dismissal is warranted only if, after accepting all well-pleaded facts as true and drawing all reasonable inferences in Plaintiff's favor, the complaint fails to state a plausible claim for relief. *See* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

36. **Claim Preclusion.** Claim preclusion applies only if (1) the parties are identical or in privity, (2) the prior judgment was by a court of competent jurisdiction, (3) there was a final judgment on the merits, and (4) the same claim was involved. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980); *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 694 (Bankr. S.D. Tex. 2008). The doctrine does not apply when parties, issues, or relief differ, or when no merits judgment was entered.

37. **Issue Preclusion.** Issue preclusion bars only issues actually litigated and decided in a prior case, and only if the determination was essential to the judgment and the opposing party had a full and fair opportunity to litigate. *See Allen*, 449 U.S. at 94. Denial of enforcement motions or rulings limited to distinct parties or issues do not meet these requirements.

## VI. DEFENDANT-SPECIFIC ALLEGATIONS SATISFY RULE 8/TWOMBLY/IQBAL

38. **As to the DIP Lender Defendants,** the SAC alleges they were both DIP lenders and architects of the private § 363 credit-bid transaction capped at $900 million. The SAC further alleges they continue to direct and benefit from Copper Property Trust's ongoing PropCo monetizations. Although Copper Property Trust is no longer a defendant, it remains under the DIP

Lender Defendants' control and functions as the vehicle through which they distribute and retain surplus proceeds.

39. These Defendants, having already recovered their $900 million DIP claim, now retain distributions in excess of that cap, diverting value that should have flowed downstream on a *pro rata* basis. To date, distributions under their control exceed $1.4 billion, with nearly another $947 million in proceeds anticipated. Defendants are unable to identify any court order that has ever authorized the DIP Lender Defendants to retain surplus above the $900 million DIP cap, and no prior ruling has adjudicated their conduct.

40. These concrete, time-anchored allegations, accepted as true, state a plausible claim for declaratory relief and enforcement of Plaintiff's intercreditor rights under *Twombly/Iqbal* and Rule 8.

41. As to Jackson Walker, the SAC alleges with particularity that, as court-appointed counsel to the debtor-in-possession, it breached fiduciary duties under 11 U.S.C. §§ 101(14), 327, 1106, and 1107, as well as Bankruptcy Rule 2014(a). Because Jackson Walker continues to advocate for the Plan, APA, Sale Order and Settlement Agreement provisions at issue, it is at minimum a necessary party to the declaratory relief sought, which will govern ongoing distributions.

42. These duties required candor, loyalty, and ensuring compliance with the Bankruptcy Code's confirmation requirements, including the filing of a liquidation analysis under § 1129(a)(8). The SAC pleads that Jackson Walker failed to ensure and disclose such a liquidation analysis, concealed material relationships, and enabled non-*pro rata*, insider-favoring distributions. These omissions were not technicalities—they directly facilitated the over-recovery now impairing Plaintiff's distributions.

43. Plaintiff seeks declaratory relief that Jackson Walker breached its fiduciary duties. Such relief will clarify the rights and obligations of the parties with respect to ongoing and future distributions and ensure compliance with the Bankruptcy Code's priority scheme. This is not an attempt to unwind the Plan; it is enforcement of existing duties in light of continuing distributions.

44. Plan releases and exculpations do not bar enforcement of post-effective-date breaches, and whether Jackson Walker qualifies as a "Released Party" is a fact-intensive question not suitable for dismissal at the pleading stage.[11] Prior rulings never adjudicated surplus allocation or Jackson Walker's conduct. At a minimum, these allegations are concrete, time-anchored, and causally linked to Plaintiff's injury, satisfying Twombly/Iqbal and Rule 8.

45. As to Penney Intermediate Holdings ("PIH"), the SAC alleges with particularity that, controlled by Simon and Brookfield, PIH received over $5 billion in OpCo assets for zero outside consideration. PIH asserts it paid approximately $2 billion for OpCo to the debtor's estate, but the SAC plausibly alleges that the supposed consideration—credit bid, cash, ABL payoff, term loan, and earnout—was illusory or funded entirely from estate assets, leaving other unsecured creditors uncompensated.

46. Whether PIH in fact provided any outside consideration is itself an unresolved controversy central to this action. If such consideration were actually paid, Defendants could easily substantiate it. Yet their Motion to Dismiss offers no evidence of payment and does not demonstrate that PIH ever provided the purported $2 billion in actual value. Instead, it merely

[11] Public disclosures since the J.C. Penney bankruptcy have revealed that then–Presiding Judge David R. Jones and a Jackson Walker partner were in a relationship during the case, a circumstance that was known to the firm but never disclosed despite disclosure obligations. Those circumstances, coupled with Jackson Walker's own role as court-appointed counsel, make dismissal at the pleading stage particularly inappropriate. At minimum, Plaintiff is entitled to develop the record on Jackson Walker's duties, disclosures, and post-effective-date conduct before any determination on releases or exculpations.

points to Plan language while leaving Plaintiff's factual allegations of a non-*pro rata* liquidation—contrary to 11 U.S.C. §§ 1123(a)(4) and 1129(b)(2)—unrefuted.[12]

47. These allegations are concrete, time-anchored, and causally linked to Plaintiff's injury, satisfying *Twombly/Iqbal* and Rule 8. Plaintiff seeks declaratory relief to clarify the rights and obligations under the Plan, APA, Sale Order and Settlement Agreement, and to redress ongoing harm arising from PIH's retention of assets that should have been distributed *pro rata* to all unsecured creditors.

48. This is not an attempt to unwind the Plan, APA, or the Sale Order and Settlement Agreement, but to enforce them as written. No prior order has adjudicated PIH's conduct or the allocation of surplus above the $900 million DIP cap. Plan releases and exculpations do not bar enforcement of post-effective-date conduct, and whether PIH qualifies as a "Released Party" is a fact-intensive question not suitable for Rule 12(b)(6) dismissal.

49. Should the Court find any gap in the SAC as to PIH, Plaintiff respectfully requests leave to amend to cure any technical deficiency. However, the SAC as pled is sufficient to survive dismissal.

## VII. ARGUMENT

50. The governing documents themselves foreclose Defendants' position. Far from permitting unilateral retention of surplus, the Plan, APA, and Sale Order and Settlement Agreement mandate *pro rata* distributions, and that once a class's allowed claim is satisfied, any

[12] Plaintiff expressly offered to dismiss Penney Intermediate Holdings from this action if Defendants could substantiate their repeated assertion that PIH provided approximately $2 billion in outside consideration for OpCo. Defendants refused this offer in writing and produced no documentation of any such payment. Their refusal to substantiate the alleged consideration—while continuing to invoke the outside consideration claims from press releases and Plan documents—suggests concealment and supports Plaintiff's allegation that no such outside consideration was ever paid.

further recovery must waterfall downstream. This is not optional or discretionary; it is the command of the governing documents and the Bankruptcy Code alike.

51. **The Governing Documents Mandated *Pro Rata* Distributions.** Defendants' suggestion that they could retain surplus above the DIP cap ignores the plain language of the controlling orders:

- Plan (Dkt. 2190 at 94): "'Credit Bid Pro Rata' shall mean... each Holder's Allowed DIP Claims bears to all Allowed DIP Claims... [and] each Holder's Allowed First Lien Claims bears to all Allowed First Lien Claims."
- APA (Dkt. 1668-1 at 7): "$900,000,000 of DIP Obligations and... $100,000,000 of Term Loan Obligations and First Lien Notes Obligations [are] to be allocated ratably based on relative outstanding obligations."
- (Sale Order & Settlement Agreement, Dkt. 1814 at 80, ¶ 6) "Neither the Debtors nor the Majority Group shall … execute any document or agreement related to the Transaction, APA, or the Plan that targets or disproportionately adversely impacts a member of the Minority Group as compared to another holder of the DIP Debt and the 1L Debt that holds an entitlement to an equal amount or percentage of credit bid consideration."

52. These provisions are not ambiguous: both the bid and the resulting distributions were to be allocated on a *pro rata* basis, and once a claim was fully satisfied, any surplus had to waterfall downstream.

53. **Fifth Circuit Authority Confirms Enforcement.** In *In re AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984), the Fifth Circuit held that bankruptcy courts lack discretion to approve distributions that violate the absolute priority rule or disregard creditors' entitlement to *pro rata*

treatment. The court reversed a settlement approved by the bankruptcy court precisely because it bypassed creditor priority and skewed distributions. *AWECO* confirms that courts must enforce the priority scheme "as written," and cannot approve or bless arrangements that allow senior creditors to over-recover at the expense of others. Here, as in *AWECO*, the law requires the Court to enforce the cap and *pro rata* mandate embedded in the Sale Order and Settlement Agreement, Plan and APA.

**A. Finality and Preclusion Do Not Bar Plaintiff's Claims**

54. **No Prior Adjudication Of Surplus Allocation.** Neither the Confirmation Order nor the Sale Order and Settlement Agreement addressed how surplus above the $900 million DIP cap must be allocated post-closing; both orders implemented the cap and private sale structure and left future monetizations to be distributed per Plan/APA. The 2024 bench ruling addressed enforcement against wind-down professionals—not the DIP Lender Defendants or OpCo—and expressly did not resolve surplus allocations. This action seeks to interpret and enforce that existing framework against the parties now retaining the surplus, not to revoke or modify any final order. *Celotex* and *Travelers* confirm the Court's authority to do exactly that. See *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (bankruptcy orders are enforceable in other courts until properly modified or reversed); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (bankruptcy court retains jurisdiction to interpret and enforce its own confirmation orders).

55. **Claim Preclusion (*Res Judicata*).** Defendants' reliance on preclusion doctrines is misplaced. Claim preclusion requires (1) identical parties or privies, (2) a prior judgment by a court of competent jurisdiction, (3) a final judgment on the merits, and (4) the same claim. *See*

*Allen v. McCurry*, 449 U.S. 90, 94 (1980); *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 694 (Bankr. S.D. Tex. 2008). None of these elements is met:

a. *Different Parties.* The 2024 bench ruling involved wind-down professionals, not the DIP Lender Defendants, Jackson Walker, or Penney Intermediate Holdings.

b. *Different Issues.* That ruling addressed fee payments and whether there was "anything to enforce" against non-party professionals. It never adjudicated surplus allocation or Defendants' ability to retain value above the DIP cap.

c. *No Final Merits Judgment.* Denial of a motion to enforce is not a final merits ruling on surplus rights. Preclusion applies only to issues actually litigated and decided. *Allen*, 449 U.S. at 94; *Blast Energy*, 396 B.R. at 694.

56. Defendants argue Plaintiff seeks to "unscramble the egg. Not so. Plaintiff accepts the Sale Order and Settlement Agreement and other governing documents as consummated. He seeks only enforcement: limiting DIP lenders to $900 million and requiring surplus to flow downstream, consistent with the governing documents, the Bankruptcy Code, and *Aweco*.

57. Plaintiff expressly stipulates that he does not challenge the $1 billion distribution structure approved in the Plan, APA, Sale Order and Settlement Agreement. First Lien/Term Loan holders received their $100 million distribution, and the DIP lenders received $900 million. The present controversy concerns only the surplus above that amount.[13]

58. **Issue Preclusion (Collateral Estoppel).** Issue preclusion applies only if an issue was actually litigated, decided, and essential to the judgment, with a full and fair opportunity to contest it. *Allen*, 449 U.S. at 94.

---

[13] Defendants continue to assert that certain of Plaintiff's bond purchases involved Cetus Capital, a party to the settlement. Plaintiff does not own, and to his knowledge has never owned, any bonds purchased from Cetus Capital. Even if he had, Plaintiff is not seeking any settlement proceeds or prior distributions. The SAC challenges only the ongoing underpayment of his *pro rata* share above the $900 million DIP cap.

a. *No Actual Litigation of Surplus Allocation.* The September 2024 bench ruling never addressed surplus distributions.

b. *No Essential Determination.* The relief sought here—Plan enforcement—was not essential to that ruling.

c. *Distinct Context.* Plaintiff's claims arise from ongoing distributions and over-recovery by Defendants, not historical fee disputes.

**B. Plan Injunctions and Releases Do Not Bar Enforcement**

59. **Plan Releases And Exculpations.** First, the claims challenge post-effective-date over-recovery and non-*pro-rata* distributions—conduct outside any release or exculpation. Second, who is a "Released Party," and whether these forward-looking enforcement claims fall within any release carve-outs, are fact-intensive questions not suitable for Rule 12(b)(6) dismissal on this record.

60. **Injunctions Cannot Authorize Violations.** Defendants' reliance on plan injunctions and releases also fails. A plan injunction protects the Plan; it does not legalize ignoring it. A confirmed plan is binding as written. *See Howe v. Vaughan (In re Howe)*, 913 F.2d 1138, 1143 (5th Cir. 1990). Federal courts retain jurisdiction to enforce their own orders. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).

61. **Plan Injunction Protects, Rather Than Bars, Plaintiff as an Exculpated Party.** <u>Plaintiff, as a First Lien Holder, is both a co-purchaser and co-credit bidder, and is also a member of the "Exculpated Parties" group protected by the Plan Injunction—not barred by it.</u> This dispute is between the very parties who purchased the JCPenney assets. The Plan Injunction

was intended to protect the Purchaser Group, not to shield one set of purchasers from another. The Plan defines "Exculpated Parties" as follows:

> "Exculpated Parties" means collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Consenting First Lien Lenders and any group thereof; (c) the Creditors' Committee and its members; (d) the Purchaser Group; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f) including, among others, agents and trustees under the First Lien Debt Documents, the Term Loan Credit Documents, and the DIP Credit Documents. (Dkt. 2190 at 96) (defining "Exculpated Parties" to include the Purchaser Group) (underline added)

62. As such, Plaintiff cannot be held in contempt for pursuing enforcement of the Plan's *pro rata* and priority provisions.[14] The Plan Injunction insulates Exculpated Parties from liability; it does not expose them to sanctions for litigating to enforce the Plan as written. Defendants' attempt to flip the injunction into a sword against an Exculpated Party is contrary to both the text and purpose of the provision.

63. **Releases Are Narrowly Construed.** The Fifth Circuit strictly limits nonconsensual third-party releases. *See In re Pac. Lumber Co.*, 584 F.3d 229, 252–53 (5th Cir. 2009); *In re Zale Corp.*, 62 F.3d 746, 760–61 (5th Cir. 1995); *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1061–63 (5th Cir. 2012). At minimum, releases cannot be read to bless post-effective-date over-recoveries or non-*pro rata* allocations.

64. First, the claims challenge post-effective-date over-recovery and non-*pro-rata* distributions—conduct outside any release or exculpation. Second, who is a "Released Party," and whether these forward-looking enforcement claims fall within any release carve-outs, are fact-intensive questions not suitable for Rule 12(b)(6) dismissal on this record.

---

[14] In the Bankruptcy Court, Defendants alleged that Plaintiff's filings in the U.S. District Court violated the Plan Injunction and, on that basis, sought sanctions of $750,000 plus $5,000 per day. Those sanctions were premised exclusively on Plaintiff's actions in this Court; he has not litigated in the Bankruptcy Court for nearly a year. Defendants pressed this position as recently as last week.

65. **Plaintiff's Claims Are Post-Confirmation.** The SAC alleges ongoing misallocation of surplus distributions. Such enforcement claims are not "Released Claims."

66. **Releases Are an Affirmative Defense.** They cannot support dismissal under Rule 12(b)(6) unless apparent on the face of the complaint. Here, factual development is required to determine who is a "Released Party" and whether the claims fall within any release.

67. **Cetus Assignment Does Not Extinguish Enforcement Rights.** Even if Cetus released some claims, Plaintiff seeks prospective enforcement of the Plan, APA, and Sale Order and Settlement Agreement. Such rights survive.

68. **Defendants also distributed Trust certificates in a non-*pro rata* manner,** violating the Plan's 'Credit Bid Pro Rata' mandate and the equal treatment requirement of § 1123(a)(4). Bottom line: Plan injunctions and releases cannot authorize overpayment or bar enforcement.

**C. Privileges of a Public Auction Do Not Apply to a Private Sale.**

69. **Not a "Winning Bidder" Without an Auction.** In an August 18, 2025 letter to Plaintiff regarding threatened sanctions, Defendants again claimed to have acquired the Debtors' assets "as the winning bidder":

> The Complaint alleges that the Sale constitutes an improper 'uptier' transaction. Compl. ¶1. That is simply not true: the JCP Investors, Simon, and Brookfield acquired the Debtors' assets as the winning bidder.[15]

But this rhetoric cannot withstand scrutiny. As discussed below, the Sale Order expressly designated the J.C. Penney transaction as a negotiated private sale under § 363—not a public auction. A private sale cannot yield a "winning bidder," and Defendants' attempt to rebrand themselves as such is misleading. Having acquired assets in a private sale, Defendants are not

[15] See Milbank Letter to Moore (Aug. 18, 2025), at 4 (Ex. D)

"winning bidders" and cannot claim the presumptions that attach only to public auctions. To claim auction benefits without an auction is to re-label an insider transaction as something it never was.

70. **Deemed a Private Sale.** The Sale Order itself controls. Section K expressly decreed that a "Private Sale is Appropriate." (Dkt. 1814 at 7, ¶K). That judicial determination forecloses Defendants' attempt to claim auction presumptions.

71. **Public Auctions.** Competitive bidding establishes presumptive fair market value, and the winning bidder may keep surplus if assets later prove more valuable. Courts recognize this presumption precisely because open, transparent competition provides evidentiary weight. See *In re Bigler, LP*, 443 B.R. 101, 110 (Bankr. S.D. Tex. 2010) (integrity of the auction process requires honoring the procedures, not post hoc changes); *United States v. Terrey*, 554 F.2d 685, 692 (5th Cir. 1977) (no presumption of market value attaches outside auction context).

72. **Private § 363 Sales.** No such presumption applies to private sales like this one. In a private sale, a secured creditor may credit bid *only up to* its allowed claim under § 363(k). Once that claim is satisfied, surplus must be distributed downstream. *Redus Fla. Com. v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1193 (11th Cir. 2014) (no auction presumption in negotiated sales); *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555 (5th Cir. 2024), as revised (Jan. 21, 2025 & Feb. 14, 2025) (private transactions lack the protections and evidentiary weight of auctions).

73. Defendants' effort to invoke auction presumptions—treating their $1 billion credit bid as fair market value/purchase price and surplus entitlement—ignores that the transaction was expressly designated a private sale. The benefits of an auction do not attach:

| PUBLIC AUCTION (competitive bidding) | PRIVATE § 363 SALE (negotiated deal, no bidding) |
|---|---|
| Presumption: auction price = fair market value | No fair market presumption |
| Bidder keeps assets, even if later proven more valuable | Creditor may credit bid up to its claim only |
| Surplus retained by purchaser | Surplus must be distributed per Plan/Code |

74. Further, the Plan does not value the estate assets or provide for distributions as though an auction occurred. The DIP Lender Defendants have simply distributed as though that were the fact, when it is not.

**D. Auction Terminology Does Not Transform a Private Sale.**

75. Defendants also point to phrases like "highest and best bid." But labels do not govern; procedures do. *Victory Corr. Container Corp.*, 183 B.R. 373, 378 (Bankr. D.N.J. 1995) ("the touchstone of an auction is competitive bidding"); *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992) (robust marketing does not substitute for open auction protections).

76. The Fifth Circuit rejects the idea that marketing or late bids can convert a private sale into an auction. *Bigler*, 443 B.R. at 110 (rejecting post-sale attempts to recharacterize private processes); *Terrey*, 554 F.2d at 692 (courts scrutinize private dispositions for commercial reasonableness, but no auction presumption applies).

77. Here, the Sale Order itself makes the issue indisputable: this was a private § 363 sale, not a public auction. Parties were entitled to rely on that notice and order. Calling it "highest and best" does not change its legal character.

78. **Application to This Case.**

a. **Auction Benefits Unavailable.** Defendants cannot invoke the presumption of fair market value or surplus retention reserved for public auctions.

b. **Private Sale Limits Apply.** Their $1 billion credit bid extinguished only their $900 million DIP claim and allocated $100 million to First Lien holders, as the governing documents provided. Surplus beyond that cap must flow downstream.

79. This was a private § 363 sale as a matter of law and fact. Defendants' attempt to import auction benefits into a transaction the Court expressly denominated a private sale is legally untenable.

**E. Statutory and Contractual Limits on Credit Bids and Surplus Distribution**

80. Section 363(k) and the governing documents are clear:

a. **Statutory Cap.** Section 363(k) allows a creditor to credit bid "up to the amount of its allowed claim." Nothing more. *See Phila. Newspapers*, 599 F.3d at 316–17; *Redus*, 777 F.3d at 1193. Credit bidding protects secured creditors from undervaluation, but it does not entitle them to windfalls.

b. **Governing Document Cap.** The Plan, APA and Sale Order and Settlement Agreement capped DIP recovery at $900 million and earmarked $100 million for First Lien holders. They required "Credit Bid Distributions" to be allocated *pro rata*. No court order authorized Defendants to retain more.

c. **Absolute Priority.** The Bankruptcy Code permits secured creditors to recover only up to the "allowed amount of [their] claims," not more. 11 U.S.C. § 1129(b)(2)(A). Any recovery beyond that amount—whether direct or

indirect—violates the Code's "fair and equitable" requirement. This principle applies with even greater force where over-recovery is concealed or undisclosed.

81. **Contradictory Valuations.** Per the Court's prior order, the Copper Property Trust Trustee, GLAS, valued the PropCo assets at over $1.9 billion as of the Effective Date—almost double the $1 billion now claimed as "market value." Copper Property Trust has reported this valuation in its SEC filings. Market value is not established in a private § 363 sale, and the credit bid was never a valuation of the Debtors' assets.[16] These contradictions and publicly available documents confirm surplus value exists, was withheld, and continues to be withheld. Plaintiff further alleges that Defendants anticipated surplus value from the outset but concealed those expectations to prevent the information from reaching the court record.

**F. Defendants' Overreach and Ongoing Injury**

82. Defendants have already recovered the full $900 million allowed on their DIP claim yet continue to capture surplus distributions from Copper Property Trust's ongoing sales. Their own SEC filings valued PropCo assets at more than $1.9 billion—confirming a surplus well above the capped DIP recovery. Despite this, Defendants retain control over more than $2 billion in proceeds and divert those funds to themselves, rather than downstream to First Lien holders as the governing documents and Bankruptcy Code require. This unlawful over-recovery directly impairs Plaintiff's *pro rata* distributions and presents a live, continuing injury that demands judicial enforcement.

[16] The Sale Order makes clear that the credit bid amount is not determinative of asset valuation. Instead, fair market value at closing is the relevant metric, and the face amount of the credit bid is expressly not controlling for valuation: "PropCo Trust will, for tax reporting purposes, report PropCo as owning the assets it acquires at their fair market value at the time of the PropCo Closing (and the face amount underlying the Credit Bid Amount shall not be determinative of fair market value)..." Sale Order, Dkt. 1814 at 87 ¶ 49.

83. **No Order Authorizing Overpayment.** The Defendant DIP Lenders do not cite any court order authorizing repayment of the DIP claim above the $900 million cap—and none exists. It is their burden to identify such authority, yet their Motion to Dismiss offers none. Absent a specific order permitting recovery beyond the allowed claim, the continued retention of surplus proceeds is unlawful.

84. **DIP Claim Already Repaid.** Defendants do not dispute that the $900 million DIP claim has been fully repaid. Indeed, they effectively conceded repayment years ago when, in November 2023, the Wind-Down Debtors began making distributions to First Lien and Term Loan holders. Such downstream distributions could not have occurred unless the senior DIP claim had already been satisfied. The Defendant DIP Lenders did not object to those payments or assert that they were entitled to them—tacitly acknowledging that their $900 million claim was paid in full. Yet they continue to retain distributions in excess of that cap.

85. **Defendants' Own Conduct Confirms Overpayment.** By standing silent while junior creditors received distributions, Defendants effectively confirmed that the DIP claim was satisfied. If Defendants truly believed they were still owed, they would have objected to or redirected those First Lien/Term Loan payments. Their failure to do so underscores the absence of any lawful basis for retaining surplus distributions now.

86. **Receivership Necessity.** Because Defendants continue to capture surplus in excess of their allowed claim, Plaintiff was compelled to seek a receivership to prevent ongoing overpayments. This urgency is underscored by Copper Property Trust's scheduled October 8 closing on the sale of all remaining PropCo assets, which threatens further unlawful diversion of surplus proceeds. Plaintiff is in favor of the sale and has dropped the purchaser from this action. The only related dispute concerns the lawful allocation of sale proceeds after closing. Other

Defendants and claims in this case are likewise unrelated to the receivership request, which is narrowly tailored to prevent ongoing misallocation.

87. The SAC alleges—and the record confirms—that Defendants exceeded the DIP cap, misallocated surplus, and violated both the Plan, APA, Sale Order and Settlement Agreement, and the Code and continue to do so. This is not a closed dispute but a live, ongoing controversy.

## G. Judicial Authority and Enforcement

88. Federal courts have continuing authority to interpret and enforce their own orders. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Here, that authority necessarily includes enforcing the $900 million DIP cap and *pro rata* distribution requirements in the Plan, APA, and Sale Order and Settlement Agreement.

89. The statutory and contractual framework is unequivocal: secured creditors may credit bid only up to their allowed claim (§ 363(k)); the Plan, APA, Sale Order and Settlement Agreement capped the DIP at $900 million; and the absolute priority rule prohibits over-recovery. Defendants' retention of surplus value violates each of these limits.

90. Accordingly, the SAC plausibly alleges ongoing violations of *Aweco*, the governing documents, and the Bankruptcy Code. Enforcement of those limits is not discretionary—it is required—and Defendants' Motion to Dismiss should be denied.

## VIII. REQUEST FOR JUDICIAL NOTICE

91. Plaintiff respectfully requests that the Court take judicial notice of the following materials, which are matters of public record and/or directly incorporated by reference in the pleadings:

- Plan Confirmation Order (Dkt. 2190)
- Sale Order (Dkt. 1814)
- Settlement Agreement (attached to Sale Order, Dkt. 1814-1)
- Asset Purchase Agreement (Dkt. 1668-1)
- Plan definitions and related provisions (Dkt. 2190)
- Transcript of the September 2024 Bench Ruling
- Copper Property Trust's SEC Form 8-K dated August 7, 2025
- Subsequent SEC filings of Copper Property Trust confirming ongoing PropCo sales and distributions

92. Courts may take judicial notice of bankruptcy filings, confirmation and sale orders, and SEC filings as public records not subject to reasonable dispute. *See* Fed. R. Evid. 201(b); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

## IX. CONCLUSION

93. Defendants have not met their burden to show that Plaintiff's Second Amended Complaint fails to state a claim. The SAC alleges concrete, time-anchored facts that, accepted as true, state plausible claims for relief against all Defendants.

94. Plaintiff's claims are not barred by preclusion doctrines, plan injunctions, releases, or prior rulings. The governing Plan, APA, Sale Order and Settlement Agreement and

Bankruptcy Code cap the DIP lenders' recovery at $900 million and require *pro rata* distribution of any surplus. Defendants' continued retention of surplus proceeds violates these statutory and contractual protections and causes ongoing, concrete injury to Plaintiff.

95. Plaintiff does not seek to claw back consummated plan transactions. The requested declarations will govern the ongoing and future allocation of Trust proceeds in line with existing orders. Defendants' motion rests on mischaracterizations of the sale structure, the scope of prior rulings, and the effect of plan provisions. The SAC meets the pleading standards under Rules 8 and 12(b)(6), presents a live controversy, and seeks only enforcement of the governing documents and Bankruptcy Code as written.

96. For these reasons, the Court should deny Defendants' Motion to Dismiss in its entirety and enforce the Plan, APA, and Sale Order and Settlement Agreement as written: capping DIP recovery at $900 million, requiring *pro rata* allocation, and preventing surplus retention. As *Aweco* makes clear, bankruptcy courts may not authorize distributions that ignore priority or *pro rata* mandates, and federal courts retain continuing authority to enforce those limits.

97. Defendants have concealed surplus distributions and, to this day, refuse even to stipulate to the surplus reflected in Copper Property Trust's own SEC filings. If a court order authorized retention of those proceeds, Defendants could simply disclose the surplus and point to that order. Their refusal underscores that no such authority exists. The SAC also alleges undisclosed and concealed transfers of cash, real estate, and OpCo assets not addressed in the APA, Sale Order, or Settlement Agreement. Plaintiff even offered to dismiss Penney Intermediate Holdings if Defendants substantiated the approximately $2 billion in consideration

referenced in their public disclosures, but Defendants refused. This case therefore presents a live, unresolved controversy that only declaratory relief can resolve.

## X. RELIEF REQUESTED

98. For the reasons above, the Court should **DENY** Defendants' Motion to Dismiss. In the alternative, to the extent the Court finds any deficiency in the pleading, Plaintiff respectfully requests leave to amend. See Fed. R. Civ. P. 15(a)(2) (leave should be "freely give[n] when justice so requires").

## XI. RESERVATION OF RIGHTS

99. Plaintiff respectfully submits this Opposition on the present record, while reserving all rights to address any new arguments or authorities raised in Defendants' reply or to provide supplemental materials at the Court's request.

Dated: September 29, 2025

Respectfully submitted,

ERIC L. MOORE
/s/ *Eric L. Moore*
202 Island Avenue
San Diego, CA 92101
Telephone: (336) 671-2193
Email: moorelyndell7@gmail.com
*Pro se*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I caused a copy of the foregoing document to be served by the Court's CM/ECF system for the United States District Court for the Southern District of Texas.

/s/ *Eric L. Moore*

Eric L. Moore
202 Island Avenue
San Diego, CA 92101
Telephone: (336) 671-2193
Email: moorelyndell7@gmail.com
*Pro se*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 1145, 1223, 1236, 1385** |

**NOTICE OF CANCELLATION OF AUCTION**

**PLEASE TAKE NOTICE** that on July 30, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed the *Debtors' Emergency Motion for Entry of an Order (I) Establishing Auction Procedures to Sell Certain Real Estate Assets and (II) Granting Related Relief* [Docket No. 1145] (the "Motion") with the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, 4th Floor, Houston, Texas 77002 (the "Court").[2]

**PLEASE TAKE FURTHER NOTICE** that, on August 12, 2020, the Court entered the *Order (I) Establishing Procedures to Sell Certain Real Estate Assets and (II) Granting Related Relief* [Docket No. 1223] (the "Order") approving procedures (the "Auction Procedures") for the sale of certain of the Debtors' owned real property and unexpired leases of non-residential real property (the "Real Estate Assets").

---

1 A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

2 Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Motion.

**PLEASE TAKE FURTHER NOTICE** that, on August 13, 2020, the Debtors filed the *Notice of Auction and Sale Hearing* [Docket No. 1236] in connection with the potential sale of certain Real Estate Assets listed on Exhibit B thereto.

**PLEASE TAKE FURTHER NOTICE** that on September 10, 2020, the Debtors filed the *Notice of Qualified Bidders* (the "Notice") [Docket No. 1385] attaching the *List of Qualified Bids* (the "Qualified Bids") as Exhibit A thereto.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Order, the Auction Procedures, and the Notice, an auction (the "Auction") was scheduled for September 14, 2020, at 9:00 a.m. (prevailing Central Time).

**PLEASE TAKE FURTHER NOTICE** that the Auction will **not** be proceeding on September 14, 2020, and the Debtors reserve the right to hold the Auction on a later date.

**PLEASE TAKE FURTHER NOTICE** that the hearing to approve certain successful bids to be later announced with respect to certain of the Real Estate Assets (the "Sale Hearing") will go forward on September 28, 2020, absent further notice of adjournment or cancellation (including as a result of any adjourned Auction).

**PLEASE TAKE FURTHER NOTICE** that in the event the Sale Hearing is continued or cancelled, the Debtors will file a notice on the docket.

Respectfully Submitted,
September 14, 2020

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
christopher.marcus@kirkland.com
aparna.yenamandra@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on September 14, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/Matthew D. Cavenaugh*
Matthew D. Cavenaugh

# EXHIBIT B

| | |
|---|---|
| | in cash and $91,300,000 in real property and other interests, for a total Credit Bid Distributions of $100,000,000. |
| Unsecured Claims Earnout Pool | A pool to be funded by OpCo Purchaser after the conclusion of Fiscal Year 2022, based on a calculation of the "Earnout Base" for Fiscal Year 2021 and Fiscal Year 2022 provided in the Earnout Report pursuant to the Earnout Agreement. *See* Part III *infra*. |

## A. Class 4 Claims: First Lien Claims

Allowed Claim Amount: $1,571,414,062.50, plus interest, fees, and other expenses and amounts incurred through the Effective Date of the Plan. Plan art. III.B.4(b).

Components of Recovery:

1. Credit Bid Pro Rata share of the Credit Bid Distributions (totaling $100,000,000), approximately $8,700,000 of which was paid in cash. Plan Article I.A.44.
2. A Pro Rata share of any Cash remaining in:
   a. the Wind-Down Reserve;
   b. the Professional Fee Escrow; and
   c. the Administrative / Priority Claims Reserve. Plan art. III.B.4(c).

Partial Recovery to Date: Recoveries to date on account of Credit Bid Distributions total $100,000,000. Included in that total are multiple cash distributions. On or about the OpCo Closing Date, an initial cash distribution was made on account of the Credit Bid Distributions in the amount of approximately $6,100,000. On January 15, 2021, a second interim cash distribution was made on account of the Credit Bid Distributions in the amount of $1,500,000.[7] On or about the Effective Date, another cash distribution was made on account of the Credit Bid Distributions in the amount of $1,100,000. Based on the assets available for recovery, Class 4 Claims cannot be paid in full.

## B. Class 6 Claims: Second Lien Notes Claims

Allowed Claim Amount: $524,925,000.00. Plan art. III.B.6(b).

Components of Recovery:

1. Pro-Rata share of $1,500,000 of Cash;
2. Pro Rata share (with Classes 4, 7, and 8) of any Cash remaining in the Wind-Down Reserve after Class 4 Claims have been paid in full; and
3. Pro-Rata share (with Classes 7 and 8) of the Unsecured Claims Earnout Pool. Plan art. III.B.6(c).

[7] This distribution was made pursuant to setion 2.1(f)(iv) of the APA.

# EXHIBIT C

**Contact Us**
For additional information, please contact:
Jessica Cummins at (847) 313-4755

Distribution Date: 8/11/2025
Record Date: 8/8/2025
Determination Date: 7/31/2025

**Monthly Cash Distributions**

| Distribution Date | Net Rental Income Distribution | Sales and Capital Activity Distribution | Sales and Capital Activity Distribution |
|---|---|---|---|
| 11-Aug-25 | $7,380,105.47 | $(326,127.16) | $7,053,978.31 |
| 10-Jul-25 | 7,293,589.96 | (404,738.94) | 6,888,851.02 |
| 10-Jun-25 | 7,447,645.39 | 20,150,684.67 | 27,598,330.06 |
| 12-May-25 | 7,440,215.19 | (299,171.36) | 7,141,043.83 |
| 10-Apr-25 | 7,558,468.04 | (1,401,902.10) | 6,156,565.94 |
| 10-Mar-25 | 7,676,557.19 | (348,181.73) | 7,328,375.46 |
| 10-Feb-25 | 6,205,961.56 | (2,623.02) | 6,203,338.54 |
| 10-Jan-25 | 7,612,539.04 | 16,606,883.96 | 24,219,423.00 |
| 10-Dec-24 | 7,563,226.90 | (360,483.51) | 7,202,743.39 |
| 12-Nov-24 | 7,583,458.10 | 17,509,711.79 | 25,093,169.89 |
| 10-Oct-24 | 7,521,784.19 | 12,041,496.65 | 19,563,280.84 |
| 10-Sep-24 | 7,845,742.96 | (73,362.76) | 7,772,380.20 |
| Trailing 12 mos. | $89,129,293.99 | $63,092,186.49 | $152,221,480.48 |
| Inception to Date | $394,126,240.03 | $1,063,859,414.16 | $1,457,985,654.19 |

# EXHIBIT D

Milbank
**ANDREW M. LEBLANC**
*Partner*
1101 New York Avenue, NW | Washington, DC 20005
T: 202-835-7574
aleblanc@milbank.com | milbank.com

August 18, 2025

**VIA E-MAIL AND FIRST-CLASS MAIL**

Eric L. Moore
202 Island Avenue
San Diego, CA 92101
Telephone: (336) 671-2193
Email: moorelyndell7@gmail.com

Re: *Moore v. Jackson Walker LLP, et al.*, Case No. 4:25-cv-02752 (S.D. Tex.)

Mr. Moore:

We write on behalf of Copper Property CTL Pass Through Trust ("Copper Trust"), H/2 Capital Partners LLC, Brigade Capital Management, LP, Silver Point Capital, L.P., and Owl Creek Asset Management, L.P. (collectively, the "JCP Investors") named as defendants in the complaint filed on June 12, 2025, as amended on July 18, 2025 (the "Complaint"), in the above-referenced action. We write to notify you that for the reasons set forth herein and in the attached Motion for Sanctions Pursuant to Rule 11 (the "Motion"), the filing of the Complaint violates Federal Rule of Civil Procedure 11 ("Rule 11"). We request, consistent with your obligations under Rule 11, that you promptly withdraw the Complaint with respect to Copper Trust, the JCP Investors, and Penney Intermediate Holdings LLC ("Penney Holdings").

The Complaint is the latest in a series of legal actions you have taken to challenge certain final orders of the United States Bankruptcy Court of the Southern District of Texas (the "Bankruptcy Court") in the bankruptcy cases of J.C. Penney Company, Inc. and its debtor affiliates (collectively, the "Debtors"). The Bankruptcy Court entered several orders relevant to your claims:

- On November 9, 2020, the Bankruptcy Court entered an order approving: (i) the sale of certain of the Debtors' assets to certain JCP Investors pursuant to a credit bid (the "Sale Order"), and (ii) the Settlement Agreement entered between the JCP Investors and a minority group of first-lien debt holders (the "Minority Group") in which the Minority Group agreed, among other things, to broadly release claims by itself and its successors and assigns against the JCP Investors.[1]

[1] The Order (I) Authorizing (A) Entry Into and Performance Under the Asset Purchase Agreement, (B) The Sale of the Opco Acquired Assets and the PropCo Acquired Assets Free and Clear of Liens, Claims, Encumbrances and Interests and (C) Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Granting Related Relief, Case No. 20-bk-20182 Dkt. No. 1814; "Settlement Agreement" means the Settlement Agreement dated as of November 5, 2020, executed by the JCP Investors on behalf of itself and each of its members, by and

- On December 16, 2020, the Bankruptcy Court entered an order confirming the Debtors' chapter 11 plan of reorganization (the "Plan") and effectuating the Sale Order and the Settlement Agreement (the "Confirmation Order").[2]

Indeed, pursuant to the Settlement Agreement, which was incorporated into the Debtors' confirmed Plan, the members of the Minority Group agreed, among other things, "on behalf of themselves, their affiliates and ***their respective successors and assigns***" to "irrevocably and unconditionally waive, release, and forever discharge" the Debtors and the JCP Investors from any claims in connection with the Sale and Plan. As an assignee of a Minority Group claim, you are deemed to have forever waived any claims against the JCP Investors relating to the Settlement Agreement and Sale transaction. *See In re NationsRent, Inc.*, 381 B.R. 83, 95 (Bankr. D. Del 2009) (interpreting a 9019 settlement and noting that "[t]he Assignee Claimant, is not entitled to more than the rights Lenders had to assign."); *In re Artic Glacier Int'l, Inc.*, 901 F.3d 162 (3d Cir. 2018) (enforcing broad releases that attached to the claims purchased by an assignee-claimant post-confirmation). The Settlement Agreement, Sale Order, and Confirmation Order are public, and had been final orders for almost three years by the time you purchased your claims.

Notwithstanding these final, non-appealable orders, and the broad release granted under the Settlement Agreement Order, on August 8, 2024, you filed a purported motion to enforce the Sale Order (the "Enforcement Motion").[3] On September 9, 2024, the Bankruptcy Court denied the Enforcement Motion in its entirety, finding, among other things: (i) the Enforcement Motion relied on a faulty presumption that the actual purchase price for the assets was fair market value; (ii) the absolute priority rule and *Jevic* were both "resolved in connection with Plan confirmation years before Moore became a debt holder"; (iii) there was an absence of "facts that even warrant [] consideration" of equitable subordination; and (iv) any direct claims against other first lien debtholders, including the JCP Investors, are waived under the Settlement Agreement given that "Moore acquired Cetus's debt years after it settled and agreed to the releases under the Settlement Agreement and the Plan was confirmed."[4]

On September 20, 2024, you filed a motion for reconsideration of the Bankruptcy Court's ruling on the Enforcement Motion and subsequently withdrew that motion on October 31, 2024. That same day, notwithstanding the Bankruptcy Court's prior orders to the contrary, you initiated an adversary proceeding against Copper Property and Penney Holdings (both named as defendants

---

through its counsel Milbank LLP, the Minority Group, and the Debtors, approved by the Court as Exhibit B to the Sale Order.

2 "Confirmation Order" refers to the *Amended Order Approving the Disclosure Statement For, and Confirming, the Amended Joint Chapter 11 Plan of Reorganization of J.C. Penney Company, Inc. and Its Debtor Affiliates*, Case No. 20-bk-20182, Dkt. No. 2190.

3 *Motion To Enforce The Sale Order, Settlement Agreement, Asset Purchase Agreement, And Motion For Turnover And Distribution Of Funds And/Or Property Exceeding The $1 Billion Credit Bid Amount; And Equitable Subordination Of The Dip Holders' 1st And 2nd Lien Debt And Unsecured Notes* (Case No. 20-bk-20184, Dkt. No. 1533).

4 *See* Bankr. Ruling 16:16-20:23.

in the current action).[5] Copper Trust moved to dismiss your adversary complaint on February 20, 2025.[6] That motion to dismiss has been fully briefed and is pending a ruling from the Bankruptcy Court.[7]

Then, on June 12, 2025, you commenced the instant action by filing the Complaint in the District Court against Copper Trust, the JCP Investors, Penney Holdings, and Jackson Walker LLP alleging nearly identical facts as your adversary complaint.

The Complaint violates Rule 11 for several reasons:

***First***, the Sale and Confirmation Orders are final, non-appealable orders and the deadline to revoke or appeal these orders have long passed. In addition, these orders have been public for more than four years. Your continued attempts to abrogate the Bankruptcy Court's findings therein are procedurally improper and run afoul of your obligations under Rule 11(b). Moreover, the Complaint's allegations are frivolous, unsupported, and in most cases, were expressly rejected by the Bankruptcy Court in its ruling on the Enforcement Motion. For example:

- The Complaint seeks declarations that bondholders' collateral should be valued at "fair market value" rather than the $1 billion credit bid. Compl., Prayer for Relief, ¶ a, b. But, in response to this argument in the Enforcement Motion, the Bankruptcy Court ruled "[t]he purchase price for the assets was the Credit Bid and additional consideration described in the sale motion, the sale hearing, the Settlement Agreement, the Sale Order, the Disclosure Statement, and the Plan." Bankr. Ruling at 16:16–23.

- The Complaint seeks declarations that the Debtors' distributions made pursuant to the Plan violate the absolute priority rule. Compl. ¶¶ 51, 71, 85. But, in response to this argument in the Enforcement Motion, the Bankruptcy Court found that the "the absolute priority and *Jevic* issues were resolved in connection with Plan confirmation years before [you] became a debt holder." Bankr. Ruling at 18:22-19:3. The Bankruptcy Court also concluded that "[t]here's no evidence that wind-down professionals are not making distributions based on the actual terms of the Plan" and "[t]here's no violation of the absolute priority rule or *Jevic* either." Bankr. Ruling at. 18:18-23.

- The Complaint alleges that no public auction or proper marketing process was conducted in connection with the Sale, but the Bankruptcy Court found that "the Credit

---

5 Case No. 20-bk-20184, Dkt. No. 1628 ¶ 37 ("Adv. Compl."); Case No. 24-02006, Dkt. No. 1.

6 *See* Motion to Dismiss, Case No. 24-02006, Dkt. No. 7; *see also Penney Intermediate Holdings Llc's Joinder to Copper Property Ctl Pass Through Trust's Reply in Support of its Motion to Dismiss,* Case No. 24-02006, Dkt. No. 21

7 On or about August 18, 2025, you purported to file a Notice of Withdrawal of Adversary Proceeding (the "Notice"). The Notice does not comply with the Federal Rules of Civil Procedure and seemingly reflects your further disregard for the judicial processes and rules.

Bid and the proposed purchase price was fair value and the highest and best offer." Bankr. Ruling at 17:17-25.

- The Complaint alleges that the Sale constitutes an improper "uptier" transaction. Compl. ¶ 1. That is simply not true: the JCP Investors, Simon, and Brookfield acquired the Debtors' assets as the winning bidder. That is definitionally not an "uptier" transaction—a liability management exercise designed to issue senior debt in exchange for existing debt.

The Bankruptcy Court's findings preclude the relief sought in the instant action. Your re-assertion of these claims gives rise to sanctions under Rule 11. *See Cantu v. Colonial Sav.*, No. 7:21-CV-84, 2021 WL 3629999 at *4 (S.D. Tex. June 21, 2021) ("the Court finds that his filing of a virtually identical pleading barred by res judicata, in an effort to thwart Defendant's previously adjudged ability to foreclose, violates Rule 11"). Rule 11(b) protects against such frivolous allegations devoid of "evidentiary support." *See* Rule 11(b)(3).

***Second***, your claims against the JCP Investors are barred by the Settlement Agreement and the releases granted therein. Indeed, you are an assignee of Cetus' claim, and Cetus, as a member of the Minority Group, agreed to waive any allegations of misconduct and release claims by its successors and assigns relating to the Sale and Plan. Filing an action in contravention of a properly executed settlement agreement is a sanctionable offence. *See e.g.*, *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 315-16 (5th Cir. 2020) (ordering plaintiff to show cause or face sanctions for filing claims "clearly foreclosed by previous proceedings and the settlement agreement"); Order Granting Sanctions at 1, *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311 (5th Cir. 2020) (No. 73-1).

***Third***, your serial filings and forum shopping reflect an improper purpose. The Bankruptcy Court has already ruled in respect of your allegations in connection with the Enforcement Motion. Moreover, substantially the same parties are already litigating your claims in the adversary proceeding. Rather than waiting for the Bankruptcy Court to address your claims in that forum, you have decided to expend additional court resources by filing a nearly identical complaint against the same defendants in the District Court. Such serial filing and forum shopping is exactly what Rule 11 is designed to prevent. *See e.g.*, *Cervantes v. Ocwen Loan Servicing, LLC,* No. 5:19-CV-7, 2019 WL 6003129 at *11 (S.D. Tex. Aug. 28, 2019), *report and recommendation adopted,* No. 5:19-CV-7, 2019 WL 13190649 (S.D. Tex. Oct. 7, 2019) (upholding sanctions against a pro se litigant who filed three successive lawsuits to avoid foreclosure on their property); *Anderson*, 953 F.3d at 316 (affirming sanctions against a pro se litigant who was on her sixth attempt to prosecute claims).

* * *

In light of the foregoing, and for further reasons explained in the enclosed Motion, your Complaint violates Rule 11 and sanctions are warranted. As required by Rule 11(c)(2), we are providing 21 days' notice of our intent to file the Motion to allow you to **withdraw the offending Complaint**. If no corrective action is taken within that time, Copper Trust, the JCP Investors, and Penney Holdings intend to file the Motion and seek a court order (i) finding that you have violated

Rule 11, (ii) enjoining you from filing future lawsuits on these issues and claims, (iii) ordering you to pay reasonable attorneys' fees and costs, and (iv) imposing any other sanctions or relief as the Court deems appropriate.

We strongly urge you to take appropriate remedial action, including by withdrawing the Complaint, within the time allowed. We reserve all rights.

Regards,

/s/ *Andrew M. Leblanc*

Andrew M. Leblanc

Enclosure: Motion

cc: Vida Robinson, Esq.
Gregory Laufer, Esq.